**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | No. 14-cv-9662 (JSR) |
| This Document Applies to: | |
| DODGE & COX INTERNATIONAL STOCK FUND; DODGE & COX GLOBAL STOCK FUND; DODGE & COX WORLDWIDE FUNDS plc – GLOBAL STOCK FUND; DODGE & COX INCOME FUND; and DODGE & COX BALANCED FUND, | Case No. 1:15-cv-10111 |
| | **AMENDED COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| PETRÓLEO BRASILEIRO S.A. – PETROBRAS; PETROBRAS GLOBAL FINANCE B.V.; PETROBRAS AMERICA INC.; JOSÉ SERGIO GABRIELLI DE AZEVEDO; MARIA DAS GRAÇAS SILVA FOSTER; ALMIR GUILHERME BARBASSA; PAULO ROBERTO COSTA; JOSÉ CARLOS COSENZA; RENATO DE SOUZA DUQUE; GUILLHERME DE OLIVEIRA ESTRELLA; JOSÉ MIRANDA FORMIGLI FILHO; JOSUÉ CHRISTIANO GOMES DA SILVA; SILVIO SINEDINO PINHEIRO; DANIEL LIMA DE OLIVEIRA; JOSÉ RAIMUNDO BRANDÃO PEREIRA; SÉRVIO TÚLIO DA ROSA TINOCO; PAULO JOSÉ ALVES; GUSTAVO TARDIN BARBOSA; ALEXANDRE QUINTÃO FERNANDES; MARCOS ANTONIO ZACARIAS; CORNELIS FRANCISCUS JOZEF LOOMAN; and THEODORE MARSHALL HELMS, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ........................................................................... 1

II. PARTIES ....................................................................................................... 14

    A.  Plaintiffs .............................................................................................. 14

    B.  Defendants ........................................................................................... 15

        1.  Petrobras and Its Subsidiaries ................................................... 15

        2.  Individual Defendants ................................................................ 17

III. RELEVANT SECURITIES ............................................................................ 20

    A.  Petrobras ADSs ................................................................................... 20

    B.  Petrobras Notes ................................................................................... 20

        1.  October 2009 Notes .................................................................... 20

        2.  2011 Notes ................................................................................. 21

        3.  2012 Notes ................................................................................. 21

        4.  2013 Notes ................................................................................. 22

        5.  2014 Notes ................................................................................. 23

        6.  Plaintiffs' Transactions in Petrobras Notes ............................... 23

IV. SUMMARY OF PLAINTIFFS' CLAIMS ....................................................... 31

    A.  Exchange Act Claims .......................................................................... 31

    B.  Securities Act Claims .......................................................................... 31

V.  JURISDICTION AND VENUE ...................................................................... 32

VI. DEFENDANTS ENGAGED IN A MASSIVE SCHEME INVOLVING
    BRIBES, KICKBACKS, AND MONEY LAUNDERING
    THROUGHOUT THE RELEVANT PERIOD ................................................ 33

    A.  Petrobras and Its Contractors Engaged in Bid-Rigging. .......................... 35

    B.  Petrobras Executives Demanded that All Contracts Include an
        Additional "Bribe Fee." ....................................................................... 40

    C.  The Company's Senior Officers Orchestrated and Covered Up the
        Scheme. ................................................................................................ 47

    D.  "Operation Car Wash" Has Elicited Extensive Testimony and
        Documentary Evidence Demonstrating How the Scheme Worked. ........ 54

        1.  The Mechanics of the Scheme .................................................... 54

# TABLE OF CONTENTS
## (continued)

Page

    2.    Bribery in the International Division ............................................ 67

    3.    Bribes and Overpayments Relating to the Abreu and Comperj Refineries .................................................................. 69

    4.    Bribery by SBM ........................................................................ 72

    5.    Bribery at Transpetro ............................................................... 75

E.    Recent Events Continue to Shed Light on the Massive Fraud at the Company. ............................................................................... 76

F.    The Exchange Act Defendants Acted with Scienter................................ 79

VII.    DEFENDANTS' MISCONDUCT RENDERED NUMEROUS REPRESENTATIONS TO INVESTORS FALSE OR MISLEADING, AND VIOLATED ACCOUNTING STANDARDS ........................................... 80

A.    Petrobras Deceived Investors Through Misleading Omissions and False Denials Concerning the Overpricing of Its Refineries and Other Projects.................................................................... 80

    1.    Pasadena Refinery....................................................................... 80

    2.    Abreu Refinery.......................................................................... 82

    3.    Comperj Refinery...................................................................... 85

    4.    SBM Contracts .......................................................................... 87

    5.    Transpetro Contracts ................................................................. 90

    6.    Repar Refinery .......................................................................... 90

B.    Petrobras Made False and Misleading Statements Attesting to Its Transparency and Denying the Existence of Corruption. ........................ 91

C.    Petrobras Made Materially False and Misleading Statements About Competitive Bidding................................................................ 97

D.    Petrobras Further Misled Investors Through False and Misleading Denials of Fraud, Bribery, and Corruption as Investigations Commenced. ........................................................................ 98

E.    Petrobras Issued False and Misleading SOX Certifications and Statements Concerning the Adequacy and Effectiveness of Its Internal Controls. ................................................................ 102

F.    Defendants Violated Accounting Standards. ........................................ 104

    1.    2009-2010:  GAAP Violations.................................................. 105

**TABLE OF CONTENTS**
**(continued)**

Page

2.   2011-2014: IFRS Violations ......................................................... 107

G.   Petrobras Made False and Misleading Statements Concerning Its
Financial Condition and Compliance with GAAP and IFRS. ............... 110

H.   Petrobras Made False and Misleading Statements Concerning
Write-Offs and Impairment Charges Relating to the Corruption
Scheme. ..................................................................................................... 120

VIII.   DEFENDANTS CANNOT FIND REFUGE UNDER THE PSLRA'S
"SAFE HARBOR" FOR FORWARD-LOOKING STATEMENTS ................ 123

IX.   PLAINTIFFS RELIED ON DEFENDANTS' MISREPRESENTATIONS...... 124

X.   WHEN THE CONCEALED FACTS WERE ULTIMATELY
DISCLOSED, THE PRICES OF PETROBRAS SECURITIES DROPPED
SHARPLY ........................................................................................................ 126

XI.   PLAINTIFFS SUFFERED LOSSES AS A RESULT OF THEIR
PURCHASES OF PETROBRAS SECURITIES ............................................. 164

XII.   PLAINTIFFS' CLAIMS ARE TIMELY ......................................................... 164

XIII.   CLAIMS FOR RELIEF .................................................................................... 165

PRAYER FOR RELIEF .................................................................................................. 172

JURY TRIAL DEMANDED ........................................................................................... 172

Plaintiffs Dodge & Cox International Stock Fund, Dodge & Cox Global Stock Fund,

Dodge & Cox Worldwide Funds plc – Global Stock Fund, Dodge & Cox Income Fund, and

Dodge & Cox Balanced Fund (collectively, "Plaintiffs"), by and through their undersigned

counsel, allege the following against Defendants Petróleo Brasileiro S.A. – Petrobras

or the "Company") and its wholly owned subsidiaries Petrobras Global Finance B.V. ("PGF")

(the corporate successor of Petrobras International Finance Company S.A. ("PifCo")) and

Petrobras America Inc. ("PAI"), as well as several individual Defendants (identified below),

based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all

other matters.[1]

## I.   <u>NATURE OF THE ACTION</u>

1.      Plaintiffs seek recovery under the federal securities laws for damages they

suffered on transactions in Petrobras securities during the period December 29, 2010 through

July 28, 2015 (the "Relevant Period"), due to a pervasive and long-running scheme of bribery

and corruption at Petrobras, a state-run semi-public energy and oil production company

headquartered in Rio de Janeiro, Brazil.[2]

---

[1] Plaintiffs' allegations are based on the investigation conducted by the undersigned counsel, which includes, among other things, review and analysis of: (i) documents filed by Petrobras, PifCo, and PGF with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and reports issued and disseminated by Petrobras; (iii) transcripts of the Company's shareholder conference calls; (iv) media coverage of Petrobras; (v) documents, testimony, and other information from Brazilian criminal investigations and court proceedings concerning Petrobras; (vi) pleadings and other filings submitted in connection with the pending putative class action (the "Class Action") and related individual actions in *In re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR) (S.D.N.Y.); and (vii) other publicly available information concerning Petrobras. Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

[2] The misconduct alleged in this Complaint began before December 29, 2010.  Plaintiffs have defined the Relevant Period in light of *Police & Fire Retirement System of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013), in which the Second Circuit held that the principle adopted in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), did not apply to a statute of "repose" under the federal securities laws.  As the five-year time-for-suit provision applicable to claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") has been characterized as a statute of "repose," Plaintiffs limit the Relevant Period alleged in this action to begin five years before the date their initial Complaint was filed.  Plaintiffs reserve the right to expand the Relevant Period if there is a change in the controlling law.

2.      Beginning around 2005 and continuing through the Relevant Period, the Company engaged in a scheme whereby contractors paid bribes to Petrobras executives and others in exchange for the award of lucrative oil and gas construction contracts.  Some of the bribes were passed on to Brazilian politicians and political parties.  The Company then paid the contractors inflated amounts under the contracts in order to repay them for the bribes.  When the fraud was finally revealed beginning in May 2014, it sent shockwaves through the Brazilian government and economy, and caused Petrobras's market capitalization to plummet.

3.      As a result of the striking misconduct detailed in this Complaint, Petrobras overstated the value of its refineries, oil rigs, and other assets by billions of dollars and materially misstated its financial results during the Relevant Period.  Rather than account for those bribes and overstated costs as expenses in its financial statements, which would have decreased its reported assets and net income, Petrobras fraudulently capitalized the bribes as assets to mask the kickback scheme, in violation of both U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS").  Authorities estimate the scheme has diverted up to or more than $28 billion from the Company's coffers.

4.      Petrobras's April 22, 2015 earnings report (the first audited financial statements released by the Company in more than eight months) confirms the magnitude of the fraud and its impact on the Company.  As of that date, Petrobras reported nearly $20 billion in losses due to the scheme, including a $2.5 billion writedown for overvalued assets, with an additional pre-tax impairment charge of nearly $17 billion.[3]  Indeed, the $20 billion writedown is grossly *understated* and has been widely cast into doubt, including by law-enforcement authorities, cooperating witnesses, and the Company's own prior disclosures.

---

[3] All currency amounts are expressed in U.S. dollars, except where indicated as "R$."  Wherever possible, the Complaint includes the approximate U.S. dollar amount from the contemporaneous exchange rate, as provided by Brazil's Central Bank:  *see* http://www4.bcb.gov.br/pec/taxas/ingl/ptaxnpesq.asp?id=quotations.

5.      Further, throughout the Relevant Period, Petrobras and its senior officers, including former Chief Executive Officer Maria das Graças Silva Foster ("Foster"), insisted the Company was a global leader in corporate governance and transparency.  Petrobras stated, for example, that it "*reject[ed] any corrupt practices and use[d] strict management methods* to assure the protection of its shareholders' interests," and repeatedly represented that "there is *no overbilling, overpricing, or any other irregularity*" in the Company's contracts.  Foster announced in 2012 that the Company's results were "absolutely true and legitimate."[4]

6.      Those and other statements by Defendants during the Relevant Period were false or misleading when made.  In fact, since no later than 2004, corrupt Petrobras executives stole billions of dollars from the Company and falsified its financial results to cover up their malfeasance.

7.      When the misconduct was publicly revealed, the value of Petrobras securities trading publicly on the New York Stock Exchange ("NYSE") and other domestic markets fell sharply, causing Plaintiffs and other investors to suffer significant damages.

8.      Dozens of Petrobras executives have been jailed, and high-ranking political officials—including the speakers of both of Brazil's houses of Congress—have been questioned about the scheme in an investigation authorized by Brazil's Supreme Court.  Petrobras is now the subject of civil and criminal investigations by law-enforcement authorities worldwide, including the SEC and the U.S. Department of Justice ("DOJ").

9.      The scheme began to unravel when, on March 20, 2014, former Petrobras Chief Downstream Officer Paulo Roberto Costa ("Costa"), who served on the Company's "Executive Directorate," was implicated in a sting operation concerning money laundering and

---

[4] Unless otherwise indicated, all emphasis in this Complaint has been added.

embezzlement spearheaded by Brazilian authorities, known as Operation "Lava Jato" (i.e., "Operation Car Wash").  When news of Costa's arrest emerged, attention turned to the Company.  Both Petrobras and Costa, however, strenuously denied any connection between Costa's arrest and his activities at Petrobras.

10.    Later that year, Costa testified that he colluded with other Petrobras executives—former Chief Services Officer and Executive Directorate member Renato de Souza Duque ("Duque"); Pedro Barusco, Duque's right-hand man and former Executive Manager of Engineering; former Chief International Officer and Executive Directorate member Nestor Cerveró; and Sergio Machado, former CEO of Petrobras's subsidiary Petrobras Transporte S.A. ("Transpetro")—along with some of Brazil's top politicians, a "cartel" of engineering and construction companies, and criminal money launderers to use the Company as a giant slush fund.

11.    Those individuals and entities collaborated to rig Petrobras's bids for outside contractors and to inflate contract costs by up to 20%.  In exchange, Petrobras officials demanded a standard 3% bribe for themselves and the Brazilian political parties that sponsored their appointment to the Company's Executive Directorate.

12.    By Petrobras's own admission, the kickback scheme impacted over $80 billion in contracts, representing one-third of the Company's total assets.  Petrobras paid billions of dollars in illegal bribes and inflated contracts pursuant to the scheme, and went to great lengths to conceal those payments from investors.  As Petrobras would later reveal, it improperly recorded those inflated contract amounts as assets in the Company's financial statements.  Petrobras then used those misstated financial statements to raise billions of dollars from investors through the

U.S. capital markets, including billions of dollars in debt securities issued through several offerings during the Relevant Period.

13.     As revealed by Costa's and Barusco's sworn testimony, the "cartelization" and bribery scheme was "endemic" and "institutionalized" at Petrobras.  Barusco testified, and provided documentation demonstrating, that the scheme, which dates back to at least 2004, actively continued well into 2014.

14.     Petrobras's senior executives covered up the misconduct and, along with the Company, continuously denied wrongdoing.  In concealing the criminal activity, they misled investors concerning the nature of Petrobras's contracts and overstated the value of its assets, which included:

- The value of Petrobras's Pasadena, Texas refinery (the "Pasadena Refinery").  In 2006, at Cerveró's instigation, Petrobras agreed to purchase a 50% stake in the Pasadena Refinery from Astra Oil for $370 million, a price that eventually ballooned to $1.18 billion. Investors did not learn, until Costa's confession years later, that Astra Oil paid millions of dollars to Petrobras's Executive Directorate to "not hinder" the deal.

- Petrobras's flagship modern oil refinery, Abreu e Lima ("Abreu").  Abreu was originally budgeted in 2007 to cost $2.5 billion, and by the time of its completion in 2014, supposedly cost $18.5 billion.  Costa and Barusco (among others) provided detailed testimony regarding multiple, specific large-scale Abreu projects whose costs were massively inflated by the cartel's bid-rigging and bribery of Petrobras executives.

- The reported $20 billion value of oil platforms that were the subject of lease agreements with Dutch company SBM Offshore N.V. ("SBM").  Barusco testified that he personally accepted $22 million in bribes in connection with SBM contracts and that Duque received even more.  The exposure of the SBM bribes may result in a ban on contracts with SBM, potentially reducing Petrobras's profits by $15 billion over the next several years.

15.     Petrobras's senior executives, including Foster and her predecessor as CEO, Jose Sergio Gabrielli de Azevedo ("Gabrielli"), were directly involved in the scheme and its cover-up. For example, a former senior Petrobras executive, Venina Velosa da Fonseca ("Velosa"), who reported directly to Costa and worked closely with Foster before the latter's elevation to CEO in

2012, revealed that she repeatedly and vociferously objected to Petrobras's improper practices. Velosa informed both Gabrielli and Foster about problems with bidding related to the construction of the Abreu refinery, including payments for services that were never rendered, overbilled contracts, and violations of the Company's ethical code.  Velosa stated she had made her concerns widely known within the Company, including to Foster and Gabrielli:

> [I]n 2008, as an executive manager, I informed . . . the director at the time, Paulo Roberto Costa.  I informed other directors, like Graças Foster.  And, at a different time, as a general manager, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my executive manager at the time.  I informed director [Jose Carlos] Cosenza, in his position as director, since he was my peer, and as executive manager.  I informed president Gabrielli.

16.     After months of raising objections and seeking to change the Company's practices, Velosa began to receive anonymous threats against her and her daughters.  Later, in 2011, Petrobras summarily removed Velosa from her position and transferred her to the Company's office in Singapore, where she was instructed to spend her time in a "training course."  In a recently revealed email of October 7, 2011 to Foster, with whom she was "close," Velosa stated that, due to the widespread improper practices at Petrobras and her "immense pride" for the Company, she "started to feel ashamed."  Velosa further stated she was considering what she should do, and explicitly noted:  "There are alternatives I'm evaluating despite fears of risking myself and my daughters.  *I would like to present to you part of the documentation that I already have.  Part of it, I know you are already aware of.*  I would like to hear from you before taking the next step."  Foster never responded.

17.     Petrobras eventually terminated Velosa's employment without explanation in late 2014, at which point she again emailed Foster:

> Since 2008 my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit].  By fighting it, I was threatened and harassed.  I even had a gun pointed to my head and received threats against my daughters.

*       *       *

I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting.  I presented the matter to the company's competent authorities, including the Legal and Audit [departments], *which was in vain*.

18.     Despite these and other efforts to conceal the scheme, the previously concealed facts began to emerge in 2014, when Costa's arrest and Operation Lava Jato were disclosed by media outlets worldwide.  Both Petrobras and Costa strenuously denied any connection between his arrest and his Petrobras activities.  Indeed, for months following the arrest, Petrobras officials, including Foster, denied any accusations of "irregularities" at the Company and claimed others were using Petrobras as a "political weapon" in an election year.

19.     In August 2014, however, Costa accepted a plea bargain whereby he agreed to turn state's evidence.  In his plea agreement and confidential video testimony, which were later made public, Costa explained the broad outlines of the cartel's operations and the payments of bribes to himself and to powerful Brazilian politicians.

20.     Faced with overwhelming evidence of misconduct, the Company finally admitted that Petrobras executives participated in the money-laundering and bribery scheme, and that the corruption had directly impacted the Company.  On November 13, 2014, after the market closed, Petrobras issued a press release acknowledging, for the first time, that if the evidence provided by Costa was true, it would "potentially impact the Company's financial statements."  The Company disclosed that it would delay filing its third-quarter 2014 financial statements in light of the investigation.

21.     On Friday, November 14, 2014, the scandal intensified with the arrest of another former Company executive, Duque, and 22 other people in connection with Operation Car Wash. The next business day (November 17, 2014), before the market opened, the Company held its

earnings conference call with investors, during which CEO Foster and Chief Financial Officer Almir Guilherme Barbassa ("Barbassa") discussed the delayed earnings and tried to maintain control over the deepening crisis.  During three hours of questioning, first from analysts and then from journalists, Foster and other top executives could not explain how Petrobras would recover or account for the billions of dollars in inflated contract payments.  Foster admitted, however, that "the accusations and investigations of the [O]peration Car Wash . . . if found to be true, *could potentially affect the Company's financial statements*."  Barbassa further admitted that the allegations, if true, would require the Company to record a substantial writedown to its Property, Plant and Equipment ("PP&E"), its largest and most valuable asset.  In response to this news, the prices of Petrobras equity securities, including its American Depository Shares ("ADSs"), dropped sharply, and the prices of Petrobras debt securities also fell significantly.

22.     On December 15, 2014, Brazilian criminal authorities announced the formal indictment of Cerveró for acts of corruption and money laundering.  Cerveró was implicated in, among other things, receiving tens of millions of dollars of bribes in connection with his facilitation of Petrobras's acquisition of the Pasadena Refinery.  As Cerveró had served as Chief of Petrobras's International Division, his arrest indicated the criminal scheme was not confined to bribery and money laundering in Brazil, but was in fact international in scope.  In response to the news of Cerveró's indictment, the Company's ADSs fell approximately 12% in a single day and Petrobras debt securities likewise declined substantially.

23.     On January 27, 2015, after a two-month delay, Petrobras released incomplete and unaudited third-quarter 2014 financial statements—which did not contain the expected writedowns because *the scope of the fraud was too vast for the Company or its auditors to estimate*.  Petrobras disclosed that the corruption scheme impacted at least "1/3 of the company's

total fixed assets," and provided a range of potential asset writedowns on those assets from R$4 billion ($1.5 billion) to R$88.6 billion ($34 billion).  Petrobras further admitted it had improperly accounted for overpayments and bribes as assets during the Relevant Period, leading to "errors" in its published financial statements.  In a letter to shareholders accompanying Petrobras's financial results, Foster acknowledged the commission of "unlawful acts" by former Petrobras employees and stated the "payments to . . . suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."  But because Petrobras and its auditors purportedly could not agree on the amount of the adjustment, the Company's financial statements did not contain any writedowns.

24.     The scope of the potential writedowns revealed by that disclosure, coupled with Petrobras's admissions concerning the falsity of its financial statements, caused the price of the Company's ADSs to plunge 11.9% and the prices of Petrobras debt securities to drop on average by over 5% over two trading days.

25.     On January 29, 2015, Moody's Investor Service ("Moody's") downgraded Petrobras to the lowest level of investment grade, noting the risk resulting from the Company's inability to quantify the costs of the corruption scandal, and the ensuing liquidity pressures as investors are left in the dark.

26.     On February 4, 2015, Foster and Barbassa, along with the rest of the Executive Directorate, left the Company due to the corruption scandal.  At first, the market responded favorably to those resignations.  But only two days later, on February 6, 2015, the market was shaken when Brazil's president Dilma Rousseff appointed her close confidant Aldemir Bendine as the new CEO of Petrobras.  According to Reuters, investors became concerned that "the

government appointed [Bendine] to limit the political fallout from a writedown rather than clean out dead-wood in the company's accounts."

27.     By mid-March 2015, the probe into the corruption at Petrobras had resulted in more than 40 indictments on racketeering, bribery, and money-laundering charges.  The investigation has snared many of Brazil's top lawmakers and resulted in the imprisonment of dozens of executives.

28.     On March 16, 2015, the scandal reached President Rouseff's inner circle when Brazilian federal prosecutors filed charges against João Vaccari Neto ("Neto"), the Treasurer of the ruling Workers' Party (Partido dos Trabalhadores, or "PT").  Prosecutors also brought charges against Duque, Petrobras's former director of services, who led the department responsible for most of the Company's investments.

29.     On March 19, 2015, multiple disclosures of additional problems connected to the Petrobras scandal were announced, including an investigation by the Brazilian federal government's public auditor (Tribunal de Contas da União, or "TCU") into whether Petrobras's board members mismanaged the Company; the addition of six more construction and engineering firms to the investigation by Brazil's Office of the Comptroller General ("CGU"), bringing the total number of contractors under investigation to 24; and Swiss regulators' seizure of $400 million of bank assets as part of the probe into Petrobras.  On those disclosures, the prices of Petrobras ADSs and debt securities declined significantly, erasing billions of dollars in market value.

30.     On April 22, 2015, Petrobras released audited financial statements for the first time in more than eight months.  The Company revealed it had written off $17 billion due to the corruption scandal, which exceeded the Company's total accumulated profit for nearly four

years.  Those losses included both the overvaluation of assets and outright theft.  As a result, Petrobras reported a net loss of approximately $9 billion for the fourth quarter, and announced it would no longer pay dividends.  Petrobras's CEO stated in a news conference that further writedowns were possible if federal prosecutors were to uncover more wrongdoing in the ongoing investigation.  Desperate to raise cash, the Company idled exploration and development plans, slashed capital spending, negotiated new financing agreements, and announced plans to sell approximately $13.7 billion in assets over the next two years.

31.     Despite purporting to come clean, Petrobras grossly *understated* the amount of incorrectly capitalized payments.  The Company's reported overcharges of $2.5 billion—which it characterized as the "best estimate" for the aggregate overstatement of its PP&E—results from applying a fixed percentage of 3%, the amount of the bribes kicked back to Petrobras and its political cronies, to the total value of the identified contracts.  But that 3% ceiling is sharply contradicted by the testimony of government cooperators—including Costa, Alberto Youssef, and Barusco—who testified that the Company routinely paid a 20% premium to the cartel. Petrobras's own disclosures of billions in impairment charges, which it claims are unrelated to the fraud (including a pre-tax impairment charge of $16.7 billion in the fourth quarter of 2012), provide an insight into the true magnitude of the scheme.  Petrobras's prior disclosures related to the "innocent" $16.7 billion impairment charges, including in SEC filings issued less than three months before, undermine the validity of the Company's self-serving April 22, 2015 writedown.

32.     Further, as *The Wall Street Journal* reported on April 28, 2015, three Petrobras independent board members strongly criticized the Company's calculation of the $2.5 billion writedown and expressed concerns that it failed to accurately reflect the massive scope of the fraud.  Citing to the April 22, 2015 minutes of the Petrobras board of directors meeting (released

Case 1:15-cv-10111-JSR   Document 57   Filed 02/01/16   Page 16 of 177

by the Brazilian securities regulator), the *Journal* reported that the three independent board members protested that they were given less than two hours to review 319 pages of documents before voting on the calculation of the impairment charge and asset writedowns.  Two of the three independent directors voted against the release, while one abstained from the voting process altogether.  Jose Guimaraes Monforte ("Monforte"), an independent board member who represented nonvoting shareholders, stated the "effort . . . fell short of what full due diligence would require on my part, especially given the need for recovering the company's credibility."  The other two independent directors also disagreed with the methodology adopted to calculate the impairment change, with one calling the amount inadequate to account for the fraud-related losses.  The three independent directors have since left the Company.

33.     Revelations concerning the magnitude and egregiousness of the scandal have continued.  On April 30, 2015, for example, the Brazilian press reported that Petrobras destroyed audio and video records obtained during discussions of the Operation Car Wash investigation and the participation of President Rousseff in the purchase of the Pasadena Refinery.  As of August 2015, the Brazilian authorities' investigation had grown to more than 100 indictments. In addition to the ongoing criminal prosecutions in Brazil, the SEC and the DOJ have launched investigations into the Petrobras kickback scheme and potential violations of the Foreign Corrupt Practices Act.  On August 18, 2015, *Business Insider* reported that the corruption probes conducted by the United States could cost Petrobras as much as $1.6 billion or more in record penalties to the DOJ and the SEC.  Additionally, authorities in Switzerland and Monaco have frozen hundreds of millions of dollars in secret bank accounts held by Petrobras executives and their co-conspirators.

-12-

34.     On October 29, 2015, a Brazilian former lawmaker who rose to become one of the top leaders of the Progressive Party was sentenced to 20 years and 7 months in prison for his role in the scheme.  And on November 4, 2015, a Brazilian construction tycoon who paid more than $8 million in bribes to secure Petrobras contracts was sentenced to nearly 20 years in prison after being convicted for corruption, money laundering, and racketeering.  More than 2,000 Petrobras employees are under investigation, reflecting the pervasive and systemic nature of the fraud.

35.     Throughout the Relevant Period, Petrobras issued public statements, including financial statements filed with the SEC, setting forth, *inter alia*:  (i) the Company's asset values; (ii) the Company's periodic expenses and net income; (iii) representations regarding the Company's anti-corruption policies and practices; and (iv) certifications that the Company did not suffer from material weaknesses in its disclosure controls and procedures or its internal controls over financial reporting.

36.     Among other things, throughout the Relevant Period, the Company unequivocally and repeatedly denied it was involved in any corrupt practices, claiming that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that the Company "is not involved in corruption."

37.     Defendants' statements during the Relevant Period were false or misleading when made, because:  (i) the Company was involved in corrupt practices, including making payments to political candidates; (ii) the Company's asset values had been inflated by the fraudulent practice of incorporating bribe-related expenses to contractors when capitalizing asset values on the Company's balance sheet, violating GAAP and IFRS; (iii) the Company's expenses were understated and its income overstated due to its practice of capitalizing bribe-related expenses

(rather than expensing them); and (iv) the Company suffered from material weaknesses in its disclosure controls and internal controls over financial reporting.

38.     As a result of those false or misleading statements, the prices of Petrobras securities were artificially inflated during the Relevant Period.  When the previously concealed information was ultimately revealed through a series of disclosures, the market value of Petrobras securities purchased by Plaintiffs declined sharply, causing Plaintiffs to suffer substantial losses.

## II.     PARTIES

### A.     Plaintiffs

39.     Plaintiff Dodge & Cox International Stock Fund is a no-load mutual fund that is a series of Dodge & Cox Funds, a Delaware statutory trust with its principal executive offices located at 555 California Street, 40th Floor, San Francisco, CA 94104.

40.     Plaintiff Dodge & Cox Global Stock Fund is a no-load mutual fund that is a series of Dodge & Cox Funds, a Delaware statutory trust with its principal executive offices located at 555 California Street, 40th Floor, San Francisco, CA 94104.

41.     Plaintiff Dodge & Cox Worldwide Funds plc – Global Stock Fund is one of four sub-funds of Dodge & Cox Worldwide Funds plc, a UCITS (Undertakings for the Collective Investment of Transferable Securities)-regulated umbrella fund incorporated in Ireland with its registered office located at 78 Sir John Rogerson's Quay, Dublin 2, Ireland.

42.     Plaintiff Dodge & Cox Income Fund is a no-load mutual fund that is a series of Dodge & Cox Funds, a Delaware statutory trust with its principal executive offices located at 555 California Street, 40th Floor, San Francisco, CA 94104.

43.     Plaintiff Dodge & Cox Balanced Fund is a no-load mutual fund that is a series of Dodge & Cox Funds, a Delaware statutory trust with its principal executive offices located at 555 California Street, 40th Floor, San Francisco, CA 94104.

44.     Dodge & Cox, a California corporation located at 555 California Street, 40th Floor, San Francisco, CA 94104, serves as Plaintiffs' investment manager and also as promoter for Plaintiff Dodge & Cox Worldwide Funds plc – Global Stock Fund.

**B.      Defendants**

**1.      Petrobras and Its Subsidiaries**

45.     Defendant Petrobras is a corporation organized under Brazilian law.  Its principal executive offices are located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.  Petrobras also has an office at 570 Lexington Avenue, 43rd Floor, New York, NY 10022.  The Company was incorporated in 1953 to conduct the Brazilian government's hydrocarbon business.  While the Company has been opened to private equity ownership, the Brazilian government still owned 28.67% of its outstanding capital stock and 50.26% of its voting shares as of December 31, 2013.  Petrobras is involved in hydrocarbon-related businesses including exploration, development, production, refining, logistics, transportation, and trading, as well as production of biofuels.

46.     Petrobras's operations account for the majority of Brazil's oil and gas production. The Company operates substantially all of the refining capacity in Brazil and participates in most aspects of the Brazilian natural gas market.  It also operates in 17 countries in addition to Brazil, including refining operations in the United States.  The Company's activities are organized into six business segments:  (i) exploration and production; (ii) refining, transportation and marketing; (iii) distribution; (iv) gas and power; (v) biofuel; and (vi) international.

47.     Petrobras was the world's third-largest energy company at the beginning of the Relevant Period; it has stood as a central pillar of Brazil's economy, and its close ties to the government once bolstered its financial security in the eyes of investors and regulators.  At its height in 2008, Petrobras had a market valuation of $310 billion.  In the wake of revelations of the Company's rampant money-laundering and kickback scheme, however, the Company's market capitalization fell to $31 billion, and all 37 Petrobras bonds issued and outstanding during the Relevant Period, which were previously rated investment grade, have been downgraded to junk.

48.     Petrobras's common and preferred shares have been traded on the NYSE since 2000, in the form of ADSs.

49.     Defendant PGF is a wholly owned finance subsidiary of Petrobras that is incorporated in the Netherlands.  Its principal executive offices are located at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, the Netherlands.

50.     PifCo was a wholly owned finance subsidiary of Petrobras.  Between the beginning of the Relevant Period and August 9, 2013, PifCo was incorporated in the Cayman Islands, with its principal executive offices located at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box I 034GT-BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg, with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off to Petrobras.  On February 12, 2014, PGF acquired the outstanding shares of PifCo as an initial step to the merger of PifCo into PGF.  On December 29, 2014, the merger of PifCo into PGF was completed and PifCo's separate corporate

existence was extinguished.  All allegations against PifCo in this Complaint are made against

PGF as the corporate successor of PifCo.

51.     Defendant PAI describes itself as a wholly owned subsidiary of Petrobras and

states that "in the US, we have a financial office in New York and a trading and procurement

office in Houston, Texas, hiring more than 400 people."  The financial office in New York is

located at 570 Lexington Avenue, New York, NY 10022.  The trading and procurement office in

Texas is located at 10350 Richmond Avenue, Suite 1400, Houston, TX 77042.  PAI lists

Defendant Theodore Helms (identified below), Consultant, as the contact person for the New

York financial office.  PAI owns Pasadena Refining System Inc., an independent refiner and

marketer of petroleum products, including petrochemical feedstock with a related crude-oil

capacity of just over 100,000 barrels per day.

### 2.     Individual Defendants

52.     Defendant José Sergio Gabrielli de Azevedo served as CEO of Petrobras during

the Relevant Period and signed the Company's 2009 and 2010 Forms 20-F filed with the SEC.

Gabrielli resigned as CEO on or around January 23, 2012.

53.     Defendant Maria das Graças Silva Foster served as CEO of Petrobras during the

Relevant Period and signed the prospectus included in the 2012 Registration Statement filed with

the SEC (identified below), as well as the 2011, 2012, and 2013 Forms 20-F filed with the SEC.

Foster resigned as CEO on or around February 4, 2015.

54.     Defendant Almir Guilherme Barbassa served as CFO of Petrobras during the

Relevant Period and signed the prospectus included in the 2012 Registration Statement, as well

as the 2010, 2011, 2012, and 2013 Forms 20-F.

55.     Defendant Paulo Roberto Costa served as the Director of Supply at Petrobras between May 2004 and April 2012.  Costa was a member of the Executive Directorate (Board of Executive Officers).

56.     Defendant José Carlos Cosenza ("Cosenza") served as the Director of Supply at Petrobras from April 2012 to February 2015.  Cosenza was a member of the Executive Directorate.

57.     Defendant Renato de Souza Duque served as the Director of Services at Petrobras between February 2003 and April 2012.  Duque was a member of the Executive Directorate.

58.     Defendant Guillherme de Oliveira Estrella ("Estrella") served as the Director of Exploration and Production at Petrobras between January 2003 and February 2012.  Estrella was a member of the Executive Directorate.

59.     Defendant José Miranda Formigli Filho ("Filho") served as the Director of Exploration and Production at Petrobras between February 2012 and February 2015.  Filho was a member of the Executive Directorate.

60.     Defendant Josué Christiano Gomes da Silva ("Silva") served as Director of Petrobras during the Relevant Period and signed certain of the Company's reports filed with the SEC.

61.     Defendant Silvio Sinedino Pinheiro ("Pinheiro") served as Director of Petrobras during the Relevant Period and signed the 2012 Registration Statement.

62.     Defendant Daniel Lima de Oliveira ("Oliveira") served as CEO and Chairman of PifCo during the Relevant Period and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

63.     Defendant José Raimundo Brandão Pereira ("Pereira") served as a Director of PifCo during the Relevant Period and signed the prospectus included in the 2012 Registration Statement.

64.     Defendant Sérvio Túlio da Rosa Tinoco ("Tinoco") served as CFO of PifCo during the Relevant Period and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

65.     Defendant Paulo José Alves ("Alves") served as the Chief Accounting Officer of PifCo during the Relevant Period and signed the prospectus included in the 2012 Registration Statement.

66.     Defendant Gustavo Tardin Barbosa ("Barbosa") served as CEO and Managing Director of PGF during the Relevant Period and signed the prospectus included in the 2012 Registration Statement.

67.     Defendant Alexandre Quintão Fernandes ("Fernandes") served as CFO and Managing Director of PGF during the Relevant Period and signed the prospectus included in the 2012 Registration Statement.

68.     Defendant Marcos Antonio Zacarias ("Zacarias") served as a Managing Director of PGF during the Relevant Period and signed the prospectus included in the 2012 Registration Statement.

69.     Defendant Cornelis Franciscus Jozef Looman ("Looman") served as a Managing Director of PGF during the Relevant Period and signed the prospectus included in the 2012 Registration Statement.

70.     Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for

PifCo during the Relevant Period.  Helms signed the prospectus included in the 2012

Registration Statement.

III.     **RELEVANT SECURITIES**

A.       **Petrobras ADSs**

71.      During the Relevant Period, Petrobras common and preferred ADSs were listed

on the NYSE.  Each Petrobras ADS represents two shares of common or preferred stock.

72.      During the Relevant Period, Plaintiffs Dodge & Cox International Stock Fund,

Dodge & Cox Global Stock Fund, and Dodge & Cox Worldwide Funds plc – Global Stock Fund

purchased, on the NYSE, Petrobras Preferred ADSs that were registered with the SEC and listed

on the NYSE (ticker symbol: PBR/A, CUSIP # 71654V101) ("Petrobras Preferred ADSs").

B.       **Petrobras Notes**[5]

1.       **October 2009 Notes**

73.      On December 18, 2006, Petrobras and PifCo filed a registration statement on

Form F-3ASR (the "2006 Registration Statement") registering "an indeterminate amount of

securities for offer and sale from time to time at indeterminate offering prices."  The 2006

Registration Statement states:

> We have agreed that New York law governs the indenture and the debt securities.
> We have filed a copy of the Petrobras indenture and PifCo indenture with the SEC
> as exhibits to our registration statement. We have consented to the non-exclusive
> jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the
> City of New York, New York . . . .

74.      On October 26, 2009, PifCo filed a prospectus supplement on Form 424B2 (the

"October 2009 Prospectus," and together with the 2006 Registration Statement and all

---

[5] Each offering of Petrobras notes referenced below was conducted pursuant to a registration statement and a
prospectus supplement issued in connection with the offering.  The date of each offering (and not the earlier date of
the registration statement) constitutes the "effective date" of the registration statement for purposes of liability under
Section 11, in accordance with 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

documents incorporated into it, the "October 2009 Offering Documents") for the offer and sale of $4 billion in debt securities in two different series of notes pursuant to the 2006 Registration Statement.

75.     Pursuant to the 2009 Offering Documents, Petrobras and PifCo offered, *inter alia*, $2.5 billion of notes paying 5.75% due in 2020 (CUSIP71645WAP6) (the "October 2009 Notes").

### 2.     2011 Notes

76.     On December 11, 2009, Petrobras and PifCo filed a registration statement on Form F-3ASR (the "2009 Registration Statement") registering "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices." The 2009 Registration Statement states:

> We have agreed that New York law governs the indenture and the debt securities.
> We have filed a copy of the Petrobras indenture and PifCo indenture with the SEC
> as exhibits to our registration statement. We have consented to the non-exclusive
> jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the
> City of New York, New York . . . .

77.     On January 21, 2011, PifCo filed a prospectus supplement on Form 424B2 (the "2011 Prospectus," and together with the 2009 Registration Statement and all documents incorporated into it, the "2011 Offering Documents") for the offer and sale of $6 billion in debt securities in three different series of notes pursuant to the 2009 Registration Statement.

78.     Pursuant to the 2011 Offering Documents, Petrobras and PifCo offered, *inter alia*, $2.5 billion of notes paying 5.375% due in 2021 (CUSIP 71645WAR2) (the "2011 Notes").

### 3.     2012 Notes

79.     On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 (the "2012 Prospectus," and together with the 2009 Registration Statement and all documents

incorporated into it, the "2012 Offering Documents") for the offer and sale of $7 billion in debt

securities in four different series of notes pursuant to the 2009 Registration Statement.

80. Pursuant to the 2012 Offering Documents, PifCo offered, *inter alia*, a $2.75

billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 (CUSIP

71645WAR2) (the "2012 Notes").

### 4.   2013 Notes

81. On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement on

Form F-3ASR (the "2012 Registration Statement," and with the 2006 Registration Statement and

the 2009 Registration Statement, the "Registration Statements") registering "an indeterminate

amount of securities for offer and sale from time to time at indeterminate offering prices."  The

2012 Registration Statement states:

> We have agreed that New York law governs the indenture and the debt securities.
> We have filed a copy of the Petrobras, PifCo and PGF indentures as exhibits to
> our registration statement. We have consented to the non-exclusive jurisdiction of
> any U.S. federal court sitting in the borough of Manhattan in the City of New
> York, New York . . . ."

82. The 2012 Registration Statement included a prospectus that expressly

incorporated by reference the following documents, among others:

(a) the combined Petrobras and PifCo Annual Report on Form 20-F for the

year ended December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on

Form 20-F/A, filed with the SEC on July 9, 2012;

(b) the Petrobras Report on Form 6-K filed with the SEC on August 10, 2012,

containing financial information for the six-month periods ended June 30, 2012 and 2011; and

(c) "[a]ny future filings of Petrobras on Form 20-F made with the SEC after

the date of this prospectus and prior to the termination of the offering of the securities offered by

this prospectus."

83.     On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 (the "2013 Prospectus," and together with the 2012 Registration Statement and all documents incorporated into it, the "2013 Offering Documents") for the offer and sale of $11 billion in debt securities in six different series of notes pursuant to the 2012 Registration Statement.

84.     Pursuant to the 2013 Offering Documents, Petrobras, PifCo, and PGF offered (the "2013 Offering"), *inter alia*, $3.5 billion of notes paying 4.375% due in 2023 (CUSIP 71647NAF6) (the "2013 Notes").

### 5.     2014 Notes

85.     On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 with the SEC (the "2014 Prospectus," and together with the 2012 Registration Statement and all documents incorporated into it, the "2014 Offering Documents," and with the October 2009 Offering Documents, the 2011 Offering Documents, the 2012 Offering Documents, and the 2013 Offering Documents, the "Note Offering Documents") for the offer and sale of $8.1 billion of debt securities in six different series of notes pursuant to the 2012 Registration Statement.

86.     Pursuant to the 2014 Offering Documents, PGF offered (the "2014 Offering"), *inter alia*, $2.5 billion of notes paying 6.250% due in 2024 (CUSIP 71647NAM1) (the "2014 Notes," and with the October 2009 Notes, 2011 Notes, 2012 Notes, and 2013 Notes, the "Petrobras Notes").

### 6.     Plaintiffs' Transactions in Petrobras Notes

87.     During the Relevant Period, Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund purchased, in domestic transactions on the open market, debt securities issued by Petrobras, PifCo, and/or PGF that were registered with the SEC and listed on the NYSE, which are fully and unconditionally guaranteed by Petrobras.  At the time of the transactions identified in ¶ 88 below, Plaintiffs Dodge & Cox Income Fund and Dodge & Cox

Balanced Fund, as well as Dodge & Cox—Plaintiffs' investment manager, which purchased

Petrobras Notes for these Funds—were located in San Francisco, CA, and each transaction was

executed by Dodge & Cox from its offices in San Francisco, CA.  Further, all of these trades

(i) were placed with entities located within the United States; (ii) were priced in U.S. dollars; and

(iii) settled and delivered into the Funds' custody accounts at State Street Bank and Trust

Company ("State Street"), which were located within the United States.  Further, at no time

during the Relevant Period did Dodge & Cox execute trades in Petrobras Notes with broker-

dealers outside of the United States.  As further detailed below, Dodge & Cox purchased

Petrobras Notes on behalf of these Plaintiffs from the following broker-dealers:

- Barclays Capital Inc. ("Barclays Capital"), located at 745 7th Avenue, New York, NY 10019;

- Cantor Fitzgerald & Co. ("Cantor Fitzgerald"), located at 110 East 59th Street, New York, NY 10022;

- Citigroup Global Markets Inc. ("Citigroup"), located at 390-388 Greenwich Street, New York, NY 10036, which served as an underwriter and joint book runner in connection with the 2013 Offering and the 2014 Offering;

- Deutsche Bank Securities Inc. ("Deutsche Bank"), located at 60 Wall Street, New York, NY 10005;

- Jefferies LLC – Bonds Direct Division ("Jefferies"), located at 520 Madison Avenue, New York, NY 10022;

- J.P. Morgan Securities LLC ("J.P. Morgan"), located at 277 Park Avenue, New York, NY 10172, which served as an underwriter and joint book runner in connection with the 2013 Offering and the 2014 Offering; and

- Morgan Stanley & Co. LLC ("Morgan Stanley"), located at 1585 Broadway, New York, NY 10036, which served as an underwriter and joint book runner in connection with the 2013 Offering.

88.     Additional details regarding these Plaintiffs' purchases of Petrobras Notes during the Relevant Period, based on information within Dodge & Cox's possession, are specified below:

**Plaintiff Dodge & Cox Income Fund**

| Trade Date | CUSIP | Amount Purchased (Face Value) | Price | Purchaser Agent (on behalf of the Fund) | Seller |
|---|---|---|---|---|---|
| 4/2/12 | 71645WAR2 | 7,445,000 | $108.098 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 4/3/12 | 71645WAP6 | 30,000,000 | $109.995 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 4/5/12 | 71645WAR2 | 8,350,000 | $107.017 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 4/13/12 | 71645WAR2 | 50,000,000 | $108.124 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 4/13/12 | 71645WAR2 | 20,000,000 | $108.124 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 11/1/12 | 71645WAR2 | 200,000 | $112.7842 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States[6] |
| 11/29/12 | 71645WAR2 | 275,000 | $112.824 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States |
| 1/24/13 | 71645WAR2 | 18,420,000 | $111.537 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |

---

[6] All transactions listed in this table in which the seller is described as "Dodge & Cox managed-account client located within the United States" consist of "in kind" transactions between Dodge & Cox Income Fund and one of Dodge & Cox's managed-account clients, through which the client purchased shares of Dodge & Cox Income Fund by transferring its ownership interest in Petrobras Notes to Dodge & Cox Income Fund in exchange for shares of the Fund, i.e., paying for Fund shares "in kind" rather than in cash.  These transactions constitute purchases of the subject Petrobras Notes by Dodge & Cox Income Fund.  All of the managed-account clients involved in these transactions were located within the United States at the time of the transactions.

| Trade Date | CUSIP | Amount Purchased (Face Value) | Price | Purchaser Agent (on behalf of the Fund) | Seller |
|---|---|---|---|---|---|
| 1/30/13 | 71645WAR2 | 7,415,000 | $110.197 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 1/30/13 | 71645WAR2 | 7,540,000 | $110.183 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 1/31/13 | 71645WAR2 | 18,875,000 | $109.992 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/4/13 | 71645WAR2 | 3,210,000 | $109.749 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 2/5/13 | 71645WAR2 | 9,425,000 | $108.933 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/13/13 | 71645WAR2 | 4,825,000 | $109.835 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/19/13 | 71645WAR2 | 13,625,000 | $109.547 | Dodge & Cox (San Francisco, CA) | Deutsche Bank (New York, NY) |
| 2/25/13 | 71645WAR2 | 7,425,000 | $109.593 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/25/13 | 71645WAR2 | 8,450,000 | $109.558 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/26/13 | 71645WAR2 | 14,880,000 | $109.421 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 2/28/13 | 71645WAR2 | 5,000,000 | $109.395 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/28/13 | 71645WAP6 | 15,000,000 | $111.21 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 4/26/13 | 71645WAR2 | 300,000 | $110.3133 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States |
| 5/13/13 (also the offer date)[7] | 71647NAF6 | 55,000 | $98.828 | Dodge & Cox (San Francisco, CA) | Morgan Stanley (New York, NY) |

[7] The settlement date for this transaction was May 20, 2013, which was the closing date of the 2013 Offering.

| Trade Date | CUSIP | Amount Purchased (Face Value) | Price | Purchaser Agent (on behalf of the Fund) | Seller |
|---|---|---|---|---|---|
| 5/13/13 (also the offer date)[8] | 71647NAF6 | 50,000,000 | $98.828 | Dodge & Cox (San Francisco, CA) | Morgan Stanley (New York, NY) |
| 5/23/13 | 71647NAF6 | 4,050,000 | $99.40 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 5/23/13 | 71645WAR2 | 2,675,000 | $108.606 | Dodge & Cox (San Francisco, CA) | J.P. Morgan (New York, NY) |
| 5/24/13 | 71645WAR2 | 11,650,000 | $108.445 | Dodge & Cox (San Francisco, CA) | J.P. Morgan (New York, NY) |
| 5/24/13 | 71647NAF6 | 4,950,000 | $99.519 | Dodge & Cox (San Francisco, CA) | Cantor Fitzgerald (New York, NY) |
| 5/28/13 | 71645WAR2 | 20,000,000 | $107.445 | Dodge & Cox (San Francisco, CA) | J.P. Morgan (New York, NY) |
| 5/29/13 | 71645WAR2 | 37,785,000 | $106.912 | Dodge & Cox (San Francisco, CA) | J.P. Morgan (New York, NY) |
| 6/27/13 | 71645WAR2 | 190,000 | $101.1955 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States |
| 6/27/13 | 71647NAF6 | 75,000 | $91.6381 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States |
| 7/24/13 | 71645WAR2 | 2,340,000 | $101.95 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 8/22/13 | 71645WAR2 | 12,450,000 | $97.75 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |

---

[8] The settlement date for this transaction was May 20, 2013, which was the closing date of the 2013 Offering.

| Trade Date | CUSIP | Amount Purchased (Face Value) | Price | Purchaser Agent (on behalf of the Fund) | Seller |
|---|---|---|---|---|---|
| 2/27/14 | 71645WAR2 | 115,000 | $100.1033 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States |
| 2/27/14 | 71647NAF6 | 50,000 | $90.1599 | Dodge & Cox (San Francisco, CA) | Dodge & Cox managed-account client located within the United States |
| 3/10/14 (also the offer date)[9] | 71647NAM1 | 43,530,000 | $99.772 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 5/30/14 | 71645WAR2 | 325,000 | $103.85 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 10/7/14 | 71647NAM1 | 14,825,000 | $106.421 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 10/7/14 | 71647NAM1 | 5,000,000 | $106.246 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 10/8/14 | 71647NAM1 | 2,450,000 | $106.058 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 10/14/14 | 71647NAM1 | 15,000,000 | $107.419 | Dodge & Cox (San Francisco, CA) | J.P. Morgan (New York, NY) |

**Plaintiff Dodge & Cox Balanced Fund**

| Trade Date | CUSIP | Amount Purchased (Face Value) | Price | Purchaser Agent (on behalf of the Fund) | Seller |
|---|---|---|---|---|---|
| 4/10/12 | 71645WAR2 | 9,725,000 | $107.914 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |

---

[9] The settlement date for this transaction was March 17, 2014, which was the closing date of the 2014 Offering.

| Trade Date | CUSIP | Amount Purchased (Face Value) | Price | Purchaser Agent (on behalf of the Fund) | Seller |
|---|---|---|---|---|---|
| 5/1/12 | 71645WAR2 | 2,000,000 | $109.687 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 1/22/13 | 71645WAR2 | 5,885,000 | $112.132 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/4/13 | 71645WAR2 | 3,800,000 | $109.742 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 2/4/13 | 71645WAR2 | 6,000,000 | $109.749 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |
| 5/13/13 (also the offer date)[10] | 71647NAF6 | 9,550,000 | $98.828 | Dodge & Cox (San Francisco, CA) | Morgan Stanley (New York, NY) |
| 5/23/13 | 71647NAF6 | 10,925,000 | $99.40 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 7/24/13 | 71645WAR2 | 2,500,000 | $101.95 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 8/13/13 | 71647NAF6 | 9,325,000 | $89.691 | Dodge & Cox (San Francisco, CA) | J.P. Morgan (New York, NY) |
| 11/22/13 | 71645WAR2 | 8,125,000 | $100.245 | Dodge & Cox (San Francisco, CA) | Jefferies (New York, NY) |
| 1/10/14 | 71645WAR2 | 5,125,000 | $99.495 | Dodge & Cox (San Francisco, CA) | Barclays Capital (New York, NY) |
| 3/10/14 (also the offer date)[11] | 71647NAM1 | 8,400,000 | $99.772 | Dodge & Cox (San Francisco, CA) | Citigroup (New York, NY) |

---

[10] The settlement date for this transaction was May 20, 2013, which was the closing date of the 2013 Offering.

[11] The settlement date for this transaction was March 17, 2014, which was the closing date of the 2014 Offering.

89.     Additionally:

(i)     The Note Offering Documents expressly limit any public offering to the United States, and Defendants selected underwriters that were located in or had offices in the United States.

(ii)     Under the Note Offering Documents, the Depository Trust Company ("DTC"), as the depository agent for the Petrobras Notes, is designated as "the only registered holder for the Notes," and The Bank of New York Mellon, located in New York, NY, is the designated trustee, registrar, paying agent, transfer agent, and calculating agent for the Notes.  Thus, the DTC, a New York depository company, governed the transfers, exchanges, and other matters relating to beneficial owners' interests in the Petrobras Notes.  Transfer of title to the Petrobras Notes took place in New York through the depository agent's book-entry system, and delivery of the Notes took place via DTC and its direct and indirect participants against payment in New York.

(iii)     Pursuant to the Note Offering Documents, Defendant PGF and its paying agent were required to maintain an office or agency in New York where notices to, and demand on them, with respect to the Notes could be served.

(iv)     The Note Offering Documents were filed with the SEC; disclaimed compliance with the laws of any jurisdiction other than the United States; selected New York law to govern the indenture, the Notes, and the guaranties of the bonds; and selected this Court (or any federal or state court in Manhattan) as a forum for dispute resolution.

90.     In light of the facts set forth in ¶¶ 87-89 above, the relevant transactions occurred within the United States, irrevocable liability was incurred by these Plaintiffs within the United States, and these Plaintiffs took title to the Petrobras Notes within the United States.

IV.     **SUMMARY OF PLAINTIFFS' CLAIMS**

A.     **Exchange Act Claims**

91.     Plaintiffs Dodge & Cox International Stock Fund, Dodge & Cox Global Stock Fund, and Dodge & Cox Worldwide Funds plc – Global Stock Fund assert claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 (collectively referred to as "10b-5 Claims"), arising from these Plaintiffs' transactions in Petrobras Preferred ADSs during the Relevant Period, against (i) Defendants Petrobras and PGF; and (ii) Defendants Foster, Gabrielli, Barbassa, Costa, Cosenza, Duque, Estrella, Filho, Silva, Pinheiro, Oliveira, Pereira, Tinoco, Alves, Barbosa, Fernandes, Zacarias, and Looman (the "Exchange Act Individual Defendants," and with Petrobras and PGF, the "Exchange Act Defendants").

92.     Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund assert 10b-5 Claims against the Exchange Act Defendants arising from these Plaintiffs' transactions in Petrobras Notes during the Relevant Period.

93.     All Plaintiffs also assert claims under Section 20(a) of the Exchange Act against the Exchange Act Individual Defendants arising from the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 alleged in this Complaint.

B.     **Securities Act Claims**

94.     Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund assert claims under Section 11 of the Securities Act against (i) Defendants Petrobras and PGF; and (ii) Defendants Foster, Barbassa, Silva, Pinheiro, Oliveira, Pereira, Tinoco, Alves, Barbosa, Fernandes, Zacarias, Looman, and Helms (the "Section 11 Officer and Director Defendants," and with Petrobras and PGF, the "Section 11 Defendants").  These claims arise from these Plaintiffs' purchases of 2013 Notes and 2014 Notes in or traceable to the 2013 Offering and the 2014 Offering.

95.     These Plaintiffs also assert claims under Section 15 of the Securities Act against (i) Defendants Petrobras and PAI; and (ii) Defendants Foster, Barbassa, Silva, Pinheiro, Oliveira, Pereira, Tinoco, Alves, Barbosa, Fernandes, Zacarias, and Looman (the "Section 15 Officer and Director Defendants") arising from the violations of Section 11 of the Securities Act alleged in this Complaint.

96.     The Securities Act claims asserted by Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund are based solely on strict liability and negligence, and not on any fraudulent or reckless conduct by or on behalf of Defendants.  These claims do not allege, arise from, or sound in fraud.  These Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness with respect to their Securities Act claims.

## V.     **JURISDICTION AND VENUE**

97.     This Court has jurisdiction over the subject matter of this action in accordance with 28 U.S.C. §§ 1331, 1337(a), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

98.     This Court has personal jurisdiction over each Defendant named in this action in accordance with Federal Rule of Civil Procedure 4(k)(1)(A) or N.Y. CPLR § 302.  Each Defendant either maintains a continuous presence within this District or participated in transactions at issue in this action within this District.

99.     Venue is proper in this District under Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Petrobras maintains an office in this District and sponsors ADSs (representing the Company's common and preferred equity) that are listed on the NYSE, which is located in this District; engaged in the public offering of ADSs and debt securities that are listed on the NYSE and other domestic markets; and certain of the acts alleged

in this Complaint, including the dissemination of materially false or misleading information to the investing public, occurred in or were issued from this District.

100.    Defendants used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets, in committing the misconduct alleged in this Complaint.

## VI.   DEFENDANTS ENGAGED IN A MASSIVE SCHEME INVOLVING BRIBES, KICKBACKS, AND MONEY LAUNDERING THROUGHOUT THE RELEVANT PERIOD

101.    Contrary to Petrobras's repeated reassurances concerning its commitment to "transparency," its "strict" compliance with laws governing competitive bidding, the legitimacy of its financial results, and the absence of "any irregularities" or "overpricing," the Company's senior executives were secretly engaged in a massive kickback scheme that grossly inflated the value of the Company's construction and services contracts, along with the financial results that the Company reported to the SEC throughout the Relevant Period.

102.    That scheme, and its impact on the Company's financial condition, has been admitted in sworn testimony provided by, among others, Costa—one of the senior-most Petrobras executives during the Relevant Period.  He has explained that, prior to and during the Relevant Period, Petrobras operated as part of a criminal enterprise together with a select group of suppliers consisting of up to 16 of Brazil's largest construction companies called the "cartel." With the Company's knowledge, the members of the cartel routinely inflated the terms of purportedly competitive bids for Petrobras construction projects by up to 20%.

103.    The inflated contract prices also included a 3% kickback that was divided among Petrobras executives, Brazilian politicians, and money launderers who helped conceal the illegal transfers.  Petrobras's senior executives—including Costa, Duque, and Cerveró—were instrumental in the scheme and received hundreds of millions of dollars in kickbacks.

104.    The bribery and bid-rigging scheme and the subsequent cover-up, including strenuous denials of wrongdoing in Company statements, also benefited Petrobras in the following ways:

(i)      Petrobras was able to execute massive refinery projects with the cartel members, which were some of Brazil's largest contractors and the only contractors capable of undertaking certain construction projects;

(ii)     Petrobras was able to maintain a beneficial relationship with the Brazilian government (the Company's majority shareholder), which passed legislation favorable to the Company, including regulations adopted in December of 2010 that reduced competition against Petrobras for development of pre-salt oil fields;

(iii)    the bid- rigging scheme and cover-up inflated the Company's net asset (PP&E) values and net income due to the bribes and contract overpayments incorporated into those numbers, which caused the prices of Petrobras securities to be artificially inflated; and

(iv)     the cover-up concealed the Company's participation in the scheme, thereby maintaining investor confidence and the inflated securities prices.

105.    Multiple Petrobras executives, cartel members, and other participants in the scheme have pled guilty to corruption and bribery and have provided sworn testimony and documents describing the scheme to Brazilian investigators.  These individuals include:

- Costa, who was one of the senior-most executives at Petrobras during his tenure as Director of the Downstream Division Supply.  Along with Duque, Petrobras's Director of Services, Costa was responsible for all contracts with outside contractors in the Downstream Division.  As reported in an October 21, 2014 Bloomberg article, during his tenure at the Company, Costa was the "charismatic face" of Petrobras.  He was arrested in 2014 and has since admitted to his role in the bribery scheme and that he personally received millions of dollars in bribes.

- Barusco, a former Petrobras executive who was Duque's "right hand man" in the Company's Services Division.  Barusco has admitted to the scheme and agreed to return

*over $100 million* that he personally reaped from illegal bribes, which places him among the largest known bribery recipients in Brazil's history and represents the largest amount ever turned over to Brazil from a single person.  In his plea deal, Barusco admitted to "crimes against the financial system, corruption crimes, embezzlement crimes, money laundering and criminal organization crimes, among others, involving the company Petróleo Brasileiro S/A."

- Youssef, a convicted black-market money launderer, who has admitted to personally delivering cash payments to Petrobras executives and Brazilian politicians.

- Augusto Ribeiro de Mendonça Neto ("Mendonça Neto"), who served as a director of Toyo Setal—an engineering, procurement, and construction ("EPC") contractor in Brazil, an affiliate of Japanese engineering firm Toyo Engineering Corporation, and a member of the cartel.

106.    In addition to the sworn written and oral testimony from these key players, the Brazilian investigation has made public thousands of pages of documents, account statements, handwritten and other recorded minutes and spreadsheets documenting the bribery payments, and other evidence of the scheme.  Former Petrobras employees also have voluntarily stepped forward to confirm there were vociferous objections to those practices within the Company—including the protestations of at least one former senior executive, Velosa, who identified numerous irregularities in Petrobras's bidding and contract processes and repeatedly brought concerns about those irregularities to Foster.  After Velosa raised those concerns, however, the Company sent her to Singapore where she was relieved of her duties, and her family was threatened.

A.    **Petrobras and Its Contractors Engaged in Bid-Rigging.**

107.    In stark contrast to Petrobras's repeated representations touting its transparency, as Costa testified in 2014, "[i]n reality, what was happening within Petrobras, primarily from 2006 onward, was a process of 'cartelization.'"  According to Costa, the cartel, which consisted of the largest construction companies in Brazil (including Odebrecht, Camargo Correa, Andrade

Gutierrez, Iesa, Engevix, Mendes Junior, UTC, OAS, and Queiroz Galvão), coordinated the bids

they submitted for Petrobras contracts.

108.    In sworn testimony offered in connection with his plea bargain, Barusco

corroborated Costa's statements.  Specifically, in Annex No. 5 to his plea bargain with the

Brazilian Federal Police, Barusco testified:

> THAT the cartel's action at Petrobras had been going on for a long time, but was made easier from 2006 until 2011, due to the high volume of big constructions, where the technical criteria to select the companies at Petrobras would always indicate the same companies of the cartel and others that were "supporters," which allowed for the actions of the cartel in the sense of dividing the works among themselves;

> THAT the companies that made up a sort of "hard core" of the cartel were around 14 (fourteen), namely CAMARGO CORREA, ANDRADE GUTIERREZ, ODEBRECHT, SETAL/SOG ÓLEO E GÁS, OAS, UTC, SKANSKA, PROMON ENGENHARIA, TECHINT, QUEIROZ GALVÃO, ENGEVIX, MENDES JÚNIOR, SCHAIN and MPE;

> THAT those were the companies that received most of the invitations, the ones that did most of the work inside of PETROBRAS;

> THAT there were also supporting companies that accepted to "discuss with the cartel" above mentioned and eventually took part in bids, acting together with the companies from the "hard core," namely CARIOCA, TOMÉ ENGENHARIA, TKK, ENGESA, JARAGUÁ, ALUSA, GDK, among others.

109.    Mendonça Neto confirmed Costa's and Barusco's testimony regarding the history

of the cartel:

> That was an initiative that started in the late nineties, but it wasn't very effective because there were only a few companies in on it, because they were nine companies in a broader market, so those companies didn't have . . . they only had the protection system running between them, and it became more effective around maybe, the end of 2003/2004, when these things started to be set up with Petrobras' Directors.  So that the companies that were invited were the ones that might be participating in the activities of, or in that group.  After that, it became more effective.  Contracting began to work out.  And after 2006, late 2006, some other companies were included, by imposition of the market, or even Petrobras.  Initially they were nine, seven more got in, and they were sixteen, all operating in the same way.

110.    As Mendonça Neto testified to Brazilian federal authorities, Petrobras and the
cartel members adhered to a set, formalized procedure:

*First*, the members of the cartel held meetings where they exchanged information
concerning upcoming procurement invitations from Petrobras.  The cartel meetings were
attended by high-level executives with "decision powers . . . so that the meetings would be secret
and safe in the first place, and, second, that everything that was agreed upon would be followed
by the company[.]"  Costa testified that his personal contacts were "always at the level of
president and director of the [contractor] companies, I had no contact with the people from
operation, execution."

*Second*, Youssef testified that once the list of upcoming projects was finalized, the cartel
determined which member would receive which contract, considering, among other things, the
number of contracts that member had already amassed.

*Third*, the cartel finalized the list of companies that would be invited to bid on a
particular project.  The agreed-upon list was sent to Duque and Costa, "who ultimately had the
power to grant final approval for the companies that would be invited to each procedure."
Youssef also corroborated in sworn testimony that bidding for Petrobras projects was never
competitive and contractors determined the winner of each tender before it was conducted.
Youssef explained that the cartel would "previously define the winner" of the Petrobras bids, and
further testified as follows:

> **JUDGE:**  Do you know of this . . . if there were, regarding Petrobras, for those
> companies to obtain those contracts, any frauds in the bidding, or any
> arrangements between the companies?  Do you have any knowledge of that?
>
> **ALBERTO YOUSSEF:**  What I am aware of is that there was an arrangement
> between the companies, not in the matter of bidding, but when there was a
> package of projects at Petrobras, the [cartel] companies, *they, among themselves,*
> *would connect and arrange who would be the winner of that project.*

111.    As Mendonça Neto explained, the cartel members memorialized the "rules" that would govern their bid-rigging operation.  In 2010, certain cartel members complained that they were not receiving as many contracts as other members.  In a document titled "Sports Championship," which was handed out at cartel meetings, the cartel members agreed on procedures concerning the bidding for projects relating to the Company's Comperj refinery ("Comperj").  According to Mendonça Neto, the document reflected the cartel's new agreement that past contracts would not be taken into account when assigning winners to new ones, and that in effect, "what's done is done, we will not be arguing who got more contracts and who didn't, up to now.  In other words, "[a]ll the teams"—i.e., the cartel members—"will have their times, records, etc. back to zero" and "we are playing the game from now on."

112.    Additionally, as *Valor International* revealed in February 2015, Petrobras employees and executives actively assisted the members of the cartel in ensuring that their bids were accepted by the Company.  Indeed, Petrobras held meetings with cartel members during the Relevant Period at the Company's offices in Rio de Janeiro to discuss the process of submitting bids to Petrobras.  As reflected in meeting minutes, Petrobras employees "show[ed] representatives of the contractors how they should present claims for contract addenda in order to avoid refusal" by the Company.

113.    Contracts with cartel members accounted for a vast amount of Petrobras's reported fixed assets during the Relevant Period.  In January 2015, Petrobras confirmed that over *R$188 billion ($73 billion)* in assets, or "1/3 of the [C]ompany's total fixed assets," relate to contracts entered into with cartel members between 2004 and April 2012 alone.

114.    The illegal coordination among cartel members removed all competition from Petrobras bids, causing them to skyrocket.  As Costa explained, the coordination of bids and the

pre-selection by the cartel of the winning bidder "obviously result[ed] in an excessive delta price," or overcharge, to Petrobras.

115.    The bids cartel members submitted to Petrobras during the Relevant Period consistently met or exceeded the maximum amounts that were internally budgeted by the Company.  Costa testified that Petrobras calculated the expected cost of supplies and labor (the budget) and imposed a general prohibition on accepting bids that came in higher than 20% over budget.  Initially, cartel members would bid at prices high above Petrobras's 20% limitation.  At that point, Petrobras would contact the bidders and would request a "rebid."  The winning cartel member would then, Costa explained, "arbitrate its price close to the additional 20%, as a rule, and the others with amounts a little higher."  In other words, as a matter of practice, contracts bid on by cartel members were inflated to the greatest extent Petrobras and its executives could conceivably permit without drawing obvious attention to the scam.

116.    Barusco's plea agreement similarly stated that Petrobras entered into inflated contracts with cartel members for projects at Abreu and that the cartel wanted to impose contract prices "way above budget."  Barusco also confirmed that "in the case of [Abreu] there was a clear overbilling."

117.    According to Barusco, Petrobras's contracts with cartel members were always "signed near the maximum amount for the internal budget of Petrobras."

118.    As detailed in a December 11, 2014 complaint filed by the Brazilian federal public prosecutors' office against Costa and eight others (the "December 11 Prosecutor's Complaint"):

> [The participants in the scheme] managed to frustrate the competitive nature of bidding for large works conducted by PETROBRAS, attaining consistent advantages by imposing higher prices compared to a freely competitive environment, ensuring contracts of a given volume of works and choosing the

works most convenient according to region or technical know-how, among other advantages.

**B.      Petrobras Executives Demanded that All Contracts Include an Additional "Bribe Fee."**

119.    Petrobras executives knew about, and personally profited from, the cartel's overpricing and bid-rigging activities during the Relevant Period.  Indeed, Petrobras executives—including Costa, Duque, and Barusco—while acting within the scope of their responsibilities, required that cartel members' inflated bids include an extra "bribe fee" that was set aside for kickbacks to Petrobras executives and bribes for government officials.  Specifically, "every" Petrobras contract with cartel members included a surcharge of up to 3% that would be "allocated to political agents."  This "bribe fee," which was incorporated into the bid price submitted by Petrobras's contractors, further inflated the Company's project costs.

120.    According to Costa, in connection with cartel contracts, 2% was allocated to the Services Division.  Of the remaining 1%, "60% went to the [Progressive Party], 20% was for expenses . . . and the remaining 20% was allocated – 70% to me and 30% either to [José] Janene or Alberto Youssef."

121.    Mendonça Neto corroborated that approximately 3% of all contract amounts were paid to Petrobras executives and politicians as bribes.  According to Mendonça Neto, the cartel members knew the payment of bribes to Petrobras senior executives, including Duque and Costa, was the only way to secure the contracts, and the cartel members were not in a position to object:

> **Public Prosecutor:**  At the meetings, besides the division of the construction projects, the cartel deals, was payment of undue advantages to Petrobras' Directors ever discussed, if it would be convenient to uphold those promises of payment or not, regarding the cartel's activities?

> **Mr. Augusto [Mendonça Neto]:**  Basically, the division of the construction projects was discussed.  And as for the payment of commissions to Petrobras' directors, maybe that didn't even merit a discussion, because *everyone was aware that it would be very much mandatory*.

122.     Mendonça Neto testified that Toyo Setal paid bribes to Costa for at least one contract related to Petrobras's Repar refinery and at least two contracts relating to the Company's Replan refinery.

123.     Other cartel members have provided additional evidence detailing the bribery scheme.  For example, Julio Camargo, another Toyo Setal executive, testified that he paid R$12 million (approx. $5.1 million) in bribes to Costa and Duque to build a major component, known as a coking unit, at the Repar refinery.  According to Camargo, the bribes were a "*rule of the game*, which means that if there was no bribe for the supply department and for the engineering department, the negotiations wouldn't be successful."

124.     Similarly, according to press reports, Erton Medeiros Fonseca ("Fonseca"), the CEO of leading Brazilian construction company Galvão Engenharia ("Galvão"), provided receipts to Brazilian prosecutors evidencing bribes paid to Duque.  According to Fonseca, Costa extorted Galvão, and Fonseca explained through his attorney that "Galvão always had the best bids, sometimes as low as two-thirds of the value of the winning bid, but it never had success with Petrobras until it was contacted by [José] Janene," a black-market money launderer who facilitated cartel bribes to Petrobras executives.  At a meeting at Fonseca's house in 2010, Janene informed Fonseca "in a very truculent way . . . that *to be able to win contracts, he would have to pay*."  Once Fonseca started paying the bribes, Galvão's bids "started getting approved." According to Fonseca's testimony, the contracts Galvão won from Petrobras after the alleged bribe payments included projects as large as R$2 billion to R$3 billion (approx. $1.1 billion to $1.7 billion), such as construction contracts at Abreu.

125.     This "rule of the game" applied to non-cartel members as well, who were also forced to include a 3% "bribe fee" in their contracts with Petrobras.  Indeed, as multiple

witnesses have testified, those bribes were standard operating procedure for Petrobras and were a

"mandatory" part of nearly every Petrobras contract executed before and during the Relevant

Period.  Youssef testified, for example:

> **JUDGE:**  Can you enlighten me, you yourself mentioned that you were a part of some of those meetings to define those . . . this percentage.  What was the . . . ?  How was that negotiation?  What was the company's gain?  How would they gain, making that payment of 1%, for instance?
>
> **ALBERTO YOUSSEF:**  The truth of it is, they would win the work.  If they didn't pay, . . . *they wouldn't get the work if they didn't pay*.

126.    The payment of those massive bribes was well-organized.  Mendonça Neto stated

that once a cartel member was chosen for a project, it would arrange for the payment of bribes

through Youssef.  Mendonça Neto  further explained that "[a]fter we agreed on an amount, dates

of payment, [Youssef] would arrange things and he would intervene if there were any problems,

delays, things like that" for bribes funneled to Costa.  According to Mendonça Neto, bribes paid

to Duque were discussed directly with Costa, the Director of Supply, and the "payments were

made either as deposits in an account abroad or in cash here in Brazil."

127.    Additionally, Barusco maintained a spreadsheet that detailed the payment of

bribes in connection with some of Petrobras's key refinery projects, including Abreu and

Comperj.  As explained above, the conspirators would allocate a specific percentage of each

contract among (i) the "house," or "casa," which referred to Petrobras executives and included

Duque, whom Barusco nicknamed "MW" or "My Way" (after the Frank Sinatra song); and (ii)

the political parties that participated in the scheme.  As reflected in Barusco's spreadsheet, which

featured a column delineating the percentage to be paid as a bribe (the "%" column), the scheme

impacted billions of dollars in Abreu contracts alone.

128.    The spreadsheet also reflects the payment of bribes to Sete Brasil chairman Joao Ferraz (who was referred to as "Mars" or "Marshall") and Barusco, who used the name "SAB," a reference to his girlfriend Sabrina.

129.    Barusco provided another spreadsheet to authorities reflecting that payments from the Jurong Shipyard totaled millions of dollars per month and continued until at least 2014. Indeed, in a February 21, 2015 article in the Brazilian publication *Veja*, Ricardo Ribeiro Pessoa ("Pessoa"), the jailed president of construction company and accused cartel participant UTC, explained that UTC had illegally funneled R$30 million (approx. $10.5 million) as part of the Petrobras bribery scheme to President Rousseff's reelection campaign in 2014 alone.

130.    According to Costa, the cartel was able to operate in secret for so long because of the tremendous power the "political agents" had over the fate of Petrobras's suppliers.  As Costa explained, there was "never, never" an instance where a cartel member refused to pay the illegal bribes because:

> [if the cartel member] did not contribute to a certain political party at that time, this would be reflected in other works at the government level, and the political parties would not look kindly to this . . . . If you create a problem on one side, it can create a problem on the other.  So in my time there, I do not remember any company that failed to pay.  There was, there were some delays, by cartel companies, *but they never failed to pay*.

131.    The bulk of the illicit bribes paid by Petrobras's outside contractors were directed to the coffers of the political patrons of Petrobras executives.  Each member of the Executive Directorate was hand-picked by Brazil's ruling political parties.  In exchange for that appointment, according to the testimony of Costa and others, Petrobras's Directors and outside contractors were supposed to direct substantial contributions to those political parties in connection with each contract.

-43-

132.     As Costa explained, Petrobras's senior managers—including Costa, Duque, Foster, and Gabrielli—owed their jobs to the politicians and political parties that had appointed them:

> Other departments such as gas and energy and exploration and production, were also PT [Workers Party], so there was PT in the exploration department, PT in the gas and energy department and PT in the service department.  So the comment in the company is that in this case the 3 percent went direct to the PT, PP [Progressive Party] did not participate in that because they were departments nominated for both execution of services and for business, PP with PT.  So what happened within the company was that the total amount would be fully for PT.

133.     Highlighting the role of different political patrons for different divisions, Costa further testified:

> The international department senior management was appointed by the Democratic Movement Party of Brazil (PMDB), so they also had funds which were passed on to the PMDB.

134.     Costa also testified that it was clear to all parties involved that enormous bribes were being directed specifically to fund politicians and political campaigns:

> **YOUSSEF'S DEFENSE LAWYER:**  The companies knew that these monies, this money that was being paid, was also going to a public agent?

> **PAULO ROBERTO [COSTA]:**  Yes.

> **YOUSSEF'S DEFENSE LAWYER:**  They knew for sure that the money was going to finance politicians and political campaigns.

> **PAULO ROBERTO [COSTA]:**  Of course.  Yes, the answer is yes.

> **YOUSSEF'S DEFENSE LAWYER:**  That is, this scheme (please forgive me for using this word but it has been used here) of bribery was also used to finance Brazilian politicians and the politicians' campaign scheme.

> **PAULO ROBERTO [COSTA]:**  The answer is yes.

135.     Barusco testified that "the payment of bribes and their amounts intensified with the increase of the billing of Petrobras, the increase of prices that were charged by the companies and the high demand of the company."  For example, in 2003 (when Barusco was hired as the

Technology Manager of Petrobras's Board of Exploration and Production) the Services Division managed and made around $3 billion per year.  By 2011 (when Barusco was Executive Manager of Engineering reporting to Duque), the Services Division was earning that amount *per month*, leading to a "proportional" and "mathematical" increase in the size of bribes he and other Petrobras executives received.

136.    Indeed, Barusco testified that he and Duque received bribes "between $40 to $50 million dollars" in connection with "90 (ninety) PETROBRAS contracts" between 2003 and 2013.  Those contracts included $3.9 billion in contracts for the UHDT Hydrotreatment Unit for Abreu, in which cartel members Odebrecht and OAS participated.  As Barusco explained, because Duque was "disorganized" and "worried that he might be caught," Duque assigned Barusco to act as an "accountant" charged with "manag[ing]" the amounts "owed" by the "hard core" construction companies that made up the cartel.  According to Barusco, Duque required him to deliver R$50,000 (approx. $21,500) in cash to Duque's home every two weeks—amounts that were deducted from the bribes Barusco received while he was at the Company.

137.    As confirmed in testimony provided by former Petrobras executives and other cartel members, the bribery scheme continued throughout the Relevant Period, and bribes were paid to Petrobras executives even after they left the Company.  For example, Barusco detailed how he continued to receive bribes after he left the Company in 2011 to become Chief Operating Officer of Sete Brasil, a company formed to provide leasing services to Petrobras.  Barusco worked with his replacement at Petrobras, Roberto Gonçalves, to continue the bribery scheme.  Barusco testified that as COO of Sete Brasil, he helped it obtain 28 contracts with Petrobras for the service and construction of drilling rigs in six shipyards in Brazil.  As in his role at Petrobras, Barusco was also charged with facilitating the payments of bribes to politicians and Petrobras

executives under those 28 contracts, which had a total value of approximately $22 billion.  As

Barusco testified, while certain amounts varied, approximately 1% of the value of those contracts

was to be paid as bribes, with (i) two-thirds of the 1% amount going to the treasurer of the

Workers Party, João Vaccari Neto, and (ii) one-third divided between recipients in "House 1"—

which consisted of Duque and Barusco's successor at Petrobras, Gonçalves—and those in

"House 2," which consisted of Barusco and other Sete Brasil executives.

138.    According to Costa and other witnesses, numerous directors throughout the

Company received kickbacks as a result of the scheme, and "everyone" at the Company knew it:

> **JUDGE:**  This, let's say, this cartelization and this payment of 3% also existed in
> the other boards?
>
> **PAULO ROBERTO [COSTA]:**  Yes.  Correct.
>
> **JUDGE:**  Do you know whether other directors, like you, also received amounts?
>
> **PAULO ROBERTO [COSTA]:**  Yes, within the service area there was the
> director Duque, who was appointed at the time by the Minister of Civil Affairs,
> José Dirceu, right?  And he had this connection with João Vaccari [Neto] within
> PT [Workers' Party] process.  Within the International Board of Directors, it was
> Nestor Cerveró, who was appointed by a politician and had strong ties with the
> PMDB [Partido do Movimento Democrático Brasileiro (Brazilian Democratic
> Movement Party)].
>
> **JUDGE:**  But do you know, for example, whether Mr. Nestor Cerveró and Mr.
> Renato Duque also personally received amounts?
>
> **PAULO ROBERTO [COSTA]:**  *Well, this was talked about within the company
> and it was clear that yes they did.  Yes, the answer is yes.*

139.    Barusco echoed those sentiments, stating bribery and corruption were "endemic"

and "institutionalized" at Petrobras.

140.    In all, the "bribe fee[s]" kicked back to Petrobras executives and government

officials—amounting to up to 3% of Petrobras's contracts—totaled billions of dollars.  Indeed,

on April 22, 2015, Petrobras reported a writedown of more than $2.5 billion attributed to such

bribes.  As detailed below, however, even that grossly understated the true financial impact of the fraud.

### C.    The Company's Senior Officers Orchestrated and Covered Up the Scheme.

141.    The massive and elaborate scheme detailed above was perpetrated through the extensive efforts of Petrobras's Executive Directorate to conceal the existence of the bid-rigging and bribes.  The cover-up goes back for years.  Indeed, several members of the Executive Directorate—including Costa, Cerveró, and Duque—were personally involved in and profited from the kickback scheme.  Additionally, Foster, Gabrielli, and Barbassa, who served side-by-side with those Directors, each collaborated in the conspiracy to cover up Petrobras's longstanding fraud.

142.    Members of Petrobras's Executive Directorate—including Foster, Gabrielli, Costa, and Barbassa—were intimately involved in the fraud alleged in this Complaint, and silenced employees who threatened to disclose it, including Velosa, a Petrobras executive from 1990 to 2014 who reported directly to Foster and Costa during the Relevant Period.

143.    On December 12, 2014, Velosa appeared on a Brazilian weekly TV news show (*Fantástico*).  That same day, Brazil's premier business newspaper, *Valor*, published an extensive interview referring to "hundreds of internal documents" Velosa provided to the newspaper.  In those interviews, Velosa described in detail her discovery of significant "irregularities" at Petrobras and how she reported those red flags to Foster, Gabrielli, Costa, Duque, and others in 2008 and 2009 before being silenced.  Velosa's warnings describing telltale signs of fraud and asset misappropriation are documented in contemporaneous emails and other documents that have been provided to Brazilian federal prosecutors.

144.    Velosa had held various positions at Petrobras from 1990 until November 2014, most recently as the managing director of subsidiary Petrobras Singapore.  In 2008 and 2009,

Velosa was an executive manager under Costa, where her division was responsible for budgeting and evaluating the economic viability of Downstream projects.  Velosa also interacted regularly with Foster.  Specifically, Velosa stated to *Fantástico*, "[W]e always had a lot of access.  I knew Graças [Foster] when she was manager of technology, in the gas sector; I was manager of the contract management sector.  We were close."

145.     As reported in *Valor*, in 2008 Velosa led an internal audit of the Downstream Division's communications section and discovered extensive fraudulent billing practices.  Velosa provided significant information to Gabrielli and Foster detailing the impact of the overbilling practices and made clear that the overcharges could only have been the result of fraud.

146.     Further, Velosa informed both Gabrielli and Foster about problems with bidding relating to the construction of Abreu, including payments for services that were never rendered.  Velosa testified to the Brazilian Federal Police that her team performed a comparative study examining the cost increases at Abreu to projects in the rest of the world, which revealed "prices for equipment that were four times higher than for the same equipment abroad."  Similarly, Velosa's team discovered that work on an earthmoving contract that was supposedly complete had not in fact been done.  Velosa explained "there were always gaping holes."  According to *Valor*, a Petrobras internal document shows that Velosa made 107 "Project Change Requests," which would have saved R$947.7 million (approx. $436.3 million) in Abreu alone; none of those requests were implemented.

147.     Most significantly, Velosa criticized Petrobras's procurement model, which allowed for significant projects to be contracted out without a bidding process.  According to Velosa, that model often benefited members of the cartel.

148.     Velosa testified that she reported those and other problems to Duque and Costa (including via emails), but no actions were ever taken.  Usually, Velosa was told to proceed as instructed, even when a project would generate a loss for the Company, as with Abreu.  In one instance, as Velosa told *Fantástico*, Costa confronted her after she raised her concerns.  Costa "pointed towards Gabrielli's [office] and asked: 'Do you want to bring down everybody?'" According to Velosa, she responded, "Look, I have two daughters.  I need to put my head onto [my] pillow and be able to sleep.  And the next morning, I have to look them in the eye without feeling embarrassed."

149.     Velosa also told *Fantástico* that she personally met with Foster to discuss those issues and other identified irregularities:

> [I]n 2008, as an executive manager, *I informed . . . the director at the time, Paulo Roberto Costa.  I informed other directors, like Graças Foster.*  And, at a different time, as a general manager, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my executive manager at the time.  I informed director Cosenza, in his position as director, since he was my peer, and as executive manager.  *I informed president Gabrielli.*

150.     In April 2009, Velosa prepared a memorandum outlining the details of the misappropriation of funds that her team had uncovered in its audit of various projects, which she intended to circulate to senior management.  On April 3, 2009, Velosa asked Foster, who at the time was Petrobras's Director of Gas and Energy, to review the memorandum.  Velosa's email stated:  "I would like to have your opinion on a final text that I need to forward.  Can I leave it for you to read?  You know about the matter.  Feel free if you feel better not reading it.  *I await your response to leave or not the material with your secretary.*"  Foster did not reply.

151.     Hearing nothing from Foster, Velosa circulated her "Internal Document of the Petrobras System," which concluded that "administrative irregularities" existed in the communications unit of the Downstream Division, to the board of directors.

152.    Velosa also made recommendations for improving Petrobras's governance practices going forward.  For example, Velosa testified that she explained to her superiors that there was a need for a responsibility matrix and fixed milestones.  Those ideas were presented to Gabrielli, Duque, Costa, Foster, and other members of the Executive Directorate, but the proposed model was never adopted.  According to Velosa, no reasons were provided for not adopting her recommendations.

153.    After reporting the above irregularities and making those recommendations, in October 2009 Velosa was transferred to Petrobras's Singapore office.  No reason was provided to her for transfer and, when she arrived, she was asked not to work and advised to take a training course.

154.    Velosa reiterated her concerns about the Downstream Division in an October 7, 2011 email to Foster, stating, "*From the immense pride that I had for my company, I started to feel ashamed*."  She continued, "what happened in the [] (the Downstream department) in the area of communications and projects was absolute nonsense."  In the email, Velosa explicitly noted that part of the documentation showing the irregularities was already in Foster's possession:  "*There are alternatives I'm evaluating despite fears of risking myself and my daughters.  I would like to present to you part of the documentation that I already have.  Part of it, I know you are already aware of.  I would like to hear from you before taking the next step*."

155.    While in Singapore, Velosa continued to report irregularities to her superiors, including significant issues with the Company's purchases of fuel abroad.  Velosa reported those additional irregularities to Foster in an email.

156.    Finally, as *Valor* put it, on November 19, 2014, "after making hundreds of warnings and recommendations on money misappropriations in the company, [Velosa] was

ousted by the current management without being informed the reason, along with several employees suspected of being involved in Operation Car Wash."

157.    As *O Estado de Sao Paulo* reported in a December 17, 2014 article, a day after her dismissal, Velosa wrote Foster one last time:

> Since 2008 my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [Division].  By fighting it, I was threatened and harassed**.**  *I even had a gun pointed to my head and received threats against my daughters*."  [Velosa] did not detail in the email to Ms. Foster what happened, but she had a gun pointed to her, in the neighborhood of Catete, in Rio de Janeiro.  They did not take a penny, but there was a recommendation that she should be quiet.

158.    Velosa's email concluded, "I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting.  *I presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain*."

159.    Velosa was not the only Petrobras employee who objected to the Company's improper practices and was dismissed or demoted for her efforts.  On January 7, 2015, Brazilian Federal Prosecutors deposed Fernando de Castro Sá (defined above as "Fernando"), a lawyer who worked in Petrobras's Supply Division and regularly interacted with Duque and Gabrielli during the Relevant Period.  During the interview, Fernando, who holds a master's degree in international trade law from the University of California, described in detail his discovery of significant "irregularities" at Petrobras and how he reported them to Gabrielli, Costa, Duque, and others in 2008 and 2009 before being silenced.

160.    Fernando drafted a legal opinion in early April 2009 concluding that Geovane de Morais ("Morais"), the director of the communications sector, should be terminated following Velosa's internal inquiry, which determined that Morais was responsible for improper payments in the Communications Department of the Downstream Division.  Later that month, Fernando's

superior, Nilton Maia ("Nilton"), informed Fernando that he had received a call at home from Duque and Gabrielli regarding the Morais opinion.  Nilton stated that Gabrielli was very angry about the opinion.  According to Fernando's testimony, Petrobras's senior management determined that "the legal department [would] give an opinion revising the previous opinions" concerning the findings of improper payments.

161.    Fernando also testified that in early 2008, as a result of the comparative study conducted by Velosa's team regarding Abreu's expanding costs, he spearheaded an effort to convince the board of directors to adopt a systematic procurement model similar to the international benchmark, or EPC, model.  The EPC model contained certain key elements that would help address the deficiencies identified in Velosa's study, such as a "single point of responsibility" clause and non-extendable milestones.  Although the board approved the adoption of the EPC model promoted by Fernando on March 8, 2008, the Services Division, which was responsible for overseeing procurement contracts, continued to use the previous procurement model over Fernando's objection.

162.    When Fernando complained about the Services Division's refusal to follow the board-approved policy, Gabrielli and other senior Petrobras managers retaliated against him and destroyed the evidence of improper practices he uncovered.  Fernando testified that when he questioned contract terms for Abreu, the Petrobras committee responsible for approving them pointed to guidelines established by ABEMI, a lobby group for the Brazilian industrial engineering industry that included multiple significant cartel members.  After being repeatedly told that numerous unfavorable contract terms would not be changed despite his objections, Fernando complained to his superiors that ABEMI was in fact dictating the contracts.  Even though Fernando was "very frightened by . . . what [he] was discovering," he received approval

from Nilton to draft up a report to document his concerns.  On July 8, 2009, Fernando met with Nilton to discuss his findings, and Nilton told him:  "This is the deal, I do not want to see [the report].  You are already out of here.  And it won't help to talk to anyone because I already talked to the president [Gabrielli] . . . I have spoken with the director [Costa] and director Duque."

163.    Soon after, Fernando was transferred to a small, isolated office in the International legal department, with no computer and without any work to do; his salary was decreased; and his former colleagues were instructed not to speak with him.  Most importantly, Fernando's new role did not involve any interaction with outside contractors.  When asked during his deposition who was responsible, Fernando replied, "I was told that Gabrielli wanted my resignation, Duque too."  Fernando further testified that on September 2, 2009, Fernando was informed by a Petrobras executive that a committee set up to investigate his complaints regarding ABEMI "had not established anything, that [the executive] was erasing all documents in the system relating thereto and that he would keep the physical documents."

164.    Petrobras also took steps to remove the Company's critics from positions of power where they could uncover the truth about the Company's practices.  For example, Mauro Cunha is one of the three independent members of the Company's board of directors.  He has represented minority investors on Petrobras's board beginning in 2013 and was a vocal critic of the pro-government policies of the Company.  In early 2014, Cunha was on the Petrobras Audit Committee investigating the Company's actions in acquiring the Pasadena Refinery and constructing Abreu and Comperj.  According to a March 18, 2014 Dow Jones article titled "Board Member of Brazil's Petrobras Voted Against 2013 Financial Report," during a February 25, 2014 board meeting, Cunha rejected the Company's 2013 earnings reports because "he didn't

have enough time to analyze the firm's finances and [] there was insufficient information and 'apparently inadequate' accounting of the firm's investments in refineries."  According to a February 6, 2015 Bloomberg article, Cunha complained about Petrobras's conduct to the CVM, Brazil's securities regulatory agency.  Cunha sent a letter to the Brazilian regulator following the February 25, 2014 meeting, stating, "They [Abreu and Comperj] are among the world's most expensive refineries . . . . I'm not comfortable with the absence of impairment."

165.    During an April 25, 2014 meeting, the board removed Cunha from the Audit Committee without any explanation.  According to an October 20, 2014 Bloomberg article titled "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," Cunha has lodged a complaint with the CVM questioning his removal and the independence of the Petrobras Audit Committee. In response, Petrobras filed a complaint with the CVM against Cunha regarding statements he made in his capacity as Head of the Brazilian Association of Capital Markets incriminating Petrobras's management team.

**D.**    **"Operation Car Wash" Has Elicited Extensive Testimony and Documentary Evidence Demonstrating How the Scheme Worked.**

166.    In addition to the Company's admissions concerning the falsity of its financial statements, multiple Petrobras executives and cartel members have pled guilty to corruption and provided extensive testimony explaining how the kickback scheme worked.

**1.**    **The Mechanics of the Scheme**

167.    According to Brazilian prosecutors, their initial focus was on investigating money laundering by Youssef, a convicted career criminal who was known as the Brazilian black market's "central banker."  Operation Car Wash got its name from the fact that most of the stolen money was laundered through a network of gas stations and car washes.

168.    According to press reports, Petrobras's scheme was only uncovered when investigators discovered Costa's name in the thousands of documents authorities had compiled through their investigation.  Specifically, investigators noticed that Costa's name appeared together with the name of career criminal Youssef on a proof of address form submitted in connection the purchase of a R$250,000 (approx. $110,000) Range Rover Evoque.  As the *Financial Times* explained, that discovery led to Costa's arrest on March 20, 2014, when Brazilian federal authorities raided his home and seized assets, including R$6 million in cash, 25 luxury cars, and the Range Rover.  According to court records, when the Brazilian Federal Police conducted the raid on Costa's home, a security camera caught his two daughters and their husbands stuffing suitcases and bags with cash, incriminating documents, and a laptop, all of which they hoped to hide from the police.

169.    Although Costa initially denied the charges, claiming in a June 2014 appearance before a Parliamentary Commission of Inquiry that he "vehemently den[ied] that there was a criminal organization in Petrobras," he ultimately struck a plea deal with prosecutors.  As part of the deal, Costa provided 42 hours of sworn video testimony in which he described how he and numerous Petrobras senior executives pocketed hundreds of millions of dollars through the decade-long criminal scheme.  Arrests and plea bargains by other culpable individuals quickly followed.

170.    In testimony to the Brazilian federal court, Costa testified that for at least seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and then used the money to "bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."  Costa noted a number of construction companies that belonged to the cartel,

including Odebrecht and Camargo Correa S.A., and detailed the role of politicians in accepting bribes linked to Petrobras contracts.  Those bribes, of which Costa personally received tens of millions of dollars, were known as a "three percent political adjustment."  In the criminal case against Costa, Brazilian prosecutors emphasized there was "evidence of fraud, overpricing and kickbacks" in at least seven contracts.  One such contract, for a R$3.4 billion Brazilian coking unit, reflected overpricing and overbilling of as much as R$446 million.

171.    Further testimony from Costa and Barusco revealed the details of secret bank accounts used by Petrobras to receive bribe payments from the cartel companies.  Costa admitted that he held numerous overseas bank accounts and testified that almost all the funds deposited in his Swiss accounts originated from Odebrecht.  Barusco similarly acknowledged his own secret accounts in Switzerland, which housed kickbacks of about $97 million.

172.    Through its investigation, the Brazilian Federal Police also discovered secret bank accounts maintained by Duque and Cerveró and evidence of millions of dollars in transfers from cartel members, such as Mendes Junior, Setal, MPE, Engevix, Galvão, and OAS, to accounts controlled by money launderer Youssef.

173.    Following Costa's testimony, the Brazilian Federal Public Prosecutor's Office filed a complaint against him and nine others on December 11, 2014 (as identified above, the December 11 Prosecutor's Complaint).  The December 11 Prosecutor's Complaint summarized the course of Operation Car Wash:

> During the operation "BIDONE" investigations, it was found that the criminal organization led by ALBERTO YOUSSEF was also active in offences against the civil service within and against PETROBRAS.  Thus, the criminal lawsuit [] was proposed through which it was charged against PAULO ROBERTO COSTA, former supply director at PETROBRAS, for money laundering crimes against the Civil Service and participating in the criminal organization led by ALBERTO YOUSSEF, *based on evidence of overpricing at the Delayed Coking Unit at the Abreu e Lima Refinery in Pernambuco*, charged to the CONSORCIO

NACIONAL CAMARGO CORREA, led by contractor CAMARGO CORREA
S/A.

\*     \*     \*

The existence of a *large criminal scheme* was revealed including crimes against
the economy, corruption and money laundering, and the establishment of a large
and powerful cartel with participating companies OAS, ODEBRECTH, UTC,
CAMARGO CORREA, TECHINT, ANDRADE GUTIERREZ, MENDES
JUNIOR, PROMON, MPE, SKANSKA, QUEIROZ GALVÃO, IESA,
ENGEVIX, SETAL, GDK and GALVÃO ENGENHARIA.  This scheme enabled
rigging the competitive bidding processes regarding the major works contracted
by PETROBRAS between 2004 and 2014, largely increasing the profits of these
companies in hundreds of million [reais].

(Emphasis in original.)

174.     The December 11 Prosecutor's Complaint further summarized the "large criminal

organization," which operated "from 2006 until at least November 14, 2014":

- The "first nucleus" consisted of executives at Petrobras's outside contractors,
  which "was geared to commit cartel and bid rigging crimes against
  PETROBRAS, to corrupt its officers and launder assets received as a result of
  these crimes."

- The "second nucleus" consisted of Costa and Duque and "other top level
  PETROBRAS employees," who "assist[ed]" the "first nucleus" in
  "conduct[ing] the offences of cartel and bid rigging."

- The "third nucleus" consisted of Youssef and "other operators, who enabled
  the payment of undue advantages to the members of the second nucleus, as
  well as asset laundering that were the result of crimes committed by the entire
  criminal organization."

175.     Documents and testimony made public as part of Operation Car Wash contain

copious details regarding the fraud.  Indeed, the contracts that Costa, Barusco, Mendonça Neto,

and Camargo testified were used to funnel bribes to Petrobras executives—including those

involving contracts at the Pasadena Refinery, Comperj, Abreu, and SBM—are the same projects

Petrobras repeatedly claimed were awarded based on a bidding process that "strictly" complied

with the law, were free of any "irregularities," and were accurately reflected in the Company's financial statements at "absolutely true and legitimate" values.

176.    On January 27, 2015, after a two-month delay, Petrobras released incomplete and unaudited third-quarter 2014 financial statements.  Notably, those financial results did not contain the expected writedowns because *the scope of the fraud was too vast for the Company or its auditors to estimate*.

177.    Following the Company's January 27, 2015 disclosures, events continued to unfold that confirm the immense scope of the underlying fraud, the continued political abuses and corruption plaguing the Company, and the fallout for investors.

178.    On February 4, 2015, Foster, Barbassa, and four other executives (constituting nearly all of the Executive Directorate) left the Company due to the corruption scandal.  At first, the departures were well-received by the market, as investors hoped Petrobras's management would be independent of political pressures.  But on February 6, 2015, President Rousseff signaled she would maintain tight control over the Company by appointing a confidante, banker Aldemir Bendine, as the new CEO of Petrobras.  According to Reuters, investors then became concerned that "the government appointed [Bendine] to limit the political fallout from a writedown rather than clean out dead-wood in the company's accounts."

179.    On February 13, 2015, Bloomberg reported that Brazil's Federal Attorney General was granting leniency to at least eight contractors implicated in the bribery scheme "to prevent a slowdown in infrastructure work that could derail efforts to revive the economy." According to the article, by admitting guilt and repaying graft money, companies would avoid being declared unfit to bid for public contracts or take loans from public banks.

180.    On February 20, 2015, the Brazilian federal prosecutor's office filed lawsuits against six members of the cartel (Camargo Corrêa SA, the Brazilian unit of Japan's Sanko Co Mendes Junior Engenharia SA, OAS SA, Galvão, and Engevix Engenharia SA), seeking R$4.47 billion ($1.55 billion) in damages in connection with contract-fixing, bribery and political kickbacks at Petrobras.

181.    Following dozens of indictments and arrests of Petrobras and cartel executives over the previous couple of months, on February 24, 2015, Brazil's Attorney General filed criminal charges against Cerveró, accusing him of money laundering and criminal conspiracy for scheming with a lobbyist and the head of a Uruguay-based company to hide bribes, in part through the purchase of a R$7.5 million ($2.6 million) apartment.

182.    On the same day, Moody's slashed Petrobras's debt rating to Ba2, or junk status, and signaled that more downgrades might come in the future.  *The Wall Street Journal* reported that the size and timing of the downgrade not only "surprised" analysts "and sent the country's leaders into a defensive crouch," but was "an unequivocal blow" to President Rousseff's administration.

183.    On March 3, 2015, Brazil's head of Federal Public Ministry ("MPF") called on Brazil's Supreme Court to open an expansive new phase of the Petrobras investigation, looking into the actions of 54 people, the majority of whom are said to be high-ranking political figures.

184.    On March 4, 2015, the *Financial Times* reported that the Brazilian Attorney General sought the Brazilian Supreme Court's approval to investigate 28 cases involving 54 people, in connection with the Petrobras corruption.

185.    On March 5, 2015, new sources reported that the Brazilian Congress, as part of its corruption probe into Petrobras, called Barusco to testify.  Barusco testified that he used several

bank accounts in Switzerland to launder the $100 million in bribes he received as part of the

Petrobras graft ring.  Based on the amount he received, Barusco estimated that Brazil's ruling

Workers' Party received as much as $200 million in bribes.  He said he started receiving bribes

from some of the country's top construction firms 18 years ago, as early as 1997, but by 2003

and 2004, the bribes became more "institutionalized."

186.     On March 10, 2015, *The Wall Street Journal* reported that, while testifying at the

CPI, Barusco said that the practice of taking bribes became widespread and institutionalized by

2003 or 2004, with Barusco himself amassing nearly $100 million in bribes as part of the

scheme.

187.     On March 11, 2015, Brazil's Office of the Comptroller General, the CGU, said it

opened a case (beyond the eight core cartel members) against 10 additional construction firms

with ties to Petrobras.

188.     That same day, Braskem S.A. ("Braskem"), Latin America's largest

petrochemical producer, whose shares trade on the NYSE, suffered its biggest intraday drop in

20 years, plunging as much as 21% following the release of testimony from Costa and Youssef

confirming that Braskem made "under-the-table payments" to Petrobras in exchange for

contracts.  Costa testified that the bribes, which amount to at least $5 million annually from 2006

to 2012, were first discussed with Braskem executives and then ratified by former CEO Jose

Carlos Grubisich.  Barbassa had served together with Foster and Costa on the Braskem board of

directors, resigning from that position on February 6, 2015.

189.     On March 15, 2015, an estimated one million Brazilians marched in the streets of

22 Brazilian states to protest the government's involvement in the Petrobras corruption scandal.

The protesters called for the impeachment of President Rousseff and expressed their belief that

she must have known about the corruption scandal at the heart of the Company whose board she sat on for many years.

190.    New arrests in the Petrobras scandal followed.  On March 16, 2015, Duque was arrested by Federal Police for the second time as part of the investigation into Petrobras and was formally charged with the crime of money laundering.  Federal prosecutor Deltan Dallagnol stated:  "This is a sophisticated and complex money-laundering scheme that was conceived to give the appearance of legality to money with illegal origins . . . . These resources weren't illegal just because they were bribe payments but because they were the product and fruit of fraudulent bidding processes and the crime of price-fixing."

191.    Also that day, one of President Rousseff's trusted advisors was implicated in the scandal, as Brazilian prosecutors formally charged the treasurer of the ruling Workers' Party, Neto, with corruption and bribery in connection with the graft scheme at Petrobras.  According to federal prosecutor Dallagnol, Neto worked with Duque to ensure the "donations" comprised of illegal bribe funds were deposited into bank accounts for use by the Workers' Party.  Further, Barusco has told investigators that the Workers' Party received as much as $200 million in "donations" taken from bribes related to Petrobras contracts.

192.    In all, by March 17, 2015, the corruption probe at Petrobras had already led to over 40 indictments on racketeering, bribery, and money-laundering charges, with prosecutors asking the Supreme Court to investigate 34 sitting politicians, including the speakers of both houses of Congress, for allegedly receiving bribe money.

193.    On March 18, 2015, the Attorney General of Switzerland announced that Switzerland had frozen *$400 million* in assets linked to the Petrobras scandal.  According to a Bloomberg report, more than 300 Swiss bank accounts at 30 different banking institutions were

used by senior Petrobras executives, suppliers, financial intermediaries, and cartel companies to process bribery payments.

194.    By April 15, 2015, the scandal grew further as authorities in Brazil formally arrested Neto.  In a second wave of protests against Petrobras and corrupt government officials, hundreds of thousands of Brazilians once again called for President Rousseff's impeachment.

195.    On April 22, 2015, Petrobras announced it had taken a $2.527 billion dollar write-off of capitalized costs "representing amounts that Petrobras overpaid for the acquisition of property, plant and equipment in prior years."  Petrobras stated it "believes that under IAS 16, the amounts it overpaid pursuant to the payment scheme should not have been included in the historical costs of its property, plant and equipment" and "should not have been capitalized as property, plant and equipment."  The Company discussed the methodology it undertook to estimate the necessary write-off, explaining that it (i) identified the suppliers and contractors implicated in the scheme; (ii) determined that the scheme was operating from 2004 to 2012; (iii) identified all contracts and supplemental contracts entered into with the implicated parties and determined the PP&E related to those contracts; (iv) calculated the total value of the contracts with the implicated parties; and (v) applied a fixed 3% to the total value of the contracts with the implicated parties.  Petrobras then wrote off the resulting amount.  The Company stated that "because it is impracticable to determine the period-specific effect in each prior period," it recognized the write-off in the third quarter of 2014.

196.    In further explaining the methodology used to arrive at the $2.527 billion write-off, Petrobras acknowledged that "the difference between the fair value and the carrying amount of those assets [affected by the bribery scheme] would conceptually be attributable to improper payments."  However, because it deemed the "shortfall between the fair value and the carrying

amount of those assets" to be "significantly larger than any reasonable estimate of the improper payments uncovered in the context of the Lavo Jato operation," Petrobras "concluded that using the fair value as a surrogate or proxy to adjust its [PP&E] would not have been appropriate." Instead, the Company employed the methodology described above, which resulted in a significantly smaller write-off than that suggested by the fair-value figures.

197.    Petrobras also announced on April 22, 2015 that it was taking a pre-tax impairment charge of $16.695 billion, of which $11.662 billion related to Abreu and Comperj. Petrobras asserted that the impairment charge was necessitated by "the postponement of these projects for an extended period of time as a result of the Company's measures to preserve cash and of the implications to the Company's suppliers of the 'Lava Jato' investigation."  Petrobras's recognition of the impairment charge, in addition to the $2.527 billion write-off specifically for the bribes, confirms that the Company's fraudulent scheme had two components:  (i) a 3% bribe to be kicked back to Petrobras executives and government officials, and (ii) a 20% premium to be paid to the cartel in exchange for the cartel's services.

198.    Before the Company's announcement of the write-off and impairment charges, members of Petrobras's board of directors and Fiscal Council expressed skepticism regarding the proposed impairment charge and the methodology applied to calculate the charge.

199.    In advance of the April 22, 2015 announcement, Petrobras's Fiscal Council met to approve the Company's 2014 annual report, balance sheet, and other financial statements. Despite dissenting votes by Reginaldo Ferreira Alexandre ("Ferreira") and Walter Luis Bernardes Albertoni ("Bernardes"), the five-member Fiscal Council concluded that the "documents provided are appropriate to be appreciated by the General Shareholders' Meeting of Petrobras."  Ferreira and Bernardes explained their dissenting votes, stating:

Facts disclosed due to the start of Operation Lava Jato offered strong evidence that the financial statements of 2013 included amounts that did not accurately represent the company's financial status, especially regarding amounts for fixed assets.  These facts, added to the large differences between the costs of RNEST and Comperj projects and international metrics, were evidenced with the independent evaluation contracted by the former Executive Directors to analyze the assets that were impacted with corruption claims.  The volume of the difference between fair value and book value made it clear that there was something very wrong with the parameters that have been used by the Company to perform asset impairment tests.

Ferreira and Bernardes further stated:

In our opinion, records proposed for the assets related to Operation Lava Jato, as result of the impairment tests, are disconnected from the effective realizable values.

Specifically, we were informed that refinery assets suffering losses are limited to the RNEST (Trem 2) and Comperj projects, and this is because of the decision by the executive directors to postpone such investments.  That is, losses were arising, basically, out of this (recent) decision, and not (apparently) as consequence of impropriety due to corruption acts, cartel, undue overpricing and ineffectiveness.

As noted above, values recorded now show significant differences when compared to those found by independent evaluators, evidencing the discrepancy between this independent evaluation and the values proposed by the management.

200.    As reported in an April 28, 2015 *Wall Street Journal* article, Monforte, Cunha, and Sinedino—the three independent members of Petrobras's board—"strongly criticized the company's calculations of its 2014 financial results before the firm's earnings were released." The independent board members said they were given *less than two hours* to review 319 pages of documents prior to the Board's vote on the sufficiency of the combined R$50.8 billion ($17 billion) writedown and impairment charges intended to account for the long-running bribery and price-fixing scheme.

201.    Monforte stated "[t]his effort . . . fell short of what full due diligence would require on my part, especially given the need for recovering the company's credibility," and he abstained from voting.  According to Monforte, he did not have enough time to make an

informed decision.  Cunha was likewise critical of the lack of time to review the necessary

documents and criticized the methodology Petrobras had undertaken to calculate the asset

impairment, stating the charge only partially reduced the substantial overvaluation of the

refineries on the Company's books.  Sinedino similarly found fault with the Company's

methodology for calculating the impairment, noting that a portion of the Abreu refinery was not

even included in the impairment charge.  Cunha and Sinedino voted against the proposed

financial statements while all of the board members selected by the government voted to approve

the financials.

202.    Appended to the minutes from the April 22, 2015 board meeting is Cunha's

explanation of his rationale for voting against approval of the financials.  Cunha stated he met

with Petrobras's management on March 18 and April 9, 2015 to discuss the approach that would

be applied in preparing the financial statements but that "such meetings were not sufficient to

convince me that Petrobras' balance sheet reasonably reflects the Company's economic and

financial reality."  Turning to the asset-impairment test, Cunha stated:

> Last year, I presented my opinion on the "apparent inadequacy of the investments
> accounting in refineries."  I reaffirm my vote this year.
>
> The facts publicly disclosed on 2014 and 2015 confirmed that the financial
> statements of 2013 presented inadequate amounts on its fixed assets.  Besides the
> information on 'Operacão Lava Jato' and high discrepancies between RNEST and
> Comperj project costs and international metrics, we acquired more evidences
> from the problem the independent evaluation retained by the Executive Board to
> analyze which assets suffered from corruption information.  The discrepancy
> between fair value and book value – although is not suitable for an immediate
> accounting entry, under CPC01 – made clear that it had something wrong with the
> parameters used by the Company to execute the impairment tests heretofore.

Specifically addressing the Abreu refinery, Cunha stated:

> [B]ased on the numbers showed by the administration of Refinaria Abreu e Lima,
> our books present the amazing figure of 27X EBITD.  The proposed impairment
> would cause this indicator to be 22X - much higher than any acceptable

The same should be true to Comperj, and even for other refineries, that received significant investments in recent years (including installation of HDT units).

203.    Further criticizing Petrobras's asset-impairment analysis, Cunha noted:  "We see a choice of parameters which result in diminished adjustments required to the financial statements.  I consider this practice to be wrong."

204.    Addressing the "[w]rite[] off [of] capitalized additional expenses," Cunha stated: "We have received several opinions requested by the Company during the process.  All of them in theory.  From the ones I received, neither made reference to accurate values or adjustment methods with independent checking."

205.    Sinedino's and Monforte's explanations for voting against approval of the financials were also appended to the board minutes.  Monforte stated, for example, "[A]s it was impossible to obtain information as detailed as to allow a deeper analysis, it is impossible to conclude the diligence of reviewing the Financial Statement."

206.    Sinedino, who was elected by Petrobras's workers, was voted out of his position. On April 24, 2015, Petrobras announced that Monforte, an independent director elected by the non-voting shareholders, "presented today his resignation letter as a member of the Board of Directors."

207.    On April 30, 2015, the Brazilian press reported that Petrobras destroyed audio and video recordings obtained during discussions of the Operation Lava Jato investigation, and noted President Rousseff's participation in the purchase of the Pasadena Refinery.  Responding to those reports, the Parliamentary Inquiry Commission ordered that Petrobras's computers be searched.  According to reports, the recordings in question included those at meetings during which the board of directors, including President Rousseff, approved the purchase of the Pasadena Refinery.

208.     On May 21, 2015, Brazilian Federal Police arrested Milton Pascowitch, a middleman who facilitated bribes between Petrobras and construction company Engevix.

209.     On May 26, 2015, former Petrobras Director of International Operations Cerveró was sentenced to five years in prison for money laundering, and was ordered to pay a fine of $159,000, in connection with the Lava Jato scheme.

210.     On June 19, 2015, Odebrecht president Marcelo Odebrecht was arrested on suspicion of corruption, money laundering, and criminal organization.  Police also detained two members of Odebrecht's construction unit, Marcio Faria and Rogerio Araujo, who was the sender of "special gifts."  Not long after, in July 2015, federal prosecutors secured convictions against three top executives at construction company Camargo Correa in connection with the Lava Jato investigation.

211.     Documents seized by the Brazilian Federal Police from Odebrecht show that Odebrecht doled out "special gifts" in 2010 to 100 top employees at Petrobras who occupied strategic positions at the Company, including Gabrielli, Foster, Estrella, Filho, Barbassa, Costa, Cosenza, Duque, Cerveró, the President of Petrobras America Inc., and the Presidents and Directors of Petrobras's key refineries, including Abreu and Comperj.

212.     On July 20, 2015, Bloomberg reported that Dalton Avancini and Eduardo Leite, former CEO and former Vice President, respectively, of Camargo Correa, were convicted and sentenced to over 15 years in prison each for corruption, money laundering, and organized crime, all relating to Petrobras's corruption scandal.

## 2.     Bribery in the International Division

213.     The corruption scandal at Petrobras included the Company's International Division, which was headed by Cerveró from 2003 to 2008.  Documents and testimony revealed through Operation Car Wash have demonstrated that, while the International Division grossly

overpaid for certain foreign assets (the value of which the Company overstated throughout the Relevant Period), the principal executives in the International Division were accepting enormous bribes.

214.    For example, Costa revealed during his sworn testimony that the International Division, and Cerveró in particular, perpetrated the same kickback scheme where 3% of the value of a contract would be diverted to management as a bribe.  When asked if the "cartelization and this payment of 3% also existed in the other boards?" and if he knew "whether other directors, like you, also received amounts?" Costa stated: "Yes . . . [w]ithin the International Board of Directors, it was Nestor Cerveró, who was appointed by a politician and had strong ties with the [Brazilian Democratic Movement Party]."

215.    Costa also told investigators that he had received $1.5 million from a lobbyist to assist in the purchase of the Pasadena Refinery.  Costa stated that he received a visit from Fernando Soares, a lobbyist with ties to one of Brazil's biggest political parties.  Costa had a longstanding relationship with Soares, and introduced him to other key members of the bribery scheme, including Barusco, at an Offshore Technology Conference in Houston, Texas.  Soares offered Costa the bribe, which Costa accepted, in exchange for not hindering the negotiations as Cerveró proposed the project for approval.  Costa stated that he believed the money came from Astra Oil, the owner of the refinery.  Moreover, Costa stated that he understood a group headed by Cerveró had received $20-30 million in bribes for the transaction.

216.    In December 2014, Brazilian federal prosecutors filed charges against Cerveró and three others in connection with $53 million in bribes allegedly paid by Samsung Heavy Industries ("Samsung") as part of a deal to supply offshore drilling vessels.  According to the charges filed, prosecutors say the bribes from Samsung were solicited and received by Cerveró

and other suspects "in order to make feasible" the contracting, by Petrobras, of two drilling vessels.  The ships cost $586 million and $616 million, respectively, and were destined for offshore oil fields in Africa and the Gulf of Mexico.  Cerveró allegedly shared $40 million of the bribe payments with Soares.  Prosecutors say Soares requested the payments from Camargo, an executive of a Brazilian engineering firm who was acting as a broker for Samsung.

217.     Soares, like Cerveró, was charged with two counts of "passive" corruption and 64 counts of money laundering.  Camargo, who allegedly received $13 million in bribes, was charged with "active" corruption, money laundering, and financial crimes.  The prosecutors specifically noted in their indictment that "[a]lthough it was Fernando Soares who made the deals with Júlio Camargo, there is no doubt that Fernando Soares passed along part of this amount to the former International Director, Cerveró, whose participation was fundamental for the deal between Samsung and Petrobras."

218.     On February 24, 2015, prosecutors filed new charges against Cerveró for "using the influence of his office to obtain contracts by payment of bribes (unfair advantage) under PETROBRAS" through the use of offshore companies located in Uruguay and Switzerland.

### 3.     Bribes and Overpayments Relating to the Abreu and Comperj Refineries

219.     The evidence demonstrating the impact of Petrobras's bribery and corruption scheme on the financial performance of the Company's Downstream (or Supply) Division, the business unit overseen by Costa, is overwhelming.  The Downstream Division was responsible for over $70 billion in capital expenditures during the Relevant Period and, as numerous witnesses have now confirmed, a staggering percentage of this amount was paid out as bribes to Petrobras officials, and as overpayments to contractors for services that should have been performed for billions of dollars less.

-69-

220.    Costa has admitted that, contrary to Petrobras's repeated public representations during the Relevant Period, there *was* "overpricing" in all contracts for Abreu involving cartel members like Camargo Correa, and that virtually every contract involving Costa's Division was inflated by the cartel's bid-rigging, as well the 3% bribe that was paid to Costa and politicians.

221.    Other Petrobras executives have corroborated the scope of the fraud in the Company's Downstream Division and admitted the Division's most important and capital intensive projects, including Abreu and Comperj, were specifically targeted by cartel members and Petrobras executives.  For example, in his November 24, 2014 plea agreement statement (No. 5), Barusco admitted that "in the case of [Abreu], *there was a clear overbilling*."  In fact, according to Barusco, the cartel's coordination of bids for 12 Abreu projects—including four of the largest packages of works related to Abreu—resulted in "contracts at prices at the top echelon of the Petrobras budget."  Further, even after the Abreu projects went through a re-bidding process, Barusco explained, the cartel and Petrobras agreed to inflated contract terms that were just under Petrobras's internal 20% threshold.

222.    In other words, at the same time Petrobras was telling investors that it had "rigorously" complied with the bidding and that there were no "irregularities" or "overbilling" at Abreu, Petrobras's senior executives were in truth awarding inflated contracts in order to secure millions of dollars in bribes.  Indeed, Barusco confirmed that "*the main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the Abreu e Lima Refinery-RNEST and the Petrochemical Complex of Rio de Janeiro-COMPERJ*, in addition to large-sized packages in some refineries, such as REPLAN, REVAP, REDUC, RELAN and REPAR."

223.     Barusco provided detailed information to the Brazilian Federal Police concerning specific projects performed in connection with Abreu totaling over *R$13 billion* (approx. $7.5 billion), which were used to divert bribes to Petrobras executives and public officials.  These contracts included, for example, a nearly R$1 billion (approx. $635 million) contract for the construction of a powerhouse, compressed air unit, input substation, and related structures (the "CAFOR da Abreu e Lima" project) awarded to cartel member Alusa; a R$3.2 billion (approx. $1.8 billion) contract for the UHDT hydrotreatment unit project awarded to Odebrecht and OAS; and a R$3.4 billion (approx. $2 billion) contract for a Delayed Coking Unit awarded to Camargo and CENC.

224.     As noted above, the detailed spreadsheet maintained by Barusco memorializes that the bribery scheme impacted billions of dollars in Abreu contracts.

225.     Additionally, Costa explained that, after he left the Company in April 2012, he set up a "consulting" company, "Costa Global," in order to facilitate the payment of bribes relating to Abreu and other contracts.  For example, Costa admitted that Costa Global entered into an arrangement with Construtora Comércio Camargo Corrêa, which performed significant work at Abreu throughout the Relevant Period, through which Costa received R$100,000 per month for 30 months (or approximately $1 million) through 2013.

226.     Barusco confirmed that the same "tactics" used by Petrobras and the cartel to bid up prices and pay bribes for Abreu were also used at the Comperj refinery.  In his plea bargain, Barusco identified numerous instances of Comperj projects that were subject to bid-rigging and bribery.  Barusco admitted that information compiled from his Company computer demonstrated that a new project relating to the Downstream Division would be tendered practically *every*

*month*, and that each such project would be used to funnel bribes to Petrobras executives—clear evidence of the massive scope of the fraud and its impact on the Company's financial results.

227.    Barusco specifically identified three Comperj projects valued at over R$4.2 billion (approx. $2.4 billion) that were used to funnel bribes to Petrobras executives, including a R$1.5 billion (approx. $838 million) project awarded to Alusa to build a Catalytic Hydrocracking Unit (HCC), a nearly R$2 billion (approx. $1.15 billion) project awarded to Andrade Guiterrez Techint to build a Coking Unit, and another R$820 million (approx. $484 million) "earthworks" project, as set forth in Barusco's spreadsheet.

228.    On January 29, 2015, *Valor* reported that the Company's board had received an appraisal report prepared by accountants that Petrobras hired to assess the impact of the bribery scheme on the Company's assets, including Abreu and Comperj.  According to *Valor*, the report showed that, while the Company had spent over $18.5 billion on projects relating to Abreu, the refinery was in fact worth just $7 billion, or *$11.5 billion* less than its cost, after accounting for the impact of the fraud and overpricing.  That same report showed that the entire value of Comperj, which has been built at a cost of $13.5 billion and is still not scheduled to open for at least another year, *should be written down to zero*.

### 4.    Bribery by SBM

229.    Directly contrary to Petrobras's claims that there were no "irregularities" in its relationship with SBM, documents and testimony revealed through Operation Car Wash demonstrate that SBM actually paid millions in bribes to Petrobras executives.

230.    According to former SBM executive Jonathan Taylor, SBM's main agent through whom bribes were paid in Brazil was Julio Faerman.  Reportedly, Taylor has in his possession several e-mails implicating Petrobras officials, including confidential Petrobras Minutes that refer to a future meeting with Petrobras's engineering chief Jose Antonio de Figueiredo to extend

a lease "without going via an open bid."  Petrobras employees "clearly connected to Julio

Faerman" include Jose Miranda Formigli Filho (Petrobras's Head of Exploration and

Production), Figueiredo (Petrobras's Engineering Director), Renato Duque, Paulo Carneiro,

Cleison Pinto, Mauro Mendes, Osmond Coelho, Ricardo Serra, Tuerte Armaral Rolim,

Alexandre Valladares Quintino dos Santos, Gilvan D'Amorim, Nilton Oliveira, and Robert

Goncalves.  Other documents in Taylor's possession include an amendment dated February 7,

2007 to an agreement dated July 2, 1999 with Faercom Energia Ltd., which confirms a

"commission" of 3% signed by "HT" for SBM Inc.  In an interview dated March 27, 2012, HT

confirms that the 3% was split as follows:  1 % for Faerman and 2% for Petrobras officials.

Additionally, a "Payments to Agents" Task Force document dated April 17, 2012 and prepared

by SBM Internal Audit shows, among other things, payments of $139,216,000.00 to the JF

Group of Companies:  Faercom, Bienfaire, Oildrive, Jandell, Journey Advisors, and Hades

Production Inc., including payments made by SBM's Houston office.  The March 27, 2012 "HT"

interview confirms that those payments (i.e. money allocated for bribes) were paid on to

Petrobras officials.

231.    Further, as part of Barusco's plea deal, he agreed to repay $100 million in illicit

bribes he received in his role as a senior procurement executive.  Barusco made it clear that *$22

million* of those bribes were paid by SBM.

232.    Specifically, as part of his plea agreement statement (No. 03) with the Brazilian

Federal Police, Barusco acknowledged that he began to accept bribes from SBM in "1997 or

1998," which continued until at least October 2010.  Barusco testified:

> [T]hat he [Barusco] started to receive bribes from the Dutch company SBM in
> 1997 or 1998, while he held the position of Manager of Facilities Technology,
> within the Board of Exploration and Production, from two FPSO contracts signed

due to technical and "essential" participation of the informant, since he was the coordinator of the technical department;

[T]hat at the time [Barusco] was in charge of formalizing the first freighted FPSO contract and he became an essential piece in the following FPSO contracts signed with SBM, and [Barusco] also started to receive bribes from them;

[T]hat due to a very close relationship that [Barusco] had developed with the SBM representative, JULIO FAERMAN, both [Barusco] requested and JULIO offered the payment of the bribe, being an initiative that came from both sides and became systematic after the second FPSO contract signed between SBM and PETROBRAS in the year 2000, if I'm not mistaken;

[T]hat these were long term contracts and, as such, the payment of bribes also lasted for many years while [Barusco] held the position of Manager of Facilities Technology between 1995 and 2003;

\*       \*       \*

[T]hat, in the year 2007, a contract was signed between SBM and PETROBRAS for the supply of a FPSO named P57, whose contract value was worth R$ 1,258,548,071.75, during the time when [Barusco] already held the position of Executive Manager of Engineering, and received 1% over the contract's amount as a bribe, paid by JULIO FAERMAN between 2007 and until October 2010; [T]hat this way the informant received, between 1997 or 1998 until October 2010, as a result of contract signed between PETROBRAS and SBM, the approximate amount of $22 million dollars[.]

233.    On November 12, 2014, SBM announced a settlement with the Dutch Public Prosecutors Office of $240 million in connection with the Dutch officials' investigation in SBM's international bribery scandal.  According to SBM in a November 26, 2014 statement, the Dutch Public Prosecutor was able to establish that "payments were made from the accounts of the Company's agent to government officials in Brazil" "using means not available to [SBM]." With this admission and Barusco's plea agreement, the Company finally admitted on November 17, 2014 that there was "overwhelming evidence" that SBM had bribed Petrobras officials.  As a result, SBM is now barred from entering into contracts with Petrobras until the allegations are proven, at which point SBM will be further suspended for an additional six months to two years.

### 5.     Bribery at Transpetro

234.    The corruption at Petrobras also extended to the Company's transportation subsidiary, Transpetro.  Barusco's testimony establishes that at least 28 contracts totaling $22 billion involving shipyards operated by Transpetro were used to funnel bribes to Petrobras executives and affiliated politicians.  According to Barusco, the very PROMEF projects that Transpetro's CEO, Machado, touted as based on a "competitive" bidding process were in fact arranged by an agreement among the cartel's members.  The costs of those contracts were artificially inflated by up to 20% as a result, and also included hidden bribes that were made to Petrobras executives and Brazilian politicians.  In fact, Costa testified that he himself received a bribe from Machado, who personally delivered a R$500,000 bribe to Costa at Machado's apartment in Rio de Janeiro:

> **FEDERAL JUDGE:**  Did this also happen with companies linked to Petrobras, subsidiaries?
>
> **PAULO ROBERTO [COSTA]:**  Well, linked to Petrobras, . . . there's Transpetro, Transpetro has some cases of passing funds on to politicians, yes. Transpetro.
>
> **FEDERAL JUDGE:**  You, for example, regarding Transpetro, which you said you had more knowledge of, did you ever receive any advantage or bribe through these Transpetro contacts?
>
> **PAULO ROBERTO [COSTA]:**  Yes, I did.  I received a payment from Transpetro.
>
> **FEDERAL JUDGE:**  Can you be more specific?
>
> **PAULO ROBERTO [COSTA]:**  If I'm not mistaken, I received 500,000 reais.
>
> **FEDERAL JUDGE:**  Who paid you?
>
> **PAULO ROBERTO [COSTA]:**  The president of Transpetro, Mr. Sérgio Machado.
>
> **FEDERAL JUDGE:**  When approximately was that?

**PAULO ROBERTO [COSTA]:**  Perhaps I have some difficulty in remembering the dates here, because there were many dates if I'm not mistaken, maybe around 2009, 2010.  Around that time, I think.

**FEDERAL JUDGE:**  But did you receive that on a single occasion?

**PAULO ROBERTO [COSTA]:**  From Transpetro, yes.  A single occasion.

**FEDERAL JUDGE:**  And can you tell me the reason why that sum was paid?

**PAULO ROBERTO [COSTA]:**  I can, it was due to the contracting of some ships, and that had to go through the supply director.  So it was due to the contracting of ships by Transpetro.

**FEDERAL JUDGE:**  And was the amount delivered directly by Mr. Sérgio Machado?

**PAULO ROBERTO [COSTA]:**  It was delivered directly by him, at his apartment in Rio de Janeiro.

235.     In light of this testimony, as well as the other evidence produced by Costa and Barusco concerning the contract inflation and bribes impacting Transpetro's financial results, Petrobras's outside auditor PricewaterhouseCoopers Auditores Independentes ("PwC") refused to sign off on Transpetro's financial statements for the third quarter of 2014.  According to news reports, PwC refused to approve the results given Machado's involvement in preparing them and demanded that Machado be fired—a proposition that was apparently met with resistance by some members of Petrobras's board who were concerned that his firing would cause friction with President Rousseff's ruling coalition.  On November 3, 2014, however, Petrobras placed Machado on unpaid leave.  Machado was eventually fired from Transpetro on February 5, 2015.

##### E.     Recent Events Continue to Shed Light on the Massive Fraud at the Company.

236.     On August 14, 2015, Veja Magazine reported that in 2007, Petrobras purchased a South Korean drilling ship, Vitoria 10000, for $616 million without employing any bidding process whatsoever.  Even more suspiciously, the contract for operation of the drilling ship was granted to Schahin, a relatively unknown and inexperienced contractor, to the tune of $1.6

billion.  Recent testimony from Petrobras executives provides a compelling picture of fraud in connection with the purchase of the drilling rig by Petrobras.  Julio Carmago, money launderer, admitted in his plea agreement that he paid $25 million in bribes to Petrobras directors, including Cerveró, in connection with the drillship transaction.  Cerveró, in his testimony, further revealed that the purchase of Vitoria 10000 was allocated to the Schahin construction company in order to pay off debts of Lula's presidential campaign in 2006, which accrued to Banco Schahin in the amount of R$60 million.  According to reports, Petrobras' CEO at the time, Gabrielli, personally instructed Cerveró to handle the matter.

237.    The impact of the bribery scandal on the Company's financials continues to become more apparent.  On August 18, 2015, *Business Insider* reported that the corruption probes conducted by the United States could cost Petrobras as much as $1.6 billion or more in record penalties to the DOJ and the SEC.  As of August 2015, the Brazilian authorities' investigation had led to more than 100 indictments.

238.    On August 26, 2015, *Estado* reported that a TCU audit held Gabrielli and other Petrobras executives responsible for the Company's billion-dollar losses at the Presidente Getulio Vargas refinery ("Repar") at Araucaria, Parana, Brazil.  Using data gleaned through the Lava Jato investigation conducted by Federal Justice in Parana, auditors calculated an estimated loss of R$ 1.27 billion due to eight contracts associated with the refinery.  According to the TCU, the Petrobras Executive Board, presided over by Gabrielli from 2005 to 2012, restricted competition in the bidding process as a "corporate strategy," one that favored the companies of the so-called "club." They were hired at values up to 19% above the initial estimate by the state-owned company.  After that, they received the benefits of contract additions that further increased the amount they were to be paid.  The auditors found that "considering that these

procedures greatly facilitated the formation of the cartel of companies revealed through Lava Jato, with grave moral and material consequences to the company (Petrobras), it is deemed appropriate to attribute the blame not only to the president of the company during that era (Gabrielli), but also to the directors, at that time, of Supply, Paulo Roberto Costa, and of Services, Renato Duque, and to the former executive manager, Pedro Barusco."

239.    SBM, despite its prior assertions that it was not involved in the Petrobras bribery scandal, was eventually prevented from participating in any bids related to Petrobras contracts. As of October 22, 2015, Brazilian authorities issued an ultimatum to SBM wherein the company would be permitted to do business with Petrobras once again if it agreed to pay a $250 million settlement.

240.    Arrests and convictions continue.  On October 29, 2015, Pedro Correo, a former Brazilian lawmaker and significant figure within the Progressive Party, was sentenced to 20 years and 7 months in prison for his role in the diversion of funds at Petrobras.

241.    On November 1, 2015, *Bloomberg* reported that the Brazilian government's probe into the bribery and corruption scheme had already recovered $622 million from the individuals and companies involved in the scandal, from 31 different lawsuits within the Brazilian judiciary system.

242.    Most recently, on November 4, 2015, Sergio Cunha Mendes, former vice president of Brazilian engineering firm Mendes Junior, was convicted on charges of corruption, money laundering, and racketeering for $8.3 million in bribes to obtain contracts with Petrobras. For his crimes, Mendes was sentenced to 19 years and four months in prison and ordered to return the $8.3 million he received in bribes to the Company.  Mendes Junior is one of the top

construction and engineering firms in Brazil, along with Camargo Correa and OAS, and the third to have executives sentenced in the Petrobras bribery scandal.

### F.     The Exchange Act Defendants Acted with Scienter.

243.    During the Relevant Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, the Exchange Act Defendants committed acts and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Petrobras securities, including Plaintiffs.

244.    The evidence that the Exchange Act Defendants knew of the bribery scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in ¶¶ 101-242 above, or at a minimum were reckless in not knowing of those matters, includes the following:

(a)      People involved in implementing the bribery scheme and inflating Petrobras's asset values were high-ranking Petrobras executives, including the former head of the Company's refining division and a former director of engineering and services, whose knowledge may be imputed to Petrobras.

(b)      From 2009 to 2013, the TCU reported directly to Petrobras's board regarding widespread overcharging on contracts and irregular tendering practices at Abreu, and recommended that the project be suspended until the irregularities were resolved. The board overruled that recommendation.

(c)      Prosecutors have frozen the assets of former CEO Gabrielli and are preparing an indictment against him in connection with his involvement in the bribery scheme. One of the persons involved in the scheme has said that Petrobras's CEO and Brazil's President

Rousseff (who was the Chairwoman of the Petrobras board from 2003 to 2010) both knew of and understood the scheme.

(d)      In 2009, a Petrobras executive warned then-CEO Foster about inflated contracts on refinery projects, and was fired soon thereafter.

(e)      The fact that the scheme involved many outside parties of major importance to Petrobras, including 23 contractors, dozens of politicians from six political parties, and a former energy minister, supports an inference that the Company knew of the scheme or was reckless in not knowing of it.

(f)      The fact that the scheme caused Petrobras's asset values to be overstated by as much as R$61.4 billion supports an inference that the Company knew of the scheme or was reckless in not knowing of it.  By way of comparison, Petrobras's total fixed assets were valued at R$597.4 billion, so the scheme could have caused the value of the Company's physical assets to be overstated by as much as 10%.

(g)      The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

## VII.   DEFENDANTS' MISCONDUCT RENDERED NUMEROUS REPRESENTATIONS TO INVESTORS FALSE OR MISLEADING, AND VIOLATED ACCOUNTING STANDARDS

### A.   Petrobras Deceived Investors Through Misleading Omissions and False Denials Concerning the Overpricing of Its Refineries and Other Projects.

#### 1.   Pasadena Refinery

245.   During the Relevant Period, Petrobras and its executives denied the existence of any irregularities or improprieties related to the Company's purchase of the Pasadena Refinery,

even as the cost of the acquisition ballooned from $360 million for the Company's 50% stake in the refinery, to a final cost of $1.18 billion. As discussed above, Petrobras's statements regarding the cost of the Pasadena Refinery were materially false and misleading or omitted material information because Petrobras's decision to purchase Pasadena was influenced by the payment of bribes. Among other things, Petrobras failed to disclose the following facts regarding the kickback and contract-fixing scheme:

(a)     Costa testified that he received a $1.5 million bribe from Soares, which Costa believed originated from the Pasadena Refinery owner, Astra, in exchange for not hindering the Pasadena acquisition; and

(b)     Costa further testified that a group headed by Cerveró received $20-30 million in bribes related to the purchase of the Pasadena Refinery.

246.     Petrobras made the following materially false and misleading statements regarding the Pasadena Refinery:

(a)     On August 7, 2013, the Company published on the "Facts and Data" section of its website ("*Facts and Data*") Gabrielli's testimony to a Brazilian Senate committee that, "[a]s the former President, the acquisition [of the Pasadena Refinery] was a normal operation, based on market conditions." That statement was materially false and misleading because the acquisition of the Pasadena Refinery was not done pursuant to "market conditions"; instead, it was pursued and approved in large measure because of tens of millions of dollars paid to Petrobras executives by Astra as described above.

(b)     On May 23, 2014, the Company insisted on *Facts and Data*:

We have strict legal procedures for payments, including for the purchase of Pasadena.

The payments made for any reason and in any country follow strict and clear procedures and relevant legislation. Additionally, we have a structured Internal

Audit group, which has unrestricted access to any unit of the Petrobras System to verify the compliance of procedures and transactions made.

That statement was materially false and misleading because the Company did not follow "strict legal procedures" or "strict and clear procedures" for its purchase of the Pasadena Refinery (or any other purchase). Instead, the acquisition of the Pasadena Refinery was tainted and motivated by tens of millions of dollars paid to Petrobras executives by Astra, as described above.

### 2. Abreu Refinery

247. As discussed above, throughout the Relevant Period, Petrobras and its executives repeatedly and vehemently denied that the Company was engaged in bribes, fraud, overpricing or wrongdoing of any kind in connection with the Abreu refinery. Each of those denials was materially false and misleading or omitted material information given the following facts (among others) regarding the kickback and contract-fixing scheme:

(a) The bribery scheme inflated the value of all of its contracts with the members of the cartel, which included the outside contractors responsible for the construction of the Abreu refinery;

(b) Costa confirmed in his sworn testimony that the illegal overpricing and bribery scheme impacted all contracts with the cartel, including Abreu contracts, inflating each contract by up to 20% and including a 3% bribe payment;

(c) Barusco similarly stated in his sworn testimony that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the ABREU E LIMA REFINERY . . .";

(d) Barusco testified that Duque received bribes in connection with projects at Abreu;

(e)      Fonseca testified that he paid bribes on projects as large as R$2 billion to R$3 billion, including for construction contracts at Abreu; and

(f)      Velosa uncovered significant irregularities in bidding and pricing for construction contracts at Abreu.

248.    Petrobras's materially false and misleading statements regarding the Abreu refinery included the following:

(a)      On November 9, 2010, in response to TCU allegations that the Repar and Abreu refinery contracts were overpriced by R$1.4 billion and R$1.3 billion, respectively, Petrobras posted a statement on *Facts and Data* stating:  "*Petrobras denies that there were irregularities in the construction works of the Presidente Getúlio Vargas (Repar) and Abreu e Lima (Rnest) refineries*."  That statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated many of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

(b)      On August 5, 2012, in response to an article titled "Abreu e Lima Refinery costs three times more than the international similar one," Petrobras stated it "*does not recognize any of the signs of irregularities identified by the Court (TCU) . . . . These so-called irregularities found by the Court (TCU)* are based in methodological differences between the Court and Petrobras regarding the analysis of the costs of the works."  The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and that "its estimates are developed by observation of the prices on the market."

(c)      Five days later, on August 10, 2012, Petrobras repeated those sentiments:

**Question:**  What is the Petrobras' position regarding these new questions in several contracts of the works on Abreu e Lima Refinery?

**Answer:**  Petrobras doesn't acknowledge any of the evidences of irregularities presented by the [TCU] during its audit regarding the contracts of Abreu e Lima Refinery, considering these irregularities found by [the TCU] are based essentially in methodological differences between [the TCU] and Petrobras regarding the analysis of the costs of the works.

The statements recounted in (b) and (c) above were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

(d)     On January 7, 2013, in response to questions concerning potential overpricing, Petrobras stated:

Petrobras reaffirms that there are no irregularities in the construction of the Abreu e Lima Refinery in Pernambuco.  The report[ ] broadcasted on Fantástico improperly compares the values of the basic design of the refinery, which was prepared seven years ago, with what is now being built.  The initial project has suffered several modifications, due to changes in the scenario.  The Company further reaffirms that there are no irregularities in the construction works of the Petrochemical Complex of Rio de Janeiro.  Petrobras has clarified all questions made by the [TCU], and reaffirms that until now there hasn't been any definitive trial that has observed any irregularity.

That statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

(e)     On May 19, 2014, Petrobras made the following statement on *Facts and Data* concerning the Abreu refinery:

*Petrobras restates that there is no "overcharging of R$69.9 million" in the contract with the consortium Abreu e Lima.  Since 2008, the company has been*

telling the TCU that there are methodological divergences in accounting for items that are specific to the oil industry.  The court itself has revised the values, after the clarification, for R$19 million.  The company is still communicating with the TCU to demonstrate that there is no overpricing or overbilling in the works.

The Company issued virtually identical statements on *Facts and Data* again on May 20, 2014, June 17, 2014, June 21, 2014, June 22, 2014, June 23, 2014, and July 14, 2014.

Those statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

(f)     On July 23, 2014, Petrobras stated: "Regarding the matter 'TCU points to irregularities,' Petrobras reaffirms that *there is no overbilling in its works*." It went on to state: "Regarding the work at Abreu e Lima refinery, Petrobras reaffirms that there is *no overbilling or overpricing*."

That statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated most of the Abreu contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

### 3.     Comperj Refinery

249.    Like the Abreu refinery, Petrobras made a series of false and misleading statements and omissions concerning its construction of the Comperj refinery in which it either omitted or flatly denied the existence of overpricing or other irregularities in the Comperj contracts.  Each of these statements was materially false and misleading or omitted material information given the following facts regarding the kickback and contract-fixing scheme:

(a)     The bribery scheme inflated the value of its contracts with the members of the cartel, which included significant outside contractors responsible for the construction of the Comperj refinery, and materially and falsely inflated the value of the Comperj assets reported by the Company;

(b)     Costa confirmed in his sworn testimony that the illegal overpricing and bribery scheme impacted all contracts with the cartel, which included many Comperj contracts, inflating each contract by up to 20% and including a 3% bribe payment;

(c)     Barusco similarly stated that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the . . . PETROCHEMICAL COMPLEX OF RIO DE JANEIRO – COMPERJ[.]"; and

(d)     Barusco identified three Comperj projects valued at over R$4.2 billion (approx. $2.4 billion) that were used to funnel bribes to Petrobras executives.

250.   Petrobras's false and misleading statements regarding the Comperj refinery included the following:

(a)     On October 8, 2010, the Company issued a statement in response to an October 8, 2010 Folha.com report titled "TCU says it found overbilling in works of Petrobras in Rio." Petrobras stated:

> Response: Petrobras reaffirms that *there are no irregularities on the contracts of the Petrochemical Complex of Rio de Janeiro (Comperj)*.  In the hiring model by overall price, what matters is that the final overall price is the one that is more economical and advantageous to Petrobras.  It is not the item to item detailing, as the TCU intends.
>
> *There is no overbilling.*  Petrobras reaffirms that there are technical disagreements between the methodology adopted by the company and by the TCU.  The criteria used by the Court are insufficient and they are not applicable to works such as the Comperj, which is far more complex and with unique specificities.  Petrobras

cooperated with the TCU on all requests and there was no obstruction on any occasion.

Those statements were false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Comperj were tainted by "irregularities" and "overbilling" as a result of the "cartelization" of Petrobras, which materially inflated most of the Comperj contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

(b)     Similarly, on January 7, 2013, in response to questions from Jornal Nacional concerning potential cost overruns at Comperj, Petrobras stated on *Facts and Data*:

The Company further reaffirms that there are *no irregularities* in the construction works of the Petrochemical Complex of Rio de Janeiro.  Petrobras has clarified all questions made by the [TCU], and reaffirms that until now there hasn't been any definitive trial that has observed any irregularity.

That statement was false and misleading because, in fact, a significant number of the contracts Petrobras entered into in connection with Comperj were tainted by "irregularities" and "overbilling" as a result of the "cartelization" of Petrobras, which materially inflated most of the Comperj contracts by up to 20%, and the "mandatory" bribe payments for every contract, as discussed above.

### 4.     SBM Contracts

251.     During the Relevant Period, Petrobras issued statements in which it falsely denied allegations that SBM had paid bribes to Company employees in connection with construction contracts.  Petrobras's denials of bribery in connection with the SBM contracts were directly contradicted by the Company's subsequent admission that there is "overwhelming evidence" that SBM had paid Petrobras officials, including Barusco's admission that he received $22 million in bribes based on Petrobras's contracts with SBM between 1997 or 1998 and October 2010.

252.   Petrobras's materially false and misleading statements regarding SBM included

the following:

(a)   On March 31, 2014, the Company announced the "Completion of Internal

Verification," in connection with the SBM bribery allegations, stating:

> Petrobras announces that the Internal Investigation Commission, created on
> 02/13/2014, to look into accusations of supposed bribe payments made to
> employees of the Company, involving the company SBM Offshore, concluded
> that, based on work performed and limited to its regulatory scope, *no facts or
> documents were found that prove the payment of bribes to employees of
> Petrobras*.

(b)   Similarly, on April 1, 2014, Petrobras announced in a press release that the

Company's own internal investigation into the alleged SBM bribes "concluded that there are no

facts or documents that evidence the payment of bribes to Petrobras employees."

(c)   In its April 30, 2014 Form 20-F, Petrobras reconfirmed that: "On March

31, 2014, our internal commission established to evaluate bribery allegations involving SBM

Offshore confirmed that it found no internal evidence to support such allegations."

253.   The statements set forth in ¶ 252 above were false and misleading and omitted to

disclose the material fact that the Company and its executives had engaged in a long-running

scheme to accept bribes from SBM, as described above.

254.   On April 4, 2014, Petrobras posted the following letter that it wrote to a Brazilian

state agency concerning SBM and the Pasadena Refinery, in which it denied any wrongdoing

and defended its short-lived internal investigation into bribery by SBM:

> Petrobras strongly rejects the terms used by the reporter . . . The reporter
> committed improprieties and injurious falsehoods by deeming as "work of
> fiction" the work of senior company managers in the internal investigation
> relating to accusations made by the press over alleged bribes by the Dutch
> company SBM to Petrobras employees.
>
> By evaluating the period of duration of the works (February 13 to March 29 of
> 2014) and stating that it could have been summarized into one day of analysis, the
> reporter casts doubt on the internal investigation methodology conducted by

Petrobras executives, having no grounds for doing so.  If the period were a single day, then it would be hurried and fragile, as the journalist suggests.

Historically, Petrobras has routinely looked into any and all accusations it receives in any unit, via the General Ombudsman or due to facts reported internally or externally to the company.  At the same time, it has cooperated with external oversight bodies such as the CGU, TCU, and Federal Public Prosecutor. In the case of Pasadena, likewise, Petrobras created a special commission to investigate, within 45 days, all of the facts related to its acquisition process.

The company's main corporate environment is related to employees that joined the company by public entrance exam, have internationally renowned technical excellence, and adhere to ethical standards in their internal and external relations. *These employees, when faced with evidence of improper conduct, do not hesitate to take punitive actions of all kinds.  To ignore that evidence is to ignore the public track record of a 60-year-old company, which does not have as a standard practice to get rid of complaints, but rather to clarify the real facts internally and externally, and to provide appropriate answers to the appropriate agencies.*

It is unacceptable that this work, so believable, is compared to a "three real bill" without proper investigation or clarification of the facts.  It is unacceptable for a piece of journalistic work to mention fraud, when there has been no proper information gathering.

The company's [executive] directors, led by the Executive Directorate, have the appropriate autonomy to investigate any and all irregularities, as they always have.  Also in this case, the reporter, in doubting that autonomy, does so without objective evidence, which good journalism requires.

255.    The Company's response defending its investigation was false and materially misleading because it failed to disclose the material fact that the Company's executives had engaged in a long-running bribery scheme with SBM, as discussed above.

256.    On June 11, 2014, Foster testified to the CPI concerning the alleged improprieties in its contracts with SBM, stating that "*no irregularities were discovered*" in the Company's dealings with SBM.

257.    Foster's statement was materially false and misleading because it concealed the material fact that the Company's executives had engaged in a long-running bribery scheme with SBM, as discussed above.

-89-

### 5.   Transpetro Contracts

258.   As with the allegations pertaining to the SBM contracts, Petrobras denied that the Company paid bribes in connection with Transpetro contracts during the Relevant Period.

259.   On February 27, 2011, in response to questions from *O Globo* newspaper regarding a piece the newspaper was writing about Transpetro contracts awarded without any bidding process, which claimed that the National Confederation of Waterway and Aerial Workers ("Conttmaf") had filed a complaint with the TCU, Petrobras stated:  "The complaints of the alleged overbilling against the administration of Transpetro that were made public by Conttmaf are unfounded."

260.   The foregoing statement was materially false and misleading when made for the reasons set forth above, and given that Machado, Transpetro's CEO, was fully involved with and complicit in the bribery scheme, as evidenced by:

(a)   PwC's refusal to accept financial statements signed by Machado in late October 2014 due to his involvement in the scheme; and

(b)   Costa's testimony that he received a bribe of R$500,000 from Machado in connection with Transpetro contracts.

### 6.   Repar Refinery

261.   On October 9, 2011, in response to an article published in *Época* magazine regarding Petrobras's Repar refinery titled "Money Leaving Through The Pipe," the Company stated on *Facts and Data*:  "The Company reaffirms that there is no overbilling, overpricing or any other irregularity in the construction works of the Presidente Getúlio Vargas Refinery (Repar)."  The following day, on October 10, 2011, the Company issued another statement responding to the same *Época* magazine article, stating:

Petrobras disclaims information on the alleged irregularities in works at Presidente Getúlio Vargas Refinery (Repar), published in the magazine Época in the article "Dinheiro saindo pelo duto" (Money leaving through the pipe).

The Company reaffirms that there is no overbilling, overpricing or any other irregularity in the construction works of the refinery. What can be observed in the cases pointed out by the [TCU] are formulations and interpretations that differ from those adopted by the Company.

262.    Each of the foregoing statements regarding the Repar refinery was false and misleading when made for the following reasons:

(a)    The bribery scheme inflated the value of its contracts with the members of the cartel, and materially and falsely inflated the value of the Repar assets reported by the Company;

(b)    Costa testified that the illegal overpricing and bribery scheme impacted all contracts with the cartel, which included Repar contracts;

(c)    Barusco similarly stated that "main contracts within the Board of Supply that generated the amounts paid as bribes . . . were the contracts from huge construction work packages for the . . . large-sized packages in some refineries, such as REPLAN, REVAP, REDUC, RELAN and *REPAR*";

(d)    Mendonça Neto testified that Toyo Setal paid bribes to Costa in connection with certain contracts at Repar; and

(e)    Camargo testified that he paid R$12 million to Costa and Duque in connection with a construction project at the Repar refinery.

**B.    Petrobras Made False and Misleading Statements Attesting to Its Transparency and Denying the Existence of Corruption.**

263.    Throughout the Relevant Period, Petrobras made statements attesting to the Company's purported commitment to strong corporate governance, transparency, and compliance with applicable disclosure regulations, while affirmatively denying the existence of

corruption and fraud.  For example, Petrobras falsely stated on December 29, 2012 on its *Facts and Data* website that "all the activities from Petrobras and its employees are totally guided by ethics and transparency principles.  *Petrobras System rejects any corruption practices and uses strict management methods* to assure the protection of its shareholders' interests."  Similarly, on November 8, 2011, Petrobras stated on *Facts and Data*:  "Petrobras clarifies that there is no overbilling, overpricing, or any other irregularity in its works."

264.    Those statements were materially false and misleading for the following reasons:

(a)    The Company has admitted that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets.";

(b)    The Company has further confirmed that its prior denials were false by stating that it needed to "correct the carrying amount of specified property, plant and equipment" and further admitting that "[t]he information currently available to the Company indicates that the contracts entered into between January 1, 2004 and April 30, 2012 . . . with the suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people.";

(c)    Costa testified that 3% of every contract with the "cartel" companies was returned to certain Petrobras executives and Brazilian politicians as a bribe.  Costa also confirmed that the illegal overpricing and bribery scheme impacted all contracts with the cartel;

(d)    Barusco, as part of his cooperation agreement with the Brazilian Federal Police, admitted to accepting over $100 million in illegal bribes in connection with the scheme and stated that the payment of these bribes started as early as 1997 or 1998.  Barusco admitted

that between 1997 or 1998 and October 2010, he received approximately $22 million in bribes resulting from the contract between Petrobras and SBM.  Barusco also stated that a 0.9% bribe was added to each Sete Brasil contract for the construction of rigs.  With respect to bribes for contracts involving the Board of Supply, Barusco explained that these contracts usually had a 2% bribe, of which 1% was allocated to Costa to distribute to individuals within Petrobras and 1% was allocated to the PT.  Barusco further confirmed that "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company" and that the bribes impacted nearly every supply arrangement that Petrobras entered into.  Barusco also stated that the amount of the illegal bribes increased proportionally with the growth of the Company;

(e)       Costa, Duque, Cerveró, Machado, and Barusco, among others, were aware of and complicit in the cartel's bid-rigging scheme which resulted in "an excessive delta price," or overcharge, to Petrobras.  Mendonça Neto confirmed that the cartel's contracts with Petrobras were routinely inflated by 20% or more through the bid- rigging and that approximately 3% of all contract amounts was paid to Petrobras executives and politicians as bribes.  Mendonça Neto further stated that the bribes were "very much mandatory" in order to do business with Petrobras. He explained that 1% of the contract amount would be paid as a bribe to the Supply Director (Costa) and "something closer to 2%" would go to the Services Director (Duque);

(f)       Foster and Gabrielli, among others, were informed of overpricing and cost manipulation by Velosa as far back as 2009, and did nothing to curb these illegal practices;

(g)       Youssef similarly testified that Petrobras mandated that the Company's suppliers and contractors pay the illegal bribes and that "they wouldn't get the work if they didn't pay";

(h)     Camargo likewise stated that bribes were a "rule of the game" and everyone at Petrobras knew it; and

(i)     Barusco stated that "the payment of bribes" was "'endemic' and institutionalized."

265.    Petrobras also made similar false statements in multiple underwriting agreements with U.S. and international banks, including banks like Citigroup and JP Morgan.  For example, on September 29, 2010, Petrobras filed with the SEC a Form 6-K, which was signed by Barbassa and attached as Exhibit 1.1 an Underwriting and Agency Agreement between the Company and several underwriters (the "September 29, 2010 Underwriting Agreement").  The September 29, 2010 Underwriting Agreement stated:

> Neither the Company [Petrobras] nor any of its Subsidiaries, nor any director or executive officer of the Company or any of its Subsidiaries, nor, to the best knowledge of the Company, any agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any applicable provision of the Foreign Corrupt Practices Act of 1977 ["FCPA"]; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

266.    On January 27, 2011, Petrobras filed with the SEC a Form 6-K, that attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters (the "January 27, 2011 Underwriting Agreement").  The January 27, 2011 Underwriting Agreement stated:

> Neither of the Companies [Petrobras and its wholly-owned subsidiary] nor any of their subsidiaries, nor any director or executive officer of the Companies or any of their subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of their subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or

is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

267.   Petrobras repeated this same representation in the following documents:

(a)   a December 9, 2011 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

(b)   a December 12, 2011 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

(c)   a February 6, 2012 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and certain underwriters.

268.   On September 26, 2012, Petrobras filed with the SEC a Form 6-K that attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters (the "September 26, 2012 Underwriting Agreement").  The September 26, 2012 Underwriting Agreement stated:

> Neither of the Companies [Petrobras and PGF] nor any of Petrobras' subsidiaries, nor any director or executive officer of the Companies or any of Petrobras' subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or other person associated with or acting on behalf of the Companies or any of Petrobras' subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 or the UK Bribery Act 2010; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

269.   Petrobras repeated the same representation in the following documents:

(a)   a May 15, 2013 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters.

(b)   a January 9, 2014 Form 6-K, which attached as Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters.

270.    On March 11, 2014, Petrobras filed with the SEC a Form 6-K, which attached as

Exhibit 1.1 an Underwriting Agreement between the Company and PGF and certain underwriters

(the "March 11, 2014 Underwriting Agreement").  The March 11, 2014 Underwriting Agreement

stated:

> Neither of the Companies [Petrobras and PGF] nor any of Petrobras' subsidiaries,
> nor any director or executive officer of the Companies or any of Petrobras'
> subsidiaries, nor, to the best knowledge of the Companies, any agent, employee or
> other person associated with or acting on behalf of the Companies or any of
> Petrobras' subsidiaries has (i) used any corporate funds for any unlawful
> contribution, gift, entertainment or other unlawful expense relating to political
> activity; (ii) made any direct or indirect unlawful payment to any foreign or
> domestic government official or employee from corporate funds; (iii) violated or
> is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977,
> the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - Nova Lei
> Anticorrupção Brasileira of 2013 (New Brazilian Anti-Corruption Law); or (iv)
> made any bribe, rebate, payoff, influence payment, kickback or other unlawful
> payment.

271.    Further emphasizing the Company's purported commitment to ethical practices,

Petrobras issued a release on May 28, 2013, containing the "Code of Ethics of the Petrobras

Group," the purpose of which was to "clearly define the ethics principles that guide the actions

and conduct of the Petrobras Group, institutionally and in relation to its employees.  In doing so,

the Code makes the ethical meaning of the Group's Mission, Vision, and Strategic Plan explicit."

Petrobras specifically identified its affirmative disavowal of "corruption and bribery":

> The Petrobras Group Code of Business Conduct
>
> In its relationship with the Society, the Government and the State, the Petrobras
> Group commits itself to:
>
> *       *       *
>
> Refusing any corruption and bribery and bribery practices and keeping formal
> control and disciplinary procedures for any possible violation of this principle;
>
> Refusing to support and contribute with political parties or political campaigns of
> candidates to elective positions.

272.     The statements identified in ¶¶ 265-71 above were false and misleading because, in reality and as discussed above, the Company's executives passed along millions of dollars in "direct [and] indirect payment[s]"—or bribes—to Brazilian politicians and Petrobras employees in direct contravention of these certifications.

### C.     Petrobras Made Materially False and Misleading Statements About Competitive Bidding.

273.     During the Relevant Period, Petrobras made multiple statements reassuring investors that Petrobras engaged in competitive, arm's-length bidding, and that, as a result, there was no improper overbilling or overpricing in its projects.  Each of those statements regarding Petrobras's bidding process was materially false and misleading because, as discussed above, the bidding process was not conducted at arm's-length in accordance with applicable laws and regulations but rather was rigged to award contracts to the cartel companies at inflated prices in exchange for kickbacks to Petrobras executives.

274.     Petrobras's materially false and misleading statements regarding Petrobras's bidding and project costs included the following:

(a)     On July 11, 2011, Petrobras stated, in response to an article published in the newspaper *O Estado de S. Paulo* asserting that Petrobras had received complaints about its bidding processes, "Petrobras rejects accusations of fraud and denies having received denouncements regarding the bidding."

(b)     On August 15, 2011, Petrobras represented on *Facts and Data*:

Petrobras contracts are carried out in accordance with Decree 2745 of 24 August 1998.  From this Decree Petrobras was relieved to fulfill the Law 8666/93, which regulates hiring in the public sector, and began to conduct their hiring according to the rules of the Bidding Simplified procedure established by Decree 2745.  It is important to clarify that *the companies participating in the bidding process at Petrobras have to prove legal, technical, economic and financial qualification and tax compliance*.

(c)     On January 22, 2012, Petrobras rejected the notion that it engaged in anything other than a competitive bidding process, stating:

> [W]e must highlight that bidding is mandatory for any procurement for works, supply of goods or services to Petrobras.  However, there are cases provided for by law, in which the bid or is waived or is even unenforceable by an absolute impossibility of competition (examples: the supplier is holder of patent or copyright on the product or service requested, or has exclusive commercial representation of foreign manufacturer).
>
> But even if the legislation eliminates the formal bid, *the practice of Petrobras is to always seek the competition* and quote at least three (03) price proposals in order to ensure competition between suppliers.

(d)     On November 13, 2013, Petrobras published a "Clarification" on *Facts and Data* responding to allegations in an *O Estado de S. Paulo* article regarding the Company's contracts with Odebrecht.  In this posting, the Company discussed its bidding process, stating: "The bidding, contracting and performance of services processes of Petrobras are constantly being assessed by its Internal Audit and its recommendations are diligently reviewed, aiming at protecting the interests of the Company."

275.    The statements identified in ¶ 274 above were false and misleading when made because a significant number of the contracts Petrobras entered into were tainted by the "cartelization" of Petrobras, which removed all competition from Petrobras bidding and inflated many of the Company's largest contracts (including the Company's contracts with Odebrecht) by up to 20%, as discussed more fully above.

**D.     Petrobras Further Misled Investors Through False and Misleading Denials of Fraud, Bribery, and Corruption as Investigations Commenced.**

276.    Between March and August 2014, as Operation Car Wash began to unfold, Petrobras, Foster, and Costa vehemently denied any participation in or knowledge of the bribery scheme, affirming repeatedly that there were "no facts or documents that evidence the payment of bribes to Petrobras employees," that Costa's "involvement in money laundering and

remittance abroad is zero," that "you will not find anything illegal at Petrobras, because there is nothing illegal about Petrobras," that "there is no indication of irregularities" at Abreu and "there is no overpricing or overbilling in the project of the Abreu e Lima refinery."

277.    Each of those statements, which are set forth fully below, was materially false and misleading when made for the following reasons:

(a)    The Company eventually admitted that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets."

(b)    The Company further confirmed that these denials were false by stating that it needed to "correct the carrying amount of specified property, plant and equipment" and further admitting that "[t]he information currently available to the Company indicates that the contracts entered into between January 1, 2004 and April 30, 2012. . . with the suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

(c)    Costa testified that 3% of every contract with the "cartel" companies was returned to certain Petrobras executives and Brazilian politicians as a bribe.  Costa also confirmed that the illegal overpricing and bribery scheme impacted all contracts with the cartel.

(d)    Barusco, as part of his cooperation agreement with the Brazilian Federal Police, admitted to accepting over $100 million in illegal bribes in connection with the scheme and stated that the payment of these bribes started as early as 1997 or 1998.  Barusco stated that between 1997 or 1998 and October 2010, he received approximately $22 million in bribes resulting from the contract between Petrobras and SBM.  Barusco also stated that a 0.9% bribe

was added to each Sete Brasil contract for the construction of rigs.  With respect to bribes for contracts involving the Board of Supply, Barusco explained that these contracts usually had a 2% bribe, of which 1% was allocated to Costa to distribute to individuals within Petrobras and 1% was allocated to the PT.  Barusco further confirmed that "the bribe was embedded within the formation of the price proposal, in the 'spreadsheet item' of the company" and that the bribes impacted nearly every supply arrangement that Petrobras entered into.  Barusco also stated that the amount of the illegal bribes increased proportionally with the growth of the Company.

(e)     Costa, Duque, Cerveró, Machado, and Barusco, among others, were aware of and complicit in the cartel's bid-rigging scheme which resulted in "an excessive delta price," or overcharge, to Petrobras.  Mendonça Neto confirmed that the cartel's contracts with Petrobras were routinely inflated by 20% or more through the bid-rigging and that approximately 3% of all contract amounts was paid to Petrobras executives and politicians as bribes.  Mendonça Neto further stated that the bribes were "very much mandatory" in order to do business with Petrobras. He explained that 1% of the contract amount would be paid as a bribe to the Supply Director (Costa) and "something closer to 2%" would go to the Services Director (Duque).  (*Id.*)

(f)     Foster and Gabrielli, among others, were informed of overpricing and cost manipulation by Velosa as far back as 2009, and did nothing to curb these illegal practices.

(g)     Youssef similarly testified that Petrobras mandated that the Company's suppliers and contractors pay the illegal bribes and that "they wouldn't get the work if they didn't pay."

(h)     Camargo likewise stated that bribes were a "rule of the game" and everyone at Petrobras knew it.

> (i)   Barusco stated that "the payment of bribes" was "'endemic' and institutionalized."

278.   In its April 30, 2014 Form 20-F, Petrobras firmly denied any noncompliance with applicable laws or regulations and represented that:

- Petrobras had five active internal investigation commissions in place to evaluate "aspects of the Pasadena Refinery acquisition;" evaluate contracts with several "service providers;" and evaluate contracts with specific service providers involved in the Abreu and Comperj refineries; and

- While none of those five commissions had completed their work, "[b]ased on the information that is currently available, we do not believe that the findings of any of these internal commissions would have a material effect on our financial statements."

279.   The Company's statement that it did not believe that "the findings of any of these internal commissions would have a material effect on [its] financial statements" was materially false and misleading because, for the reasons set forth above, Petrobras had no reasonable basis to make such a statement.

280.   On May 12, 2014, Petrobras held a conference call for analysts and investors to discuss the Company's first quarter 2014 financial results.  During the First Quarter 2014 Conference Call, Foster denied the accusations of bribery and corruption at the Company, stating in pertinent part:

> Finally, this is not a slide, but it's my final comment to you.  [This] [r]efers to the processes of investigation we've set up in the last few months.  We have answered different questions.  We have been inquired not only at the House of Representatives but also at the Senate.  We have answered questions about facts which are extremely unfavorable for our Company, and we have been working hard to investigate many of these episodes, such as the SBM Offshore situation.
>
> We have our own internal investigation committee.  They conducted investigations during 45 days.  And regarding Petrobras action, regarding our operations, *there are no facts or documents that would document the payment of bribery to any employees of Petrobras*.  The final report by the investigation committee was offered to the national authorities, as not only executive and legislative but also judicial authorities.

281.     Foster's statements that the Company "ha[s] been working hard to investigate many of these episodes, such as the SBM Offshore situation" and that "there are no facts or documents that would document the payment of bribery to any employees of Petrobras" were materially false and misleading because they omitted the material facts set forth above.

282.     On July 12, 2014, Petrobras responded to a *Los Angeles Times* article titled "Petrobras shares fall, analysts point to poor management by Brazil."  The article discussed, among other things, how the Company had become "ensnared in political scandals," including charges of having "drastically overpaid" for the Pasadena Refinery and the open criminal investigation into the allegations that Petrobras employees accepted $139 million in bribes from SBM for steering oil platform and drilling contracts to the Dutch company.  In responding to this article on *Facts and Data*, on July 12, Petrobras denied the allegations, reaffirming that Petrobras "has not found any facts or documents evidencing the payment of bribes to employees of Petrobras."

283.     The Company's statement that there was no "evidenc[e] [of] the payment of bribes to employees of Petrobras" by SBM was materially false and misleading for the reasons set forth above.

E.     **Petrobras Issued False and Misleading SOX Certifications and Statements Concerning the Adequacy and Effectiveness of Its Internal Controls.**

284.     Throughout the Relevant Period, Gabrielli, Foster, and Barbassa certified the effectiveness of the Company's internal controls and procedures.  Specifically, each of the Company's Forms 20-F included a certification signed by Barbassa, as well as Gabrielli (for the 2009 Form 20-F and the 2010 Form 20-F) and Foster (for the 2011 Form 20-F, the 2012 Form 20-F, and the 2013 Form 20-F), stating that:

> The Company's other certifying officer and I . . . have:

\*      \*      \*

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, <u>to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles</u>;

\*      \*      \*

The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

285.    Additionally, the February 29, 2012 Form 6-K, the 2010 Form 20-F and the 2011 Form 20-F contained the following statement:

[M]anagement assessed the effectiveness of [the] Company's internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  Based on that assessment, management has concluded that as of December 31 [of the reporting year,] [the] Company's internal control over financial reporting is effective.

286.    The 2012 Form 20-F, the 2013 Form 20-F, and the March 7, 2014 Form 6-K filed with the SEC contained the following representation:

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control – Integrated Framework [(1992)] issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has

concluded that Company's internal control over financial reporting was effective as of December 31 [of the reporting year].

287.    Each of the statements set forth in ¶¶ 284-86 above was false and misleading for the following reasons:  As described in detail herein, Petrobras's internal controls were grossly ineffective and were routinely overridden during the Relevant Period.  Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-rigging on construction contracts and the overpayment of costs in connection with these contracts in exchange for substantial kickbacks to Petrobras executives.  In the wake of the testimony from Costa and others involved in the scheme, Foster expressly admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls."  The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading because Velosa informed Gabrielli and Foster as early as 2008 of the "[i]rregularities," including "contracts that . . . were overbilled," yet no action was taken by the Company to discontinue the fraudulent scheme.

### F.    Defendants Violated Accounting Standards.

288.    Petrobras's improper capitalization of bribery-related payments violated GAAP and IFRS accounting standards in at least three ways:

*First*, by improperly capitalizing its bribery-related payments and then failing to conduct appropriate writedowns, Petrobras overstated the value of its PP&E and the total value of its assets.

*Second*, because bribery-related payments should have been treated as operating expenses and deducted from net revenues rather than capitalized and depreciated over time, Petrobras's operating expenses were understated and its net income was overstated.

*Third*, because Petrobras calculated depreciation, depletion and amortization ("DD&A") expenses by reference to inflated asset values, the Company's DD&A expenses were inflated.

### 1.    2009-2010:  GAAP Violations

289.    Petrobras's Form 20-F annual reports for 2009 and 2010 stated that "[t]he audited consolidated financial statements of Petrobras and our consolidated subsidiaries . . . have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

290.    Accounting Standards Codification ("ASC") 360 of US GAAP requires that the carrying values of property, plants, and equipment are initially measured at historical cost, including all normal expenditures necessary to bring the asset to a location and condition for its intended use.  GAAP does *not*, however, permit general administrative or overhead expenses to be included when capitalizing assets, as those costs do not give rise to any expectations of future profitability.  During and prior to the Relevant Period, however, the Company improperly capitalized bribery-related payments that inflated the costs of the properties it acquired without in any way enhancing the values of the properties. By doing so, Petrobras violated ASC 360.

291.    GAAP also requires that a Company write down the values of its property, plants, and equipment when events indicate that the carrying value of an asset or group of assets may not be recoverable.  ASC 360-10-35-17 provides, "An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. . . .  An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value."

292.    Petrobras specifically represented that it was, in fact, carrying out reviews of its long-lived assets in order to determine whether writedowns were necessary and appropriate as required by GAAP.  The Company's Forms 20-F for 2009 and 2010 each stated:

*In accordance with Codification Topic 360-10, management reviews long-lived assets, primarily property, plant and equipment to be used in the business and capitalized costs relating to oil and gas producing activities, whenever events or changes in circumstances indicate that the carrying value of an asset or group of assets may not be recoverable on the bases of undiscounted future cash flows.* The reviews are carried out at the lowest level of assets to which the Company is able to attribute identifiable future cash flows. *The net book value of the underlying assets is adjusted to their fair value using a discounted future cash flows model, if the sum of the expected undiscounted future cash flows is less than the book value.*

The main assumptions of cash flows are: prices based on last strategic plan presented, production curves associated to existent projects comprising the Company's portfolio, operating market costs and investments needed for projects conclusion.

293.    Petrobras knew that the carrying values of PP&E that had been impacted by bribery were not recoverable because those values had been inflated by fraud.  Petrobras, however, failed to conduct appropriate writedowns to reflect that fact.  As discussed above, the Company has admitted that such writedowns were necessary.

294.    Petrobras's practice of capitalizing bribery-related payments also caused its operating expenses to be understated and its net income to be overstated.  GAAP provides that general and administrative expenses should be recorded as expenses, not capitalized, and Petrobras's Forms 20-F for 2009 and 2010 each state that its operating expenses include "general and administrative expenses."  Thus, by capitalizing bribery-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses.  Because operating expenses are *subtracted* from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

295.    Petrobras's inflated valuations of its PP&E also caused its DD&A to be overstated.  The Company's Forms 20-F for 2009 and 2010 each stated that PP&E are depreciated on a straight-line basis.  Thus, the DD&A of each property that was affected by the

bribery scheme was overstated to the degree that the property's capitalized cost was inflated by bribery.  For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

### 2.    2011-2014:  IFRS Violations

296.    Beginning with fiscal year 2011, Petrobras switched from the use of GAAP to IFRS in connection with its financial statements.  Each of Petrobras's Form 20-F annual reports for 2011, 2012, 2013, and 2014 contained a statement to the effect that the Company's "consolidated financial statements have been prepared and are being presented in accordance with the International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board."

297.    Under IFRS, International Accounting Standard ("IAS") 16 governs the initial measurement of property, plants, and equipment capitalization.  Certain relevant provisions of IAS 16 are listed below.

(a)    IAS 16-7 provides that "[t]he cost of an item of property, plant and equipment shall be recognized as an asset if, and only if: (a) it is probable that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably."

(b)    IAS 16-15 provides that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost."

(c)    IAS 16 provides that "[t]he cost of an item of property, plant and equipment comprises: (a) its purchase price, including import duties and non-refundable purchase taxes, after deducting trade discounts and rebates[; and] (b) any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management[.]"

(d)      IAS 16-19(d) provides that "[e]xamples of costs that are not costs of an item of property, plant and equipment are: administration and other general overhead costs."

298.    Petrobras stated in its Form 20-F filings that it was following these rules. Its 2011, 2012, and 2013 Forms 20-F each included language to the effect that "[p]roperty, plant and equipment, net is stated at the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."

299.    Because repaying bribes to contractors did not give rise to any future economic benefits that would flow to Petrobras, and because the costs of corruption, by their nature, cannot be measured reliably, the costs that Petrobras incurred by repaying bribes did not qualify for recognition as assets under IAS 16-7.  Rather, they would fall under the category of general overhead costs, which IAS 16-19(d) specifies may not be capitalized.

300.    Further, like GAAP, IFRS requires that capitalized items of property, plants, or equipment be written down where there is evidence that the carrying value of those assets exceeds their fair value (i.e. market value as determined by an appraisal).   Relevant portions of IAS 16 include:

(a)      IAS 16-30: "After recognition as an asset, an item of property, plant and equipment shall be carried at its cost less any accumulated depreciation and any accumulated impairment losses."

(b)      IAS 16-31: "After recognition as an asset, an item of property, plant and equipment whose fair value can be measured reliably shall be carried at a revalued amount, being its fair value at the date of the revaluation less any subsequent accumulated depreciation and subsequent accumulated impairment losses. Revaluations shall be made with sufficient regularity

to ensure that the carrying amount does not differ materially from that which would be determined using fair value at the end of the reporting period."

   (c) IAS 16-32: "The fair value of land and buildings is usually determined from market-based evidence by appraisal that is normally undertaken by professionally qualified valuers. The fair value of items of plant and equipment is usually their market value determined by appraisal."

   (d) IAS 16-34: "The frequency of revaluations depends upon the changes in fair values of the items of property, plant and equipment being revalued. When the fair value of a revalued asset differs materially from its carrying amount, a further revaluation is required . . . ."

  301. Regarding revaluation, Petrobras's 2011, 2012, and 2013 Forms 20-F each included language substantially identical to the below:

> *Property, plant and equipment and intangible assets with definite useful lives are assessed for impairment when there is evidence that the carrying amount may not be recoverable.*
>
> Assets related to exploration and development of oil and gas and assets that have an indefinite useful life, such as goodwill, are tested for impairment annually. . . .
>
> *Impairment test comprises a comparison of the carrying amount of a cash generating unit with its recoverable amount. Where the carrying amount of cash generating unit exceeds its recoverable amount, it is considered impaired and is written off to its recoverable amount.* Reversal of previously recognized impairment losses is permitted, except for goodwill.
>
> The recoverable amount of an asset or group of assets is the higher amount between its fair value less cost to sell and its value in use. Value in use is generally used by the Company for impairment testing purposes, except when specifically indicated.

  302. Petrobras violated IAS 16 by failing to write down to their market value those assets whose costs had been inflated by fraud.  Petrobras knew that the fair value of its assets differed materially from their carrying values, and that to the extent its asset values had been

inflated by bribery-related payments, that inflation was not recoverable.  Nevertheless, the Company failed to take appropriate writedowns as required by IAS 16-30 and 16-31.

303.    Petrobras's practice of capitalizing bribery-related payments also caused its operating expenses to be understated, and its net income to be overstated.  As discussed above IAS 16-7 prohibits the recognition of general and administrative expenses not likely to cause future economic benefits as capital assets.  Rather, these expenses should be recorded as operating expenses under IAS 7 and included in the reporting entity's cash flow statement.  Petrobras's Forms 20-F for 2009 and 2010 each state that its operating expenses include "general and administrative expenses."  Thus, by capitalizing bribery-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses.  Because operating expenses are *subtracted* from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

304.    As under GAAP, Petrobras's inflated PP&E valuations also caused its DD&A to be overstated under IFRS.  The Company's 2011, 2012, and 2013 Form 20-F each contained a statement to the effect that "[e]xcept for land, which is not depreciated, other property, plant and equipment are depreciated on a straight line basis."  Petrobras's inflated valuations of its PP&E also caused its DD&A to be overstated.  Again, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that property's capitalized cost was inflated by bribery.

G.    **Petrobras Made False and Misleading Statements Concerning Its Financial Condition and Compliance with GAAP and IFRS.**

305.    Petrobras reported materially false and misleading financial results at the end of each quarter and fiscal year throughout the Relevant Period.  In particular, the PP&E, total

assets, expenses and net income figures that Petrobras reported to the market during the Relevant Period, which are set forth in detail below, were materially false and misleading when made for the following reasons:

(a)     Petrobras admitted in January 2015 that:

- The "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets."

- "[C]ontracts entered into between January 1, 2004 and April 30, 2012 (the period during which the scheme operated, as stated in the depositions described above) with the suppliers and contractors named in the [Costa, Youssef, Camargo and Mendonça Neto] depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

- "[A]mounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount.  However, those costs should not have been capitalized."

- "[I]t is necessary to correct the amounts related to the misconduct that were capitalized" and, in particular, to "deduct from [PP&E] any amount that could be linked to bribery of any sort."

- While the Company did not correct its misstated PP&E figure (or its misstated total assets, expenses and net income figures), it provided two possible methodologies for quantifying the required writedown. This analysis indicated a potential writedown between R\$4.06 billion (\$1.5 billion) and R\$88.6 billion (\$34 billion) with respect to contracts Petrobras signed with the cartel companies between January 1, 2004 and April 30, 2012.

(b)     Costa has admitted that the value of Petrobras's construction contracts were overstated by up to 3% due to the bribes, and by additional amounts of up to 20% due to the cartel's overpricing of Petrobras contracts.

(c)     The Company's January 27, 2015 estimates of a PP&E misstatement of between R\$4.06 billion (\$1.5 billion) and R\$88.6 billion (\$34 billion) were vastly understated

because they only accounted for the contracts entered into with known cartel members before April 30, 2012. As alleged above, the fraudulent scheme was not limited to cartel members and did not stop on April 30, 2012. As a result, the range provided by the Company downplayed the overstatement.

(d)     As described below, Petrobras's improper capitalization of these bribes and inflated costs throughout the Relevant Period violated both GAAP and IFRS.

(e)     Accountants hired by Petrobras found that while the Company spent over $18.5 billion on projects related to Abreu, the refinery is only worth $7 billion and while the Company spent $13.5 billion building Comperj, the refinery should be written down to zero.

306.     By wrongfully recognizing the cash paid out in bribes as assets instead of expenses, Petrobras materially overstated the amount of PP&E and total assets in each of its quarterly and annual financial statements for the period beginning January 1, 2004 (the point at which the Company itself has acknowledged improper bribes and bid-rigging began to occur) through the present. Additionally, Petrobras misreported net income in each of its quarterly and annual financial statements by failing to record an impairment charge necessitated by the overstatement of the Company's PP&E and total assets. Moreover, Petrobras misreported net income and the Company's total costs and expenses in each of those periods during which a bribe was paid and was improperly capitalized instead of having been expensed immediately.

307.     Specifically, the Company reported the following figures, which were materially false and misleading when made (unless otherwise indicated, all figures are taken directly from Forms 6-K or 20-F filed with the SEC and are presented in $ millions):

| SEC Filing | PP&E at Period- | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 11/23/2010 press release filed on Form 6-K | $206,278 | $298,136 | $13,288 | | 3Q 2010 |
| 11/24/2010 Form 6-K (the "November 24, 2010 Form 6-K") | $206,278 | $298,136 | $13,288 | $69,854 | 3Q 2010 |
| 3/15/2011 press release filed on Form 6-K with SEC | $218,567 | $308,683 | $19,475 | | 4Q and FY 2010 |
| 3/17/2011 Form 6-K (the "March 17, 2011 Form 6-K") | $218,567 | $308,683 | $19,475 | $95,894 | 4Q and FY 2010 |
| 5/24/2011 press release filed on Form 6-K | $230,370 | $330,551 | $6,524 | | 1Q 2011 |
| 5/26/2011 Form 20-F (the "2010 Form 20-F") | $218,567 | $308,683 | $19,184 | $95,894 | 4Q and FY 2010 |
| 5/26/2011 Form 6-K (the "May 26, 2011 Form 6-K") | $230,370 | $330,551 | $6,524 | $25,219 | 1Q 2011 |
| 8/24/2011 press release filed on Form 6-K | $247,276 | $350,661 | $13,576 | | 2Q 2011 |
| 8/25/2011 Form 6-K (the "August 25, 2011 Form 6-K") | $247,276 | $350,661 | $13,576 | $56,382 | 2Q 2011 |
| 11/22/2011 press release filed on Form 6-K | $220,306 | $308,956 | $16,833 | | 3Q 2011 |
| 11/22/2011 Form 6-K (the November 22, 2011 Form 6-K") | $220,306 | $308,956 | $16,833 | $87,921 | 3Q 2011 |

| SEC Filing | PP&E at Period- | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 2/28/2012 press release filed on Form 6-K | $182,465 | $319,410 | $20,121 | | 4Q and FY 2011 |
| 2/29/2012 Form 6-K (the "February 29, 2012 Form 6-K") | $182,465 | $319,410 | $20,121 | $110,102 | 4Q and FY 2011 |
| 4/2/2012 Form 20-F (the "2011 Form 20-F") | $182,465 | $319,410 | $20,121 | $110,102 | 4Q and FY 2011 |
| 5/15/2012 press release filed on Form 6-K | $194,099 | $337,971 | $5,212 | | 1Q 2012 |
| 5/17/2012 Form 6-K (the May 17, 2012 Form 6-K") | $194,099 | $337,971 | $5,212 | $30,751 | 1Q 2012 |
| 8/3/2012 press release filed on Form 6-K | $184,997 | $310,704 | $4,527 | | 2Q 2012 |
| 8/10/2012 Form 6-K (the August 10, 2012 Form 6-K") | $184,997 | $310,704 | $4,527 | $62,721 | 2Q 2012 |
| 10/26/2012 press release filed on Form 6-K | $191,395 | $318,467 | $7,271 | | 3Q 2012 |
| 10/30/2012 Form 6-K (the "October 30, 2012 Form 6-K") | $191,395 | $318,467 | $7,271 | $94,855 | 3Q 2012 |
| 2/4/2013 press release filed on Form 6-K | $204,901 | $331,645 | $11,034 | | 4Q and FY 2012 |
| 2/6/2013 Form 6-K (the "February 6, 2013 Form 6-K") | $204,901 | $331,645 | $11,034 | $127,727 | 4Q and FY 2012 |
| 4/29/2013 Form 20-F (the "2012 Form 20-F") | $204,901 | $331,645 | $11,034 | $127.727 | 4Q and FY 2012 |

| SEC Filing | PP&E at Period- | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 4/26/2013 Press Release filed on Form 6-K | $214,457 | $345,274 | $3,854 | | 1Q 2013 |
| 4/30/2013 Form 6-K (the "April 30, 2013 Form 6-K") | $214,457 | $345,274 | $3,854 | $31,410 | 1Q 2013 |
| 8/9/2013 press release filed on Form 6-K | $203,716 | $338,068 | $6,850 | | 2Q 2013 |
| 8/13/2013 Form 6-K (the "August 13, 2013 Form 6-K") | $203,716 | $338,068 | $6,850 | $61,613 | 2Q 2013 |
| 10/25/2013 press release filed on Form 6-K | $208,362 | $340,106 | $8,334 | | 3Q 2013 |
| 10/28/2013 Form 6-K | $208,362 | $340,106 | $8,334 | $93,167 | 3Q 2013 |
| 2/25/2014 press release filed on Form 6-K | $227,901 | $321,423 | $11,094 | | 4Q and FY 2013 |
| 2/26/2014 Form 6-K (the "February 26, 2014 Form 6-K") | $227,901 | $321,423 | $11,094 | $125,768 | 4Q and FY 2013 |
| 4/30/2014 Form 20-F (the "2013 Form 20-F") | $227,901 | $321,423 | $11,094 | $125,768 | 4Q and FY 2013 |
| 5/9/2014 press release filed on Form 6-K | $240,793 | $354,403 | $2,280 | | 1Q 2014 |
| 5/12/2014 Form 6-K (the "May 12, 2014 Form 6-K") | $240,793 | $354,403 | $2,280 | $31,433 | 1Q 2014 |
| 8/8/2014 press release filed on Form 6-K | $253,955 | $363,392 | $4,505 | | 2Q 2014 |

| SEC Filing | PP&E at Period- | Total Assets at Period-End | YTD Net Income | YTD Costs & Expenses | Period |
|---|---|---|---|---|---|
| 8/11/2014 Form 6-K (the "August 11, 2014 Form 6-K") | $253,955 | $363,392 | $4,505 | $64,514 | 2Q 2014 |

Each of the foregoing financial figures was materially false and misleading when made.

308.    In addition to its quarterly and annual SEC filings, the Company also published its financial statements in the prospectus supplements that it filed with the SEC in advance of its U.S. securities offerings.  During the Relevant Period, Petrobras's prospectus supplements disclosed the following amounts for PP&E, total assets, and net income (in $ millions):

| Filing | PP&E at Period-End | Total Assets at Period-End | YTD Net Income |
|---|---|---|---|
| 2/3/2012 Prospectus Supplement filed on Form 424(b)(2) | $218,567 as of 12/31/10, $136,167 as of 12/31/09, $84,719 as of 12/31/08, $220,306 as of 9/30/11; $206,278 as of 9/30/10 | $308,683 as of 12/31/10; $200,270 as of 12/31/09; $125,695 as of 12/31/08; $308,956 as of 9/31/11; $298,136 as of 9/30/2010 | $19,184 as of 12/31/10, $15,504 as of 12/31/09, $18,879 as of 12/31/08, $17,031 as of 9/30/11, and $13,288 as of 9/30/10 |
| 5/15/2013 Prospectus Supplement filed on Form 424(b)(2) | $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; $214,457 as of 3/31/13 | $334,654 as of 12/31/12; $319,914 as of 12/31/11; $310,194 as of 12/31/10; $345,274 as of 3/31/13 | $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $3,854 as of 3/31/13; $5,212 as of 3/31/12 |
| 3/11/2014 Prospectus Supplement filed on Form 424(b)(2) | $227,901 as of 12/31/13; $204,901 as of 12/31/12; $182,918 as of 12/31/11; $168,104 as of 12/31/10; $128,754 as of 12/31/09 | $321,423 as of 12/31/13; $327,396 as of 12/31/12; $316,414 as of 12/31/11; $310,194 as of 12/31/10; $199,442 as of 12/31/09 | $11,094 as of 12/31/13; $11,034 as of 12/31/12; $20,121 as of 12/31/11; $20,055 as of 12/31/10; $15,308 as of 12/31/09 |

Each of the foregoing financial figures was materially false and misleading when made.

309.     Additionally, the November 24, 2010 Form 6-K represented that Petrobras's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements."  Petrobras made the same representations in the March 17, 2011 Form 6-K; May 26, 2011 Form 6-K; August 25, 2011 Form 6-K; and November 22, 2011 Form 6-K.  Likewise, Petrobras represented in the 2009 Form 20-F and 2010 Form 20-F that the Company's "audited consolidated financial statements . . . and the accompanying notes, contained in this report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

310.     Each of those representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with GAAP.  Specifically, the Company's financial statements violated, among other GAAP provisions, FASCON 6 and ASC 360.

311.     Following Petrobras's transition to IFRS reporting, the Company represented that Petrobras's financial statements were "presented" and/or "prepared" "*in accordance with IAS 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)*" in its February 29, 2012 Form 6-K; May 17, 2012 Form 6-K; August 10, 2012 Form 6-K; October 30, 2012 Form 6-K; February 6, 2013 Form 6-K; April 30, 2013 Form 6-K; August 13, 2013 Form 6-K; October 28, 2013 Form 6-K; February 26, 2014 Form 6-K; May 12, 2014 Form 6-K; and August 11, 2014 Form 6-K.  Similarly, the Company's 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F represented that Petrobras's financial statements were "presented" and/or

"prepared" "*in accordance with the international financial reporting standards (IFRS) issued by the International Accounting Standards Board (IASB)*."

312.     Those representations were false and misleading when made, because the Company's financial statements were not prepared in accordance with IFRS.  Specifically, the Company's financial statements violated, among other IFRS provisions, IFRS CF 4.52 and IAS 16.

313.     The 2009 Form 20-F and 2010 Form 20-F contained certifications executed by Gabrielli and Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "*fairly presents, in all material respects, the financial condition and results of operations of the Company*."  The 2011 Form 20-F, 2012 Form 20-F, and 2013 Form 20-F contained the same certifications executed by Foster and Barbassa.  Those certifications were materially false and misleading when made.

314.     The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E:

> *Property, plant and equipment are measured at the cost to acquire or construct*, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses.

That statement was materially false and misleading.

315.     Petrobras repeatedly stressed to investors that Petrobras's financial statements had been subjected to scrutiny by the Company's management and outside auditors and the Company was subject to the requirements of the SEC.  For example, during the Company's August 6, 2012 conference call to discuss the Company's second quarter 2012 financial results, Foster reassured analysts:

We have qualified people.  We know how to work.  We know how to operate.
We have invested along our history billions dollars in our development and we
know what we are doing.  *Our results are absolutely true and legitimate*.

316.    That statement was false and misleading because the Company's financial results

were not "true and legitimate" and instead the Company's financial results were inflated by

massive bribes and bid-rigging.

317.    On May 9, 2014, in response to an interview question asking Foster to identify

"the most important aspects of the company's governance," Foster stated Petrobras "compl[ies]

with the rules of the Securities and Exchange Commission (SEC) and the NYSE in the United

States, the Latibex and Bolsa y Mercado Españoles, Spain and the National Securities

Commission (CNV) and the Buenos Aires Stock Exchange, Argentina."

318.    Foster's statement attesting to Petrobras's compliance with the SEC's and

NYSE's rules, including the SEC's requirement that all financial statements be accurately

reported, was false and misleading.

319.    Similarly, in a September 6, 2011 post on *Facts and Data*, Petrobras represented

that its "activities are fully guided by principles of ethics and transparency" and further stated:

It is important to note that Petrobras has analyzed their accounts permanently and
continuously, by internal and external audits, through the Comptroller General
(CGU) and the Court of Audit (TCU).  In addition, *the Company meets the
requirements of agencies such as the Brazilian Securities and Exchange
Commission (CVM), Securities and Exchange Commission (SEC) of the US, and
the Sarbanes- Oxley Act, with its audited financial statements and approved in all
instances*.

320.    Similarly, on December 29, 2012, Petrobras posted the following on *Facts and
Data*:

All the activities from Petrobras are monitored by the Shareholders, which are
Government representatives and private shareholders.  *The accounts of Petrobras
are analyzed permanently and continuously by internal and external audits*,
through the Government Accountability Office (CGU) and Federal Accounts
Court (TCU).  *The Company meets the requirements of agencies like the Brazilian*

*Securities and Exchange Commission (CVM), Securities and Exchange Commission (SEC), of the United States and the Sarbanes-Oxley Act, and its financial statements are audited and approved in all courts.*

321.    The statements identified in ¶¶ 319-20 above were false and misleading because, as set forth above, the Company did not meet the requirements of the SEC or SOX because its financial statements were inaccurately reported, as the Company later admitted.  Those statements were also false and misleading because the Company omitted to disclose that its "audited financial statements" were materially misstated and did not comply with GAAP or IFRS (as applicable) at all times during the Relevant Period.

### H.    Petrobras Made False and Misleading Statements Concerning Write-Offs and Impairment Charges Relating to the Corruption Scheme.

322.    On April 22, 2015, Petrobras published on its website the Company's financial results for the fourth quarter of 2014.  Petrobras reported a $7.367 billion loss in 2014 resulting from impairment charges in the amount of $16.823 billion.  Petrobras reported write-offs of overpayments incorrectly capitalized in the amount of $US 2.527 billion related to the payment scheme uncovered by the investigations of the Lava Jato Operation, which losses it stated were recognized in the third quarter of 2014.

323.    On April 22, 2015, Petrobras published on its website consolidated financial statements as of December 31, 2014, 2013 and 2012 with report of independent registered public accounting firm.  Petrobras again reported that in the third quarter of 2014, the Company wrote off US $2.527 billion of capitalized costs representing the amounts that Petrobras overpaid for the acquisition of property, plant and equipment in prior years.

324.    On May 15, 2015, Petrobras filed with the SEC an annual report for the year ended December 31, 2014, on Form 20-F (the "2014 20-F"), which again disclosed the write-off of US $2.527 billion of capitalized costs representing the amounts that Petrobras overpaid for the

acquisition of property, plant and equipment in prior years.  The Company disclosed that under IAS 16, the amounts it overpaid pursuant to this payment scheme should not have been included in the historical costs of its property, plant and equipment.

325.    Each of the statements set forth in ¶¶ 323-24 above was false and misleading for the following reasons:  The subject financial statements grossly understated the amount of overpayments incorrectly capitalized.  Petrobras reported total overcharges of only $2.5 billion related to the bribery scheme.  Petrobras cherry-picked this figure by applying a fixed percentage to the total contract value: the Company estimated the aggregate overpayment by applying a percentage indicated in the depositions (3%) to the total amounts for identified contracts. (Petrobras reported in its consolidated financial statements for FY 2012-2014 that the contracts tainted by the bribery scheme amount to $81.4 billion.)

326.    Petrobras's position that the most it overpaid on the contracts is 3% (the amount of the bribes kicked back to Petrobras executives and their political appointees) is contradicted by the testimony of government cooperators.  This includes Costa, Youssef, and Barusco, who testify that Petrobras routinely paid a 20% premium to the cartel.  Costa admitted that the value of Petrobras' construction contracts was overstated by up to 20% as a result of bribes and additional amounts due to the cartel's overpricing of Petrobras' contracts.  Costa testified that "a cartel was formed there with the object of frustrating the effective competitive bidding process for contracting' and that "the bribe comes from a percentage of the enterprise's previously established profit, which, due to the lack of effective competition always stretches to the limit the contracting enterprise allows." Youssef similarly testified that the cartel members set the price of their contracts close to the plus 20%: Q: "So, we can conclude that, due to the existence of the cartel, the contracts executed by Petrobras were always executed at the maximum amount

possible or close to it?" A: "Or close to it." A plea agreement executed by Barusco corroborates that Petrobras granted inflated contracts to cartel members for various projects, including those at the Abreu refinery, and that the cartel demanded contract prices that were "very much above the budget." According to Barusco's plea agreement, Petrobras's contracts with the cartel were always signed near the maximum amount for the internal budget of Petrobras. Barusco also confirmed that "in the case of [Abreu] there was clear overbilling."

327.    Petrobras's own disclosures of billions in impairment charges (which it claims are unrelated to the fraud) provide an indication of the true magnitude of the scheme. Petrobras reported a loss of $9.7 billion in the fourth quarter of 2012, due mainly to pre-tax impairment charges of $16.7 billion—the largest loss ever to be reported by any listed company in Brazil since 1986. The Company disclosed that its impairment loss was attributable to items such as project planning deficiencies, the use of higher discount rates, delays in future cash inflows and unfavorable business prospects resulting in lower projected growth, and claims that this portion of the write-down was not attributable to the cartel and bribery scheme. But in a Form 6-K that Petrobras had filed with the SEC on January 28, 2015, the Company disclosed that the "cartelization of suppliers: corruption and overcharging" was part of the difference when the fair value of an asset was lower than its carrying amount, thereby necessitating a write-down. Therefore, it is clear that a significant portion of the $16.7 billion that Petrobras classified as mere impairment should have been—but was not—written off as "overpayments incorrectly capitalized."

328.    Moreover, Petrobras disclosed that the $16.7 billion in purportedly innocuous impairment charges were "mainly related to" Abreu and Comperj, two of the refineries marred by corruption, and amounted to $11.6 billion of the $16.7 billion. Petrobras wrote down $3.4

billion from Abreu and $8.22 billion from Comperj.  Petrobras represented that projects at those refineries were postponed for an extended period of time as a result of the Company's measures to preserve cash and of the implications to the Company's suppliers of the Lava Jato investigation.  Yet, Petrobras failed to attribute any of the write-off to the padded contracts that amounted to billions in overpayments.

329.    Finally, Petrobras's impairment calculation of $16.7 billion stands in sharp contrast to its January 2015 calculation, which revealed a potential $30 billion write-down that was tied to the scandal-related losses.

## VIII.  DEFENDANTS CANNOT FIND REFUGE UNDER THE PSLRA'S "SAFE HARBOR" FOR FORWARD-LOOKING STATEMENTS

330.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  Many of the specific statements pleaded in this Complaint were not identified as "forward-looking statements" when made.  Further, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.  To the extent there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statements.

331.    Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading

forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras, PifCo, and/or PGF who knew that those statements were false or misleading when made.

## IX.   **PLAINTIFFS RELIED ON DEFENDANTS' MISREPRESENTATIONS**

332.   The presumption of reliance established by the fraud-on-the-market doctrine applies to Plaintiffs' 10b-5 Claims.  At all relevant times, the markets for Petrobras's securities were efficient for the following reasons, among others:

(a)   Petrobras ADSs, including the Petrobras Preferred ADSs, met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient market, and the Petrobras Notes were registered with the SEC and listed on the NYSE, and were traded in large and transparent markets with well-developed infrastructure for trading and dissemination of information;

(b)   As a registered and regulated issuer of securities, Petrobras filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

(c)   Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Company's websites, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, as well as through investor conference calls;

(d)   Petrobras was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e)     Petrobras was also covered by the major bond rating agencies Fitch, Moody's, and S&P, which published detailed research and credit analyses on each class of Petrobras bonds. Each of these reports was publicly available and entered the public marketplace;

(f)     The average weekly trading volume of Petrobras ADSs and U.S.-traded bonds met or exceeded the 2% threshold that establishes a strong presumption of market efficiency;

(g)     The material misstatements and omissions alleged in this Complaint would tend to induce a reasonable investor to misjudge the value of Petrobras securities; and

(h)     Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired Petrobras securities between the time that the Company made the material misstatements and omissions and the time that the truth was revealed, during which time the prices of Petrobras securities were artificially inflated by those misstatements and omissions.

333.    As a result of the foregoing, the market for Petrobras securities promptly digested current information regarding Petrobras from all publicly available sources, and the prices of Petrobras securities reflected such information. Based on the false and misleading statements of material fact and omissions of material fact alleged in this Complaint, Petrobras securities traded at artificially inflated prices during the Relevant Period. Plaintiffs purchased Petrobras securities relying on the integrity of the market price of those securities and other market information

relating to Petrobras, and were damaged when previously concealed facts relating to the misconduct alleged in this Complaint were ultimately revealed.

334.    Further, to the extent Defendants concealed or otherwise improperly failed to disclose material facts with regard to Petrobras or its subsidiaries, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

## X.    WHEN THE CONCEALED FACTS WERE ULTIMATELY DISCLOSED, THE PRICES OF PETROBRAS SECURITIES DROPPED SHARPLY

335.    Petrobras's wrongful conduct, as alleged in this Complaint, directly and proximately caused the damages Plaintiffs suffered.  The disclosures of previously misstated and concealed facts about Petrobras's involvement in a decade-long bribery scheme, related government investigations, and the attendant impact on the Company's business operations and financial condition caused the price of Petrobras's equity and debt securities to decline markedly, wiping out billions of dollars in shareholder wealth and bondholder value.

336.    All told, Petrobras's equity securities have lost more than *85%* of their value over the Relevant Period, erasing over *$216 billion* in market capitalization.  This precipitous decline has substantially eroded a critical equity cushion for investors in the Company's debt securities, which have also declined substantially in value—approximately *17.6%* on average—causing more than *$9.5 billion* in valuation losses to investors in Petrobras U.S.-listed bonds.  As a result of these disclosures, all 37 Petrobras bonds issued and outstanding during the Relevant Period, which were previously rated investment grade, have now been downgraded to junk.

337.    It was foreseeable to Defendants that concealing from the public, *inter alia*, Petrobras's involvement in a bid-rigging and bribery scheme that vastly inflated the value of the Company's construction contracts and its improper capitalization of overpayments and bribes

would artificially inflate the price of Petrobras securities.  It was also foreseeable that the
disclosure of this information, and the materialization of concealed risks associated with
Defendants' misconduct, would cause the price of Petrobras securities to decline as the inflation
caused by the Company's earlier misstatements and omissions was removed from the price of
Petrobras securities.  Accordingly, Defendants' conduct, as alleged in this Complaint,
proximately caused foreseeable losses to Plaintiffs, who purchased Petrobras securities during
the Relevant Period.

338.    More specifically, on November 9, 2012, Bloomberg reported that according to
the leading weekly Brazilian news magazine *Veja*, a Brazilian Federal prosecutor had requested
information from Petrobras to confirm the Company spent $1.1 billion to acquire the Pasadena
Refinery, which it is now looking to sell, and was considering opening an investigation.
According to *Veja*, Delta Airlines bought a similar refinery in April 2012 for only $150 million.
On November 12, 2012, the next trading day following this news, Petrobras's common ADSs
declined 1.97% and Petrobras's preferred ADSs declined 2.03%.  The prices of Petrobras's
common and preferred ADSs continued to decline for four more days, for a cumulative five-day
decline of 8.65% for common ADSs and 8.11% for preferred ADSs between November 12 and
16, 2012.

339.    On February 14, 2014, Bloomberg reported that Petrobras started an internal
investigation into the allegations of bribery payments made by SBM.  Further details came to
light over the next several trading days.  On February 14, 2014, Petrobras's common ADSs
declined by $0.05 or 0.43%, and Petrobras's preferred ADSs declined by $0.05 or 0.41%.

340.    On February 17, 2014, according to Bloomberg, the Brazilian Comptroller
requested information from Petrobras related to the contracts signed with SBM.  Additionally,

Foster reportedly publicly acknowledged the Company's internal investigation into the SBM bribery allegations.  On February 18, 2014, Petrobras's common ADSs declined by $0.31, or 2.69%, and Petrobras's preferred ADSs declined by $0.43, or 3.5%.

341.    On March 13, 2014, the Brazilian newspaper *O Globo* reported that members of the Brazilian Parliament advocated to expand the special commission investigating bribery allegations.  The same day, *Folha* published an article stating Brazilian federal authorities had initiated a criminal investigation into allegations that Petrobras officials received bribes from SBM.  That day, Petrobras's common ADSs declined by $0.15, or 1.40%, Petrobras's preferred ADSs declined by $0.20, or 1.78%, and, on average, the market value of Petrobras U.S.-registered debt securities declined by 0.22%, erasing over $92 million in bondholder value.

342.    On March 14, 2014, *O Globo* further reported that the TCU had opened an investigation into the bribery allegations related to SBM.  The same day, *Bloomberg* reported that Antonio Imbassaby, an opposition lawmaker, proposed a guide for the investigation of Petrobras to the Brazilian Legislature.  One of the main provisions of the guide mandated that Brazil's Congress supervise the investigation.  That day, Petrobras's common ADSs declined by $0.17, or 1.61%, and Petrobras's preferred ADSs declined by $0.19, or 1.72%.

343.    On March 17, 2014, Petrobras issued a press release announcing its board had approved the Company's financial statements for 2013 by a majority vote.  The announcement went on to note, however, that "Director Mauro Rodrigues da Cunha voted against the approval of the Financial Statements of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) lack of information and apparent accounting inadequacy of refinery investments."

Following this news, Petrobras's common ADSs declined 0.96%, closing at $10.27, and its preferred ADSs declined 1.66% to close at $10.68.

344.     On April 8, 2014, Bloomberg reported that leaders of the opposition parties filed an injunction with Brazil's Supreme Court to ensure that the investigation of Petrobras's purchase of the Pasadena Refinery would be conducted exclusively by a parliamentary commission.  That day, Petrobras's common ADSs declined $0.30, or 2.11%, to close at $13.92, and Petrobras's preferred ADSs declined $0.35, or 2.36%, to close at $14.48.

345.     On April 9, 2014, the Brazilian Senate approved a broader probe involving Petrobras.  On April 9, 2014, Petrobras's common ADSs declined $0.09, or 0.65%, to close at $13.83, and Petrobras's preferred ADSs declined $0.08, or 0.55%, to close at $14.40.

346.     On April 11, 2014, Foster met with police at Petrobras's offices and agreed to turn over documents concerning the Company's contracts with third parties.

347.     On April 15, 2014, the Brazilian Congress instituted an inquiry in response to reports of overspending by Petrobras on the Pasadena Refinery, as well as allegations that Petrobras managers received bribes in connection with the Company's contracts with SBM.  On that day, Foster spoke about the project before a Brazilian Senate hearing and conceded that the Company was likely to lose money on the deal.  That day, the price of Petrobras common ADSs and preferred ADSs fell $0.55 and $0.61 per share, respectively, or 3.96% and 4.24%, to close at $13.33 and $13.77.

348.     On April 22, 2014, *Folhade S. Paulo* published an article providing more details about the Pasadena transaction.  According to the article, Transcor originally owned the Pasadena Refinery and sold half of it to Petrobras.  Reportedly, in 2007, Transcor offered to buy back Petrobras's share in the refinery.  Petrobras refused and an extensive legal battle ensued,

after which Petrobras was forced to purchase the remaining half still owned by Transcor for $885 million.  This ultimately brought the total purchase price for the Pasadena Refinery to $1.25 billion.  In stark contrast, the refinery was originally purchased by Transcor for only $42.5 million in 2005.  On April 22, 2014, Petrobras's common ADSs fell $0.37, or 2.65%, to close at $13.60 and Petrobras's preferred ADSs fell $0.31, or 2.12%, to close at $14.29.

349.    On April 25, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that an ex-Petrobras official was accused of money laundering from 2009 to 2014, related to the payment of overpriced contracts to companies who directly or indirectly rendered services to Petrobras, an activity that Costa assisted.  On April 25, 2014, Petrobras's common ADSs fell by $0.23, or 1.68%, to close at $13.50 per share and Petrobras's preferred ADSs fell by $0.21, or 1.45%, to close at $14.27.

350.    On May 8, 2014, *Valor* reported that Petrobras planned to postpone the conclusion of its internal investigation into the Pasadena transaction for another thirty days.  The findings were to be submitted to the Comptroller, the TCU, and other Brazilian regulatory bodies.  That day, Petrobras's common ADSs declined $0.48, or 3.07%, to close at $15.18, and Petrobras's preferred ADSs declined $0.58, or 3.46%, to close at $16.19.

351.    On May 14, 2014, after the close of trading, *The Wall Street Journal* reported that the Brazilian Senate had opened a probe into Petrobras's purchase of the Pasadena Refinery and that "Petrobras's current chief executive officer, Maria das Graças Silva Foster, and the CEO before Ms. Foster, Jose Sergio Gabrielli, are expected to testify next week."  On May 15, 2014, Petrobras's common ADSs declined $0.32, or 2.05%, to close at $15.27, and Petrobras's preferred ADSs declined $0.24, or 1.45%, to close at $16.27.

352.     On June 17, 2014, *Estado* reported that the Federal Public Ministry was investigating whether the Company's Repar refinery in Parana was part of the money-laundering scheme.  That day, Petrobras's common ADSs declined $0.28, or 1.77%, to close at $15.52, Petrobras's preferred ADSs declined $0.35, or 2.08%, to close at $16.44, and, on average, the value of Petrobras U.S.-registered debt securities declined 0.35%, erasing over $145 million in bondholder value.

353.     On July 23, 2014, the TCU conducted an audit of the Pasadena Refinery and found serious evidence of illegitimate acts by Gabrielli and five other Petrobras executives: Cerveró, Duque, Barbassa, Estrella, and former director Luis Carlos Moreira da Silva.  The TCU found the elements of conviction to be "very strong" and declared that the initial evaluation "reveal[s] highly reprovable conducts and significant losses."  As a result, the TCU concluded it was necessary to freeze the personal assets of Gabrielli and to seek a trial.  Those individuals appealed that decision to the Supreme Court of Brazil, which affirmed the lower court's ruling on August 13, 2014.  Also on July 23, 2014, Bloomberg reported that the TCU fined four former top Petrobras officials—including Gabrielli, Costa, and Cerveró—in a combined amount of $792 million, for their conduct related to the purchase of the Pasadena Refinery.  As a result of this news, Petrobras's common ADSs declined $0.47, or 2.67%, to close at $17.15, and Petrobras's preferred ADSs declined $0.76, or 3.99%, closing at $18.28.

354.     On August 12, 2014, after the market closed, *Bloomberg* News reported that Brazilian prosecutors were investigating whether certain financial institutions, including Citigroup, HSBC, and Bradesco, met compliance requirements and whether the banks were potentially linked to the Petrobras money-laundering scheme.  On August 13, 2014, Petrobras's

common ADSs declined $0.72, or 4.45%, to close at $15.46, and Petrobras's preferred ADSs declined $0.84, or 4.88%, to close at $16.37.

355.    On August 22, 2014, Bloomberg reported that Brazilian prosecutors were considering expanding the money-laundering investigation of Petrobras, while the Brazilian court was considering freezing Foster's assets.  Following this news, that day Petrobras's common ADSs declined $0.53, or 2.99%, to close at $17.20, and Petrobras's preferred ADSs declined $0.51, or 2.71%, to close at $18.28.  There was a similar price decline in debt securities.

356.    On Sunday, September 7, 2014, *Bloomberg News* reported that information was being leaked "to local media from a police investigation into alleged kickbacks involving [Petrobras] in an attempt to alter the results of the October national election."  On September 8, 2014, Petrobras's common ADSs and Petrobras's preferred ADSs both declined $1.03 per share, or more than 5%, to close at $18.35 and $19.24, respectively.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.24%, erasing over $100 million in bondholder value.

357.    On September 8, 2014, after the market closed, Petrobras issued a statement acknowledging Costa's arrest and the ongoing federal criminal investigation.  The Company stated, in part:

> It is in the best interests of the company's management to see the completion of all ongoing investigations.  Any irregular acts that may have been committed by a person or group of people, whether or not they are company employees, do not represent the conduct of the Petrobras institution and its workforce.

On September 9, 2014, Petrobras's common ADSs declined $0.52, or 2.83%, to close at $17.83, and Petrobras's preferred ADSs declined $0.53, or 2.75%, to close at $18.71.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.61%, erasing over $252 million in bondholder value.

358.     On September 12, 2014, according to a report in Brazilian newspaper *Folha de S. Paulo*, President Rousseff stated she had no affiliations with Costa, who had recently been arrested for involvement in Petrobras's corruption scheme.  Rousseff claimed she removed Costa from the Company because "for one, I did not know what he was doing and, secondly, he was not a person I trusted."  Following this report, that day Petrobras's common ADSs declined $1.25, or 7.09%, to close at $16.38, and Petrobras's preferred ADSs declined $1.34, or 7.22%, to close at $17.21.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.49%, erasing nearly $202 million in bondholder value.

359.     On September 27, 2014, Bloomberg reported that, according to *Veja*, Costa told the Brazilian police that members of President Rousseff's 2010 presidential campaign asked him for a donation of two million reais.  The *Valor* report further revealed that Petrobras failed to completely respond to information requests by the Government's Ethics Committee relating to the role of Cerveró (Director of Petrobras's International Division) in the Pasadena purchase.  On this news, on September 29, 2014 (the next trading day), Petrobras's common ADSs declined $1.76, or 10.69%, to close at $14.70, and Petrobras's preferred ADSs declined $1.98, or 11.41%, to close at $15.37.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.71%, erasing nearly $295 million in bondholder value.

360.     On September 30, 2014, after the market closed, *Bloomberg News* reported that top executives at Petrobras were potentially involved in the bribery and kickback scandal. According to the article, Duque "stamped and signed at least 6.6 billion Brazilian reais ($2.7 billion) in contracts for the Abreu e Lima refinery," and Costa had revealed to prosecutors that "misappropriation of funds also existed in other divisions including the one Duque headed."  On

October 1, 2014, Petrobras's common ADSs declined $0.89, or 6.27%, and Petrobras's preferred ADSs declined $1.05, or 7.05%.

361.    On October 9, 2014, after the market closed, *The Wall Street Journal* reported that Costa "alleged a certain percentage of the contracts at the refining unit at Petrobras were to go to members of the Workers' Party."  The article also noted recordings of Costa's testimony in Brazilian court had been released.  On October 10, 2014, Petrobras's common ADSs declined $1.15, or 6.86%, to close at $15.62, and Petrobras's preferred ADSs declined $1.22, or 6.87%, to close at $16.55.

362.    On October 15, 2014, the Administrative Council for Economic Defense, an agency of the Brazilian government responsible for (among other things) combatting corruption, announced its intention to formally investigate the existence of a cartel involving enterprises that contracted with Petrobras.  That day, Petrobras's common ADSs declined $1.55, or 9.06%, and Petrobras's preferred ADSs declined $1.58, or 8.73%.

363.    On October 16, 2014, before the market opened, multiple news reports described the TCU's findings concerning Comperj.  The TCU report described the project's management as "reckless" and stated that Petrobras was expected to spend 60% more than originally budgeted at one of its refineries.  Specifically, the TCU concluded that Petrobras's management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  On October 16, 2014, Petrobras's common ADSs declined $1.05, or 6.75%, and Petrobras's preferred ADSs declined $1.30, or 7.87%.

364.    On Saturday, October 18, 2014, during a news conference, President Rousseff admitted that embezzlement occurred at Petrobras.  She also announced that the Brazilian government would seek reimbursement of any money illegally diverted from the Company.  On

October 20, 2014 (the next trading day), Petrobras's common ADSs declined $0.93, or 6.23%, to close at $14.00, and Petrobras's preferred ADSs declined $1.08, or 6.9%, to close at $14.57.

365.    Also on October 20, 2014, after the market closed, *Bloomberg News* released a detailed article about the money-laundering and bribery scheme at Petrobras.  According to the article, Costa admitted that for nearly a decade he and other Petrobras officials accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."  On October 21, 2014, Petrobras's common ADSs declined $0.80, or 5.71%, to close at $13.20, and Petrobras's preferred ADSs declined $0.98, or 6.73%, to close at $13.59.  The value of Petrobras's U.S.-registered debt securities also declined on October 21, 2014, on average by 0.79%, erasing nearly $327 million in bondholder value.

366.    On October 22, 2014, Bloomberg reported that securities regulators began an inquiry into whether Petrobras violated securities laws.  That day, Petrobras's common ADSs declined $0.37, or 2.80%, Petrobras's preferred ADSs declined $0.35, or 2.58%, and the value of Petrobras's U.S.-registered debt securities declined on average by 0.53%, erasing over $218 million in bondholder value.

367.    On October 27, 2014, after months of repeatedly and vehemently denying the existence of the bribery and corruption scheme, Petrobras issued a formal statement filed in a Form 6-K with the SEC regarding Operation Car Wash.  In this statement, Petrobras acknowledged, for the first time, that the facts revealed by the police investigation could have a significant negative impact on its business.  The Company also detailed the actions it was taking in response to the testimony and the investigation, announcing it had hired two "independent specialized investigation companies" (later revealed to be Brazilian law firm Trench, Rossi e

Watanabe Advogados and U.S. law firm Gibson, Dunn & Crutcher LLP) to "examin[e] the nature, exten[t] and impacts of the actions that might have been performed" at the Company and to "analyze correlated facts and circumstances that might have [a] material impact over the Company's business." Petrobras emphasized, however, that "the relevant government authorities have officially acknowledged the Company as a victim in this investigative procedure."

368.   Petrobras's admission that Costa's claims of bribery and graft were legitimate and could have serious financial consequences for the Company's financial condition stunned the market. In response to the Company's October 27, 2014 statement, Petrobras securities declined in value, with Petrobras's common ADSs dropping 15.86%, from a close of $12.93 on October 24, 2014 to a close of $11.16 on October 27, 2014, and Petrobras's preferred ADSs dropping 17.15%, from a close of $13.46 on October 24, 2014 to a close of $11.49 on October 27, 2014.

369.   On November 1, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that Petrobras's auditor PwC had declined to sign off on the Company's third quarter financial results in light of the money-laundering and bribery investigations. Specifically, PwC refused to sign off on the financial results for Transpetro, a Petrobras subsidiary, which were signed by Machado, the Petrobras executive implicated by Costa. According to the reports, PwC urged the Company to dismiss Machado and on November 3, 2014, Machado agreed to take a 31-day unpaid leave of absence. On the same day, Petrobras issued a press release announcing that Machado had "presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days." On this news, Petrobras's common ADSs declined $0.44, or 3.76%, to close at $11.26 on November 3, 2014, and Petrobras's preferred ADSs declined $0.56,

or 4.58%, to close at $11.67 that day.  The value of Petrobras's U.S.-registered debt securities also declined that day, on average by 0.47%, erasing nearly $195 million in bondholder value.

370.     On November 9, 2014, the *Financial Times* reported that the DOJ and SEC both opened investigations into whether Petrobras or its employees were paid bribes in violation of the Foreign Corrupt Practices Act.  On this news, on November 10, 2014 Petrobras's common ADSs declined $0.28, or 2.57%, to close at $10.62, and Petrobras's preferred ADSs declined $0.23, or 2.04%, to close at $11.04.

371.     On November 13, 2014, after the market closed, Petrobras issued a press release with its SEC Form 6-K.  Petrobras admitted for the first time that the allegations of bribery and corruption at the Company could potentially impact its financial statements, but did not specify how they would be affected.  Accordingly, the Company stated that because it required time to quantify the financial impact of the corruption allegations, it would be unable to publish its audited third-quarter 2014 financial statements by the SEC's deadline of November 14, 2014. The Company committed to release unaudited accounting information concerning its third-quarter results by December 12, 2014.

372.     On November 14, 2014, the Brazilian Federal Police arrested Duque, which revealed to the market that Costa's admissions regarding bribery and graft were not the actions of a rogue employee, but instead spread throughout the Company.  On the same day, the Brazilian Federal Police arrested 26 other likely cartel members, including senior executives and contractors whose contracts with Petrobras were valued at approximately $59 billion.  According to the *Financial Times*, the Federal Police also served dozens of search warrants and raided the offices of 11 companies suspected of participating in the scam, including Petrobras's offices. Also that day, the office of Brazil's Comptroller General announced its investigation into

allegations that Petrobras officials accepted bribes to award contracts to SBM.  Petrobras

executives also admitted that SBM, one of the world's largest companies, was now formally

barred from future bid rounds.

373.    The prices of Petrobras securities declined significantly in response to the

November 13 and 14, 2014 disclosures.  Specifically, the common ADSs dropped 2.5%, falling

from a close of $10.20 on November 13, 2014 to a close of $9.95 on November 14, 2014.

Likewise, Petrobras's preferred ADSs dropped 2.8%, falling from a close of $10.52 on

November 13, 2014 to a close of $10.23 on November 14, 2014.  By Friday morning alone,

shares of Petrobras ADSs had hit a 52-week low in reaction to these disclosures that

"intensified" the "corruption scandal," according to The Street.com.  The value of Petrobras debt

securities also fell on November 14, 2014, on average by 2.43%, erasing over $1 billion in

bondholder value.

374.    In response to the foregoing revelations, Bank of America downgraded Petrobras

from a "buy" to a "neutral" rating on November 14, 2014.  *O Globo* quoted a Professor of

Accounting and Finance who "classified [Petrobras's actions] as 'extremely unusual and

atypical' and signifying a reduction of the Company's 'trustworthiness.'"

375.    On Monday, November 17, 2014, before the market opened, Petrobras conducted

a previously scheduled earnings conference call with investors.  During the call, Foster admitted

that while the Company had not yet determined the extent of the corruption scheme, "the

accusations and investigations of the [O]peration Car Wash . . . if found to be true, could

potentially affect the Company's financial statements."  When an analyst asked the Company to

explain "what kind of accounting adjustments could be necessary," Barbassa identified the

specific line items on Petrobras's balance sheet and income statement that were impacted by the

fraud, stating, "if the accusations are proven to be true . . . payment above what would be a fair value for a good [or] service . . . should be removed from the PP&E line item . . . and should be taken to the result."  Barbassa went on to state that Petrobras's PP&E "should not include values which are not a fair value for that good or service"—i.e., bribes—and that the Company "would deduct from it any amount that could be linked to bribery of any sort; any excessive price that would have been charged."  When asked why the alleged corruption would necessitate an asset writedown, Foster stated:  "*You have an obligation to write off from the asset a cost related to corruption . . . if there is a cost relating to corruption in the value of [a] net asset, even if the asset can pay off that cost, you have an obligation to write off that cost.*"  In response to this news, the price of  Petrobras's common ADSs dropped over 6%, from a close of $9.95 on November 14, 2014 to a close of $9.33 per share on November 17, 2014, and Petrobras's preferred ADSs dropped nearly 6%, from $10.23 to $9.64.  Additionally, on November 15, 2014, the value of Petrobras's U.S.- registered debt securities declined on average by 0.69%, erasing over $287 million in bondholder value.

376.    On November 17, 2014, the *Washington Post* published an article titled "'Operation Carwash' in Brazil causes normally staid business meeting to go off script," reporting that the Company's conference call contained "[w]ords that nobody wants to hear at a quarterly results event for a world-renowned oil company with a $220.6 billion business plan to complete: 'corruption,' 'bribe,' 'federal police,' 'internal investigation,' 'over-invoicing,' 'governance,' 'difficult moment' and 'painful.'"  In response to Foster's dubious representations that no one within the Company "ha[d] any idea of the scale of the corruption problem," the *Washington Post* responded:  "So nobody knew anything.  If not, why not?  There are billions of dollars involved in Operation Carwash.  Two top executives were jailed."

377.    Following this revelation, Morgan Stanley analysts noted the Company's representations "raise[] new concerns and impl[y] potentially material adjustments to the financials."  Morgan Stanley further opined that the probe was likely to result in a "sizable asset write-off" of $2 billion to $8 billion and the lowering of dividends for voting shares.  Despite maintaining a positive rating for Petrobras on November 14, 2014, the new revelations prompted Moody's to lower the Company's baseline credit rating to below investment grade.  Moody's stated the bribery probe contributed to a negative outlook on the entire country of Brazil.

378.    On November 18, 2014, a UBS analyst opined that as a result of the ongoing corruption scandal, "[w]e have *become more negative on Petrobras over the past two weeks* and cut our 2014-16 [earnings-per-share] estimates substantially, reflecting weaker BRL . . . vs. co's high leverage and a $10 billion impairment assumption, mostly on refinery projects."

379.    Some analysts, however, expressed doubts that the scandal would lead to a significant impact on Petrobras's financial condition because the Company did not provide a range or scope of the potential writedowns.  In an analyst report titled "PBR Conference Call – What Happens Next?" analysts from Itau BBA noted:

> The adjustments will be based on the testimony of the former executives and companies questioned and considered by the Federal Police to be proof of bribery. We do not expect Petrobras to mark-to-market the cost of the [Abreu] refinery, at least for the time being.  Proving the overpricing in this case is likely to be a more difficult task, particularly because the original contracts have been amended numerous times.  *The impact might therefore not be too significant for the time being*, at least not as considerable as the USD 16 billion estimated capex overrun for [Abreu].  Additional adjustments might be required as the investigations evolve.

380.    The Itau BBA analysts concluded that "[t]he impact of a possible write-off, assuming a reduction in the asset value, is therefore minimal."

381.    HSBC analysts stated in a November 21, 2014 report that "[i]t is hard to quantify the impact as of now [because] we have low visibility on the penalties that might by imposed by the Brazilian court and the company management."

382.    On November 24, 2014, an article in the Brazilian newspaper *O Globo* reported that at the June 11, 2014 hearing, Foster was asked about payments amounting to $139 million to Petrobras employees or executives by SBM, but she answered that the Company's internal committee "did not identify, within its activities and scope, payments of any benefits to any of our employees."  Foster also refused to confirm whether Petrobras already knew about the suspicion of bribery to Petrobras employees since 2012.  On this news, Petrobras's common ADSs declined $0.34, or 3.14%, to close at $10.50 on November 24, 2014, and Petrobras's preferred ADSs declined $0.38, or 3.32%, to close at $11.06.

383.    Also on November 24, 2014, Bloomberg reported that Erton Medeiros Fonseca, head of construction firm Galvao Engineering, gave police what he said were receipts for bribes paid to Petrobras director Duque.  After trading closed on November 24, 2014, Petrobras issued a press release announcing that the Company was under investigation by the SEC and would be required to produce certain documents pursuant to the investigation.  On this news, on November 25, 2014 Petrobras's common ADSs declined $0.11, or 1.05%, to close at $10.39, and Petrobras's preferred ADSs declined $0.04, or 0.36%, to close at $11.02.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.29%, erasing over $120 million in bondholder value.

384.    On November 28, 2014, Bloomberg reported that according to *Valor*, Lava Jato investigators discovered new evidence regarding the structure used to embezzle Petrobras funds to offshore bank accounts and tax-haven territories.  They also learned that as part of the scheme,

money was diverted to Chinese banks to be redistributed to dozens of secret bank accounts in Europe.  According to the report, Brazilian investigators expected more information to be revealed by Swiss authorities.  On this news, that day Petrobras's common ADSs declined $0.88, or 8.3%, to close at $9.72, and Petrobras's preferred ADSs declined $1.00, or 8.92%, to close at $10.21.

385.    On November 30, 2014, *Estadao* reported that Machado was resigning due to his alleged involvement in the Petrobras corruption scheme.  A separate article published by bidnessetc.com that day reported that corruption charges were negatively impacting both Petrobras and the Brazilian economy as a whole.  On this news, on December 1, 2014 Petrobras's common ADSs declined $0.60, or 6.17%, to close at $9.12, and Petrobras's preferred ADSs declined $0.56, or 5.48%, to close at $9.65.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 1.06%, erasing over $440 million in bondholder value.

386.    On December 2, 2014, reports by Fitch Ratings Inc. ("Fitch") predicted that the corruption allegations could slow production growth, affect access to debt capital markets, and result in monetary penalties, thus lowering Petrobras's credit rating.  On this news, that day Petrobras's common ADSs declined $0.12, or 1.32%, to close at $9.00, and Petrobras's preferred ADSs declined $0.14, or 1.45%, to close at $9.51.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.48%, erasing over $198 million in bondholder value.

387.    On December 4, 2014, Bloomberg reported that Costa testified that he "personally" informed Petrobras's board about the irregularities in 2009.  Costa also told the congressional committee investigating Petrobras that he sent an email to the ministry of the

presidency when President Rousseff headed both the Company's board and the ministry.  On this news, that day Petrobras's common ADSs declined $0.36, or 3.88%, to close at $8.91, and Petrobras's preferred ADSs declined $0.39, or 3.97%, to close at $9.44.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.64%, erasing over $263 million in bondholder value.

388.    On December 5, 2014, a report stated the criminality at Petrobras "came from inside out, i.e. from Petrobras' institutional structure itself."  On this news, that day Petrobras's common ADSs declined $0.09, or 1.01%, to close at $8.82, and Petrobras's preferred ADSs declined $0.04, or 0.42%, to close at $9.40.  There was a similar price decline in debt securities.

389.    Later, after the market closed that day, Bloomberg reported that the Brazilian probe had expanded from local suppliers to companies working on projects for Petrobras worldwide.  Brazilian authorities were investigating several foreign companies, including AP Moeller-Maersk A/S, regarding allegations that they bribed Petrobras executives in exchange for contracts.  On this news, on December 8, 2014 (the next trading day) Petrobras's common ADSs declined $0.59, or 6.69%, to close at $8.23, and Petrobras's preferred ADSs declined $0.65, or 6.91%, to close at $8.75.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 1.02%, erasing over $422 million in bondholder value.

390.    On December 10, 2014, several damaging news reports were published regarding the corruption scandal at Petrobras.  *First*, an article in *Valor* stated that at least R$20 billion in illegal kickbacks had been paid as result of the bribery scheme.  The *Wall Street Journal* then reported that Brazilian police indicted 13 suspects in the corruption probe.  According to an article published by SeekingAlpha.com, Petrobras faced limited financing options as the widening corruption probe threatened to temporarily leave it out of capital markets.  On this

news, that day Petrobras's common ADSs declined $0.40, or 4.91%, to close at $7.75, and Petrobras's preferred ADSs declined $0.45, or 5.14%, to close at $8.31.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.72%, erasing over $296 million in bondholder value.

391.    On December 11, 2014, Bloomberg reported that Brazilian prosecutors intended to seek the return of at least R$1 billion through the Petrobras corruption probe.  On this news, that day Petrobras's common ADSs declined $0.33, or 4.26%, to close at $7.42, and Petrobras's preferred ADSs declined $0.33, or 3.97%, to close at $7.98.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.75%, erasing over $311 million in bondholder value.

392.    Investors anticipated that Petrobras's December 12 earnings release would provide clarity as to the impact of the corruption on the Company's financial condition.  On December 11, 2014, *Forbes* noted:

> Petrobras is expected to announce its unaudited financial results for the third quarter on December 12, after a delay of more than a month, primarily because of ongoing investigations into the alleged bribery and corruption scandal that has hit the company.  We expect a focus on the potential impact of the ongoing probe to overshadow improvements in the company's key business drivers such as net upstream production and downstream margins.

393.    On December 12, 2014, however, the Company announced it would delay *for the second time* the release of its third-quarter 2014 financial statements, attributing the delay to new developments in the widening corruption probe, including the December 11 indictments of multiple executives at the country's largest engineering firms related to their involvement in the kickback scheme.  The Company previously had announced that December 12 was its deadline for the release of these financial statements.  In announcing the delay, however, the Company revealed that it actually had until January 15, 2015 to present the unaudited results without

breaching any debt covenants.  These debt covenants, if breached, would send some of the

Company's debt into technical default and force early repayment.  Bloomberg reported that the

real reason for delay was due to "disagreement" among Petrobras's board members, who

"differ[ed] on the size of writedowns stemming from graft-related costs."

394.    Also on December 12, 2004, former Petrobras executive Velosa appeared on a

popular Brazilian television news show, *Fantástico*, and detailed her substantial efforts to alert

Foster, Costa, and others to the corruption as far back as 2009.  Velosa detailed how in 2008,

while working under Costa to analyze the costs of the Abreu refinery, she discovered numerous

irregularities and misappropriation of resources in connection with the construction of Abreu.

395.    Petrobras took swift action to discredit Velosa.  Late on December 12, 2014,

Petrobras stated on *Facts and Data* that the Company "took all measures to elucidate the facts in

[Velosa's] reports."  The Company also questioned why Velosa waited five years to raise her

concerns in a public forum, insinuating it was nothing more than an act of retaliation.  On

December 15, 2014, Petrobras formally denied Velosa's account to the Brazilian CPI.

396.    On December 15, 2014, only several weeks after appearing before the CPI and

denying receiving bribes or knowing about the alleged corruption, Brazilian criminal authorities

announced a formal indictment against Cerveró for corruption and money laundering.  Cerveró

was implicated in, among other things, receiving tens of millions of dollars in bribes in

connection with his implementation of the suspicious Pasadena acquisition, as well as an

additional $53 million in bribes in connection with a deal to supply offshore drilling vessels by

Samsung.

397.    Cerveró's arrest suggested to investors that the corruption at Petrobras was more

rampant and broader in scope than had previously been disclosed.  As the former International

Director of Petrobras, Cerveró's arrest indicated the criminal scheme was not confined to bribery and money laundering in Brazil, but had actually reached international proportions.

398.    As the market absorbed Petrobras's failure to publish its third-quarter results, Velosa's allegations, and the news of Cerveró's indictment, the prices of the Company's securities declined, with its common ADSs falling 11.96%, from a close of $7.11 on December 12, 2014 to a close of $6.26 on December 15, 2014, the next trading day.  Likewise, the preferred ADSs fell 13.66%, from a close of $7.57 on December 12, 2014 to a close of $6.66 on December 15, 2014.  The same day, the value of Petrobras's U.S.-registered debt securities also plummeted, on average by 3.81%, erasing over $1.5 billion in bondholder value.

399.    On December 23, 2014, Petrobras announced it was forming a Special Committee to conduct an internal investigation into corruption allegations.  On this news, on December 24, 2014 Petrobras's common ADSs declined $0.11, or 1.43%, to close at $7.60, and Petrobras's preferred ADSs declined $0.04, or $0.50%, to close at $7.95.

400.    On December 29, 2014, *Valor* reported that the leader of Brazil's House of Representatives, Cunha, indicated "there [were] people involved from the start" in the bribery scheme.  He further testified that Foster participated in the meetings approving the majority of the illicit investments.  On this news, that day Petrobras's common ADSs declined $0.12, or 1.62%, to close at $7.27, and Petrobras's preferred ADSs declined $0.16, or 2.08%.

401.    On January 1, 2015, after the close of trading, an article on PetroGlobalNews.com reported that Petrobras bondholders' insistence on delayed results was pushing Petrobras dangerously close to a technical default.  Additionally, on January 2, 2015, an article published on bidnessetc.com reported that the Brazilian Market Regulator (CVM) intended to begin an investigation into corruption at Petrobras.  On this news, that day Petrobras's common ADSs

declined $0.54, or 7.4%, to close at $6.76, and Petrobras's preferred ADSs declined $0.63, or 8.31%, to close at $6.95.

402.    On Sunday, January 4, 2015, new information was revealed concerning the scope of the fraud at Petrobras and its impact on the Company's financial results.  First, *O Globo* reported that bribes were funneled through the construction of the Gasene pipeline—a project Foster oversaw during her tenure as the CEO of Petrobras's Gas and Energy Division—through "paper companies" set up to build the R$6.3 billion undertaking.  Specifically, *O Globo* reported that a previously confidential TCU audit had discovered overpricing in contracts for the Gasene pipeline exceeding *1800%*.  Upon these reports, the CPI was asked to investigate whether the use of "paper companies" and a special purpose entity to fund the pipeline's construction was intended to circumvent competitive-bidding requirements.  Also that day, *Folha S. Paulo* published a report stating that an internal Petrobras audit completed in November 2014 concluded that the Company would have to record R$1 billion in losses for Comperj-related equipment purchases that could no longer be used.  Further, *Folha* reported, the internal audit identified other "irregularities" in connection with a R$3.8 billion contract for Comperj that was awarded without competitive bidding to cartel members Odebrecht, UTC, and Toyo.  In both cases, the internal audit concluded, the Comperj contracts had been influenced by "pressures" from Duque and Costa.[12]  In response to these disclosures, the price of Petrobras's securities declined, with its common and preferred ADSs falling approximately 8%:  Petrobras's common ADS fell from $7.06 on January 2, 2015 to $6.57 on January 5, 2015, and Petrobras's preferred ADSs dropped from $7.58 to $6.95 over the same time—reaching their lowest level in over a

---

[12] On March 10, 2015, Barusco confirmed in testimony before the CPI that contracts associated with the Gasene pipeline involved kickbacks of 3% that were divided among Petrobras executives and the PT.

decade.  The same day, the value of Petrobras's U.S.-registered debt securities also plummeted, on average by 2.08%, erasing over $861 million in bondholder value.

403.    Analysts and commentators immediately regarded the revelations of bribery in one of Foster's significant projects while she served as chief of the Gas and Energy Division as important new information concerning the fraud.  On January 5, 2015, before the market opened, Brazil's leading financial news site *InfoMoney* published a report stating that the revelations in *O Globo* and *Folha de S. Paulo* concerning the Gasene pipeline and Comperj overbilling were "shaking the news" that morning.  Later that day, *InfoMoney* reported that Petrobras shares had fallen "[i]n the midst of very busy news and various clarifications during the weekend," including those related to the *O Globo* report.  Similarly, *Valor Economico* reported that Petrobras common shares declined to their lowest level since 2004 following "new allegations" and the "bad news" in *O Globo* and *Folha*, and the Associated Press reported that while oil prices had also declined, Petrobras investors were in fact "react[ing] to the sequence of news about corruption and mismanagement," including the new facts revealed in *O Globo*.  As Reuters reported, Petrobras shares had plunged in the face of "an avalanche of bad news."

404.    Then, on January 6, 2015, Petrobras disclosed that pursuant to a confidential meeting of its board of directors on January 5, 2015, the unpaid leave of Transpetro CEO Machado was to be extended until January 21, 2015.  In response to this disclosure, that day Petrobras's common ADS fell, closing at $6.02, and Petrobras's preferred ADS also declined, closing at $6.14.

405.    On January 12, 2015, Bloomberg reported that a Bank of America analyst cautioned that Petrobras bonds could be downgraded to junk status.  Bloomberg also reported that Petrobras, after banning certain builders involved in the corruption scheme, had to delay

projects, including a multibillion-dollar refinery. On this news, that day Petrobras's common ADSs declined $0.49, or 6.94%, to close at $6.57, and Petrobras's preferred ADSs declined $0.53, or 7.4%, to close at $6.63.

406.    On January 17, 2015, *O Globo* reported that Cerveró blamed Petrobras's board for errors at the Pasadena Refinery. On January 18, 2015, Bloomberg repeated an account from *Folha* that predicted Petrobras could lose $3.2 billion related to Abreu. On this news, on January 20, 2015 (the next trading day) Petrobras's common ADSs declined $0.25, or 3.54%, to close at $6.81, and Petrobras's preferred ADSs declined $0.08, or 1.11%, to close at $7.11. There was a similar price decline in debt securities.

407.    On January 23, 2015, Bloomberg reported that Brazilian prosecutors were preparing to announce a new round of accusations regarding Lava Jato participants and that Petrobras was considering possible a writedown of assets and projects for regulatory filing. On this news, that day Petrobras's common ADSs declined $0.40, or 5.23%, to close at $7.25, and Petrobras's preferred ADSs declined $0.36, or 4.52%, to close at $7.61.

408.    After the markets closed on January 27, 2015, Petrobras finally released its unaudited third-quarter financial statements. The Company's external auditor, PwC, did not sign off on them, and the Company's reported results did not contain any writedowns of PP&E. Nevertheless, in its January 27, 2015 earnings release (filed with the SEC on Form 6-K on January 28, 2015), Petrobras revealed the staggering scope of the corruption scheme. Note 3 to the release contained a section titled "Reasons to correct the carrying amount of specified property, plant and equipment," in which the Company acknowledged that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 . . . with suppliers and contractors named in the depositions may have

included amounts related to the misconduct by suppliers and contractors, political agents,

Petrobras personnel and other people." Petrobras further disclosed that R*$188.4 billion ($73

billion)* of the Company's assets, "or approximately 1/3 of the company's total fixed assets,"

relate to "contracts signed between Petrobras and the [cartel] companies . . . from 2004 to April

2012," and are thus impacted by the corruption charges.

409.    The Company also admitted it improperly capitalized as assets the inflated

contract amounts confessed to by Costa, resulting in the material overstatement of its PP&E:

> The payments related to the misconduct previously mentioned were recognized as
> part of the cost of certain property, plant and equipment and, as of September 30,
> 2014, most of those assets were under construction or were recently completed,
> and therefore, had little accumulated depreciation.

> No impairment losses have been recognized in the past for the property, plant and
> equipment affected by the payments related to misconduct because their
> recoverability is tested for impairment in cash-generating units (CGU), whose
> value-in-use has been historically higher than their carrying amounts. The
> recoverable amount calculated under the value-in-use approach includes the
> benefits of existing synergies between the assets that comprise the CGU.

> Therefore, under the circumstances described above, the Company believes that
> amounts related to the misconduct by third parties were capitalized as part of the
> historical cost of its property, plant and equipment and are still part of their
> carrying amount. However, those costs should not have been capitalized.

410.    In the January 27, 2015 earnings release, Petrobras repeatedly acknowledged the

need to "correct" the carrying value of its PP&E. The Company likewise admitted in Note 2 that

the failure to correct the carrying value of PP&E meant that its financial statements contained

material errors and did not comply with IFRS:

> These consolidated interim financial statements and notes to the financial
> statements have not been reviewed by independent auditors and reflect
> management's best judgment in fairly presenting the Company's financial
> position in light of facts known to management and based on documentation
> available as of the current date, *except for errors in the carrying amount of
> certain property, plant and equipment, which could not be corrected by the
> Company as of the date of issue of these financial statements, as set out in note 3*.

These consolidated interim financial statements have been prepared in accordance with IAS 34 - Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), *except for the errors mentioned above and further discussed in note 3.*

411.    Despite acknowledging that the corruption scandal would result in significant financial adjustments to the Company's balance sheet and income statement, Petrobras did not record an asset writedown.  However, as the Company disclosed, its internal review of certain assets impacted by the fraud indicated a range of potential writedowns between $1.5 billion and $34 billion.

412.    Similarly, in a January 27, 2015 letter to shareholders that accompanied Petrobras's third-quarter results, Foster admitted that "facts and proofs obtained in the 'Operation [Car Wash]' . . . have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets."  Foster also admitted that an internal review of assets impacted by the fraud uncovered R$88.6 billion ($34 billion) of overvalued assets and R$27.2 billion ($10 billion) of undervalued assets.  Reuters reported that these figures, "[i]f confirmed by auditors . . . would lead to a 61.4 billion [($22 billion)] writedown, an amount equal to more than half the company's current 120 billion-real ($43.3 billion) market value."

413.    Additionally, in her letter to shareholders, Foster stated the Company was working with PwC to adjust its financial statements *and* to "enhance [its] internal controls."  The Company's earnings release identified several measures it was implementing in order to strengthen its internal controls.

414.    Petrobras's startling admissions concerning the material errors in its financial results and the vast scope of the fraud, the Company's internal control weaknesses, and

continued lack of transparency regarding the quantification of the writedown, immediately caused the Company's securities to plunge.  Specifically, on January 28, 2015, Petrobras's common ADSs fell 11.95%, from a close of $7.45 on January 27, 2015 to a close of $6.56 on January 28, 2015.  Likewise, Petrobras's preferred ADSs fell 11.7%, from a close of $7.86 on January 27, 2015 to a close of $6.94.  The announcement kicked off a damaging week during which Petrobras lost nearly $9 billion in market capitalization.  Similarly, the market prices of the Company's debt securities declined dramatically on January 28, 2015, resulting in another $2 billion in valuation losses.

415.    Further, in response to this disclosure, analysts commented on Petrobras's inability to produce audited financials and its failure to take a writedown.  Morgan Stanley stated:  "After great expectation about the publication of PBR's write-off amount, no consensus was reached internally on the value and 3Q14 came out without a charge.  We think this was the worst outcome and expect the stock to be under pressure . . . the worst outcome is the continuation of the uncertainty [and there is] . . . no visibility as to when audited financials will be reported."  Similarly, Itau BBA commented "No News Is . . . Bad News!" and explained that the Company's decision to not record a writedown would likely result in "a pretty negative market reaction to this decision of excluding the write-offs, as we read it as a sign of lack of an agreement between the company and its board, which may, at the limit, jeopardize the attempt to get an audited balance on schedule (by the end of June at the latest)."

416.    Brazilian analysts at Votorantim Corretora noted Petrobras's "[f]inancial Figures [Were] Less Important than Lack of Information," opined that "investor sentiment will drive the shares much more than the financial figures," and suggested that "the market has been eager to ascertain the impact of the impairments arising from the [Operation Car Wash] investigation on

the company's balance sheet," but "the extent of the damage to the company's financial figures remains unknown . . . [s]o, investors remain in the dark, and this will severely harm the shares."

417.    The media also noted the market's negative and surprised reaction to this disclosure, with *The Wall Street Journal* commenting:  "'When it didn't [announce a writedown], *the credibility went down the drain and nothing else matters*.  We need to see, as investors, a credible statement with the numbers.'"  On January 30, 2015, Reuters reported that the Company's decision not to provide a "monetary estimate for how much the company's assets were overvalued as a result of the corruption scheme" was "a surprise."

418.    Also following the release of Petrobras's third-quarter results, both Moody's (on January 29) and Fitch (on February 3) downgraded the Company to the lowest level of investment grade.  Both rating agencies cited, as primary reasons for the downgrades, the risk resulting from the Company's inability to quantify the costs of the corruption scandal and the resulting liquidity pressures.

419.    On January 28, 2015, Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."  Nevertheless, Petrobras released its delayed unaudited third-quarter results without a writedown for graft, leaving investors in the dark over the financial impact of the multibillion-dollar corruption scandal.  According to reports, the board initially decided to take a writedown but reversed itself due to pressure from Chairman and former Finance Minister Guido Mantega, who is close to Brazil's ruling Workers' Party.

420.    After the meeting, Petrobras stated it "understands that it will be necessary to make adjustments at the financial statements to correct the [carrying] values of fixed assets that may have been impacted by amounts related to misconducts made by suppliers, politicians, Petrobras employees and other groups in the context of the 'Lava Jato operation.'"  According to the Company, the revisions were necessary because court documents show "illicit acts, such as suppliers' cartelization and bribes received by former employees."

421.    Caving to President Rousseff, Foster changed her story and now said it was "impractical" to quantify the writedown because it was not easy to separate corruption-related charges from those caused by other factors.  Brazilian accounting experts questioned that explanation.  "There is no reason for the company not to have estimated, even in a provisional way, the write-downs related to corruption," said Gonçalves, an accounting professor at Faculdade Santa Marcelina, a Sao Paulo university.  He further noted, "I have the strong impression that this is the government trying to avoid the inevitable."  Analyst Ricardo Kim of XP Investimentos, a Brazilian brokerage firm, stated, "Without the write-down, what's the point?"

422.    On this news, on January 28, 2015 Petrobras's common ADSs declined $0.89, or 11.95%, to close at $6.56, and Petrobras's preferred ADSs declined $0.92, or 11.70%, to close at $6.94.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 1.67%, erasing nearly $690 million in bondholder value.

423.    On January 30, 2015, Bloomberg reported that Moody's downgraded Petrobras rating to "Baa3" as a result of the corruption probe.  *The Wall Street Journal* published an article on the same day, stating:

> Moody's said it downgraded the company's unsecured debt from Baa2 to Baa3 and lowered Petrobras' baseline credit assessment from ba1 to ba2, based on

"concerns about corruption investigations" and "uncertainty about the timely
delivery of audited financial statements [that] could lead to significant liquidity
pressures." Moody's said the ratings "remain on review for further downgrade."

On this news, Petrobras's common ADSs declined $0.39, or 6.09%, to close at $6.01, and

Petrobras's preferred ADSs declined $0.46, or 6.96%, to close at $6.15.  The same day, the value

of Petrobras's U.S.-registered debt securities also declined.

424.     On February 6, 2015, Petrobras announced it had appointed a new chief

executive, leader of Banco do Brasil, Bendine.  Cunha, who represents minority shareholders on

the 10-member board, said he learned about Bendine's appointment from news reports before the

board even had a chance to vote on the appointment:  "We have seen today an episode of

disrespect for the board of directors of Petrobras," Cuhna stated.  "Once again the controlling

shareholder (the government) has imposed its will over the interests of Petrobras, ignoring the

appeals of long-term investors."

425.     Anger at state interference led all three independent board members to vote

against Bendine's appointment.  Sinedino, a representative of the Company's unionized

employees, expressed a similar sentiment when he said he voted against Bendine and five other

senior appointments in protest over the political nature of the appointments and the failure to

consult the board and Company workers.  Sinedino demanded that Petrobras set objective criteria

for naming senior executives, and blamed a history of political interference in the selection of

top-level Petrobras managers for the corruption scandal that has engulfed the Company.  Marcelo

Varejao, an investment analyst with Sao Paulo brokerage Socopa, commented:  "Markets wanted

a name to bring Petrobras the credibility and the corporate governance lacking today.  Those

hopes were ended with Bendine.  It is not a question of whether he is competent or not but rather

that he is linked to Dilma."  On this news, on February 6, 2015 Petrobras's common ADSs

declined $0.57, or 8.02%, to close at $6.54, and Petrobras's preferred ADSs declined $0.63, or

8.73%, to close at $6.59.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.77%, erasing nearly $320 million in bondholder value.

426.    On February 10, 2015, Bloomberg reported that Petrobras might need to take a R$10-20 billion writedown.  On this news, that day Petrobras's common ADSs declined $0.49, or 7.29%, to close at $6.23, and Petrobras's preferred ADSs declined $0.41, or 6.10%, to close at $6.31.  Petrobras's debt securities experienced a similar decline.

427.    On February 19, 2015, Bloomberg reported that the investment fund of George Soros (Soros Fund Management), which manages about $28 billion, sold all its Petrobras shares based on the news about the Petrobras scandal.  Bloomberg further noted Judge Moro refused to release four executives (Joao Ricardo Auler, Avancini and Leite, of Camargo Correa, and Pessoa, of UTC) who had been accused of participating in Petrobras's corruption scheme, because their release would pose a threat to public order and to the integrity of the judicial system.  On this news, that day Petrobras's common ADSs declined $0.33, or 4.73%, to close at $6.64, and Petrobras's preferred ADSs declined $0.35, or 4.94%, to close at $6.73.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.52%, erasing over $215 million in bondholder value.

428.    On February 24, 2015, after the market closed, Moody's downgraded Petrobras's bonds to junk in response to the widening corruption probe.  The downgrade "reflects increasing concern about corruption investigations and liquidity pressures," Nymia de Almeida, an analyst at the rating company, said in a statement.  Adriano Pires, the head of Rio de Janeiro-based energy and infrastructure consulting firm CBIE, commented:  "Petrobras was already living the perfect storm.  Now it is even worse."  On this news, on February 25, 2015 Petrobras's common ADSs declined $0.37, or 5.39%, to close at $6.49, and Petrobras's preferred ADSs declined

$0.47, or 6.72% to close at $6.52.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 1.98%, erasing nearly $820 million in bondholder value.

429.    On February 28, 2015, the Brazilian newspaper *Folha de Sao Paulo* reported that Avancini and Leite, CEO and Vice President of the contractor Camargo Correa, executed plea agreements with prosecutors and the federal police.  Both were said to be close to Youssef and had been charged with paying R$40 million in bribes associated with Abreu.  On this news, on March 2, 2015 (the next trading day) Petrobras's common ADSs declined $0.26, or 3.92%, to close at $6.37, and Petrobras's preferred ADSs declined $0.21, or 3.13%, to close at $6.50.

430.    On March 3, 2015, after the market closed, Bloomberg reported that a difference of opinion on a writedown of $30 billion in Petrobras assets led President Rousseff to fire Foster earlier that year.  Additionally, on March 4, 2015, the *Financial Times* reported that the Brazilian Attorney General sought the Brazilian Supreme Court's approval to investigate 28 cases involving 54 people, mostly politicians whose names have not yet been disclosed, in connection with the Petrobras corruption.  On this news, on March 4, 2015 Petrobras's common ADSs declined $0.23, or 3.59%, to close at $6.18, and Petrobras's preferred ADSs declined $0.28, or 4.31%, to close at $6.21.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.41%, erasing over $170 million in bondholder value.

431.    On March 8, 2015, after the market closed, the *Financial Times* reported that documents released by a Brazilian court outlined the alleged use of Swiss bank accounts for the payment of bribes in the Petrobras scandal.  Additionally, on March 9, 2015, the website 24/7 Wall St. revealed more information regarding the progress of the Lava Jato investigations, including a court ruling that 54 Brazilian politicians would be added to the investigation.  On this news, on March 9, 2015 Petrobras's common ADSs declined $0.37, or 6.21%, to close at $5.59,

and Petrobras's preferred ADSs declined $0.35, or 5.80%, to close at $5.68.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.90%, erasing over $373 million in bondholder value.

432.    On March 10, 2015, *The Wall Street Journal* reported that, while testifying at the CPI (and for the first time publicly) regarding the Petrobras scandal, Barusco said he amassed nearly $100 million in bribes as part of the scheme.  On this news, that day Petrobras's common ADSs declined $0.29, or 5.19%, to close at $5.30, and Petrobras's preferred ADSs declined $0.21, or 3.70%, to close at $5.47.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.37%, erasing over $153 million in bondholder value.

433.    On March 12, 2015, Bloomberg and the Brazilian newspaper *Valor Econômico* reported that Gabrielli spoke at a hearing before the CPI and acknowledged that the corruption and the bribes involved "*some people and some suppliers*" and that there was no way to know on a day-to-day basis whether an individual was embezzling money.  On this news, that day Petrobras's common ADSs declined $0.20, or 3.70%, to close at $5.21, and Petrobras's preferred ADSs declined $0.29, or 5.16%, to close at $5.33.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.38%, erasing over $157 million in bondholder value.

434.    On March 13, 2015, Bloomberg reported that Petrobras intended to seek to extend its deadline to publish audited results by six months to avoid the acceleration of payments on its debt.  On this news, that day Petrobras's common ADSs declined $0.20, or 3.84%, to close at $5.01, and Petrobras's preferred ADSs declined $0.23, or 4.32%, to close at $5.10.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 1.54%, erasing over $636 million in bondholder value.

435.    On March 19, 2015, before the market opened, it was reported that Cristiano Kok, chairman of the contractor Engevix, admitted he paid approximately R$10 million in bribes to Youssef to win contracts for Petrobras.  On this news, that day Petrobras's common ADSs declined $0.40, or 7.07%, to close at $5.26, and Petrobras's preferred ADSs declined $0.36, or 6.26%, to close at $5.39.  The same day, the value of Petrobras's U.S.- registered debt securities also declined, on average by 0.51%, erasing over $210 million in bondholder value.  Moreover, the value of the Company's debt securities fell on average by 4.4% during the week of March 19, 2015, resulting in $4.3 billion in valuation losses.

436.    On March 26, 2015, both Bloomberg and the website ino.com reported that in her testimony before Brazil's House of Representatives during a parliamentary investigative committee, Foster stated she and other executives of Petrobras were taken by surprise by the corruption scheme, and claimed she had never before heard of bribes at Petrobras.  Foster also stated that, looking back on the Pasadena Refinery purchase, it was not a "good business deal."  On this news, that day Petrobras's common ADSs declined $0.24, or 3.98%, to close at $5.79, and Petrobras's preferred ADSs declined $0.29, or 4.74%, to close at $5.83.

437.    On April 27, 2015, after Petrobras reported a write-off related to the fraud of over $2 billion, Barrons.com reported that Morgan Stanley had changed its Petrobras recommendation from "neutral [hold]" to "sell" based on the Company's debt level and the fact that the Company's operating cash flow was not enough to support its leverage level.  On this news, that day Petrobras's common ADSs declined $0.66, or 6.61%, to close at $9.33, and Petrobras's preferred ADSs declined $0.20, or 2.24%, to close at $8.71.  Petrobras's debt securities experienced a similar price decline.

438.     On May 15, 2015, eight minutes before the market closed, a report broke that Petrobras had admitted that its internal controls were deficient.  On this news, on May 18, 2015 (the next trading day) Petrobras's common ADSs declined $0.44, or 4.34%, to close at $9.69, and Petrobras's preferred ADSs declined $0.24, or 2.56%, to close at $9.14.  Petrobras's debt securities experienced a similar price decline.

439.     On May 19, 2015, *Folha* reported that eight members of Petrobras's CPI traveled to London to listen to the testimony of SBM's former employee Johnathan Taylor.  Taylor was expected to give details about the relationship between SBM and the money launderer Julio Faerman.  The article reported that Faerman's Virgin Islands account received over $31 million in resources of Petrobras.  On this news, that day Petrobras's common ADSs declined $0.60, or 6.19%, to close at $9.09, and Petrobras's preferred ADSs declined $0.62, or 6.78%, to close at $8.52.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.35%, erasing over $145 million in bondholder value.

440.     On May 22, 2015, *Folha* reported that documents sent from Monaco's authorities to Lava Jato showed that Petrobras's former officers Duque and Jorge Zelada ("Zelada") opened accounts in Monaco, making it clear that both had been associated with the transfer of funds from Petrobras.  On this news, that day Petrobras's common ADSs declined $0.34, or 3.58%, to close at $9.15, and Petrobras's preferred ADSs declined $0.33, or 3.75%, to close at $8.48.

441.     On May 26, 2015, Bloomberg reported that Cerveró, former head of Petrobras's International Division, was sentenced to five years in prison.  Also on May 26, 2015, the Brazilian newspaper *O Estado de Sao Paulo* reported that Leite, a former executive of the cartel contractor Camargo Correa, confirmed the cartel operation at Petrobras during a CPI hearing in Brazil's House of Representatives.  On this news, that day Petrobras's common ADSs declined

$0.64, or 6.99%, to close at $8.51, and Petrobras's preferred ADSs declined $0.61, or 7.19%, to close at $7.87.  Petrobras's debt securities experienced a similar price decline.

442.    On June 19, 2015, Bloomberg reported that the top executives (including CEOs) of Brazil's biggest contractors, Odebrecht and Andrade Gutierrez, were arrested and that their offices were searched and seized by the Federal Police.  On this news, that day Petrobras's common ADSs declined $0.29, or 2.99%, to close at $9.40, and Petrobras's preferred ADSs declined $0.27, or 3.08%, to close at $8.50.

443.    On July 2, 2015, after the close of trading, the *Financial Times* reported that Petrobras's losses from the corruption scheme could be larger than reported, citing to a statement given by the Brazilian federal prosecutors suggesting that the state-run Company could possibly be forced to adjust its 2014 financial statements.  It was also reported that Petrobras's losses could reach 20% of the value of the contracts.  A delegate from the Federal Police, Igor Romario de Paulo, one of the Lava Jato coordinators, affirmed that the evidence "could suggest losses to Petrobras of 15-20% of its contracts."  On this news, on July 6, 2015 (the next trading day) Petrobras's common ADSs declined $0.63, or 7.13%, to close at $8.20, and Petrobras's preferred ADSs declined $0.64, or 8.07%, to close at $7.29.  Petrobras's debt securities experienced a similar price decline.

444.    On July 8, 2015, Bloomberg reported that Antonio G. Rodrigues, President for the Brazilian Control Council for Financial Activities ("COAF"), testified in a hearing before the CPI that his agency submitted 267 reports to Lava Jato investigators, flagging suspicious financial transactions in a total of R$51.9 billion.  On this news, that day Petrobras's common ADSs declined $0.25, or 3.02%, to close at $8.04, and Petrobras's preferred ADSs declined $0.24, or 3.24%, to close at $7.17.

445.     On July 17, 2015, *Valor* reported that Julio Camargo's testimony before the CPI implicated Cuhna, the President of the House, in the scandal, and that the Brazilian prosecutors opened a criminal investigation against the former president Luiz Inacio Lula da Silva regarding his relationship with the cartel contractor Odebrecht.  On this news, that day Petrobras's common ADSs declined $0.46, or 5.47%, to close at $7.95, and Petrobras's preferred ADSs declined $0.38, or 5.03%, to close at $7.18.  Petrobras's debt securities experienced a similar price decline.

446.     On July 20, 2015, Bloomberg reported that former Camargo Correa CEO Avancini and former Camargo Correa Vice President Leite were each convicted and sentenced to over 15 years in prison for corruption, money laundering, and organized crime, all relating to Petrobras's corruption scandal.  On this news, that day Petrobras's common ADSs declined $0.46, or 5.79%, to close at $7.49, and Petrobras's preferred ADSs declined $0.39, or 5.43%, to close at $6.79.  Petrobras's debt securities experienced a similar price decline.

447.     On July 21, 2015, after the close of trading, Bloomberg reported that Braskem (a member of Odebrecht's group) was going to revise a contract with Petrobras after the Company confirmed that an internal investigation committee found that some procedures related to the 2009 supply agreement were not in conformance with the Company's internal guidelines.  On this news, on July 22, 2015 Petrobras's common ADSs declined $0.42, or 5.61%, to close at $7.06, and Petrobras's preferred ADSs declined $0.42, or 6.17%, to close at $6.39.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.51%, erasing over $211 million in bondholder value.

448.     On July 24, 2015, *O Estado de Sao Paulo* reported that Lava Jato investigators and Judge Moro discovered Swiss documents related to 10 offshore accounts used by Odebrecht

to pay bribes.  The bank-account scheme provided for payments, in a complex payment scheme, to Petrobras officers, including Costa, Barusco, Duque, Cerveró, and Zelada—a finding that justified the renewal of Odebrecht's new prison decree.  Also that day, Bloomberg reported that Brazilian prosecutors were expected to formally charge executives from two of Brazil's top builders—the CEO of Odebrecht and the president of Andrade Gutierrez—with participating in Brazil's biggest corruption scandal in history.  A judge will decide whether to file charges against them.  On this news, that day Petrobras's common ADSs declined $0.26, or 3.76%, to close at $6.65, and Petrobras's preferred ADSs declined $0.17, or 2.74%, to close at $6.04.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.27%, erasing over $111 million in bondholder value.

449.    On July 27, 2015, *O Estado de Sao Paulo* reported that former Petrobras officers, including Gabrielli and Foster, were given high-value gifts by Odebrecht, including artwork by renowned artists.  On this news, that day Petrobras's common ADSs declined $0.40, or 6.02%, to close at $6.25, and Petrobras's preferred ADSs declined $0.36, or 5.96%, to close at $5.68.  The same day, the value of Petrobras's U.S.-registered debt securities also declined, on average by 0.73%, erasing over $304 million in bondholder value.

450.    Finally, on July 28, 2015, after the close of trading, Bloomberg reported that the Brazilian judge decided to accept the charges against the Odebrecht and Andrade Gutierrez executives.  On this news, on July 30, 2015 Petrobras's common ADSs declined $0.22, or 3.11%, to close at $6.85, and Petrobras's preferred ADS declined $0.18, or 2.81%, to close at $6.22.  Petrobras's debt securities also declined on this news.

## XI.   PLAINTIFFS SUFFERED LOSSES AS A RESULT OF THEIR PURCHASES OF PETROBRAS SECURITIES

451.   During the Relevant Period, as detailed above, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Petrobras, PifCo, and PGF, and operated as a fraud or deceit on purchasers of such securities, such as Plaintiffs, by misrepresenting Petrobras's asset values, expenses, net income, internal controls, and anti-corruption policies.

452.   Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market, the price of the securities of Petrobras, PifCo, and PGF fell as the prior artificial inflation ceased to prop up their respective prices.  As a result of their purchases of the securities issued by Petrobras, PifCo, and/or PGF during the Relevant Period, Plaintiffs suffered economic losses.

453.   In part due to Petrobras's own delays in recording the necessary writedowns, the full truth regarding the overstatement of asset values and the extent of the corruption has not yet been disclosed.  Should further corrective disclosures cause the value of Petrobras securities to further decline, Plaintiffs reserve the right to claim damages based on those disclosures.

## XII.   PLAINTIFFS' CLAIMS ARE TIMELY

454.   Between December 8, 2014 and January 7, 2015, five separate putative class-action complaints were filed in this Court asserting substantially similar claims against Defendants for violation of the federal securities laws.  *See Kaltman v. Petrobras*, No. 14–cv–9662 (S.D.N.Y. filed Dec. 8, 2014); *Ngo v. Petrobras*, No. 14–cv–9760 (S.D.N.Y. filed Dec. 10, 2014); *Messing v. Petrobras*; No. 14–cv–9847 (S.D.N.Y. filed Dec. 12, 2014); *City of Providence v. Petrobras et al.*, No. 14–cv–10117 (S.D.N.Y. filed Dec. 24, 2014); *Kennedy v.*

*Petrobras*, No. 15–cv–93 (S.D.N.Y. filed Jan. 7, 2015).  Those securities class actions were

consolidated under *In re Petrobras Securities Litigation*, No. 14–cv–9662 (JSR) (S.D.N.Y.).

Plaintiffs are members of the putative class.

455.    On March 27, 2015, the Court-appointed Lead Plaintiff in the Class Action filed a

Consolidated Class Action Complaint ("Consolidated Complaint") against Defendants Petrobras,

PGF, and others, asserting claims under, *inter alia*, Sections 10(b) and 20(a) of the Exchange Act

and Sections 11, 12(a)(2), and 15 of the Securities Act based on allegations substantially similar

to those in this Complaint.  On July 30, 2015, United States District Judge Jed S. Rakoff largely

denied Defendants' motions to dismiss the Consolidated Complaint.

456.    The class complaints referenced above were filed less than one year after

Plaintiffs discovered or reasonably could have discovered the facts on which the Securities Act

claims asserted in this Complaint are based, and less than two years after Plaintiffs discovered or

reasonably could have discovered the facts on which the Exchange Act claims asserted in this

Complaint are based.  The filing of those class complaints, or certain of them, served to toll any

applicable statute of limitations for the claims set forth in this Complaint in accordance with the

doctrine articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

## XIII.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**By All Plaintiffs**
**Against the Exchange Act Defendants**

457.    Plaintiffs reallege each and every allegation above as if fully set forth herein.

458.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against the

Exchange Act Defendants.  The Exchange Act Defendants (i) employed devices, schemes, and

artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

459.    The Exchange Act Defendants promoted and sold the Petrobras Preferred ADSs, October 2009 Notes, 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes purchased by Plaintiffs pursuant to false and misleading statements contained in SEC filings, press releases, conference call statements, and sustainability reports.  The Exchange Act Defendants made untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

460.    The Exchange Act Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.  Further, senior executives whose knowledge may be imputed to Petrobras, PifCo, and PGF knew of and participated in the fraud.

461.    Plaintiffs purchased Petrobras Preferred ADSs, October 2009 Notes, 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes without knowledge that the Exchange Act Defendants had misstated or omitted material facts.  In purchasing those securities, Plaintiffs relied directly or indirectly on false and misleading statements and omissions made by the Exchange Act Defendants.  Plaintiffs were damaged as a result of their reliance on the Exchange Act Defendants' false statements and omissions of material facts.

462.    At the time of the Exchange Act Defendants' false and misleading statements and omissions, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs would not have purchased or otherwise acquired Petrobras securities had they known the truth about the matters discussed above.

463.    Plaintiffs are filing this action within two years following discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiffs' claim, and within five years after the violations with respect to Plaintiffs' investments.

464.    By virtue of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

465.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchases of Petrobras Preferred ADSs, October 2009 Notes, 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 20(a) of the Exchange Act**
**By All Plaintiffs**
**Against the Exchange Act Individual Defendants**

466.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

467.    This count is asserted under Section 20(a) of the Exchange Act against the Exchange Act Individual Defendants.

468.    Each of the Exchange Act Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged in this Complaint and as set forth in this Complaint, a control person of Petrobras, PifCo, and/or PGF within the meaning of Section 20(a) of the Exchange Act.

469.     As a result of their control of Petrobras, PifCo, and/or PGF, the Exchange Act Individual Defendants reviewed, or had the opportunity to review, the statements at issue in this Complaint and therefore knew or should have known that those statements contained misrepresentations and omissions.  The Exchange Act Individual Defendants could have prevented the issuance of the SEC filings, press releases, conference call statements, and sustainability reports at issue in this Complaint, or caused them to be corrected.  As a result, the Exchange Act Individual Defendants did not act in good faith.

470.     As set forth above, Petrobras, PifCo, and PGF each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  By virtue of their positions as control persons, the Exchange Act Individual Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

471.     As a direct and proximate result of the Exchange Act Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Petrobras Preferred ADSs, October 2009 Notes, 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes.

### THIRD CLAIM FOR RELIEF
#### Violation of Section 11 of the Securities Act
#### By Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund
#### Against the Section 11 Defendants

472.     Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund repeat and reallege the allegations set forth in ¶¶ 1-456 above as if set forth fully herein, only to the extent such allegations do not allege fraud, scienter, or the intent of Defendants to defraud these Plaintiffs.

473.     This cause of action is brought pursuant to Section 11 of the Securities Act against the Section 11 Defendants, and is predicated on the Section 11 Defendants' strict liability

for making false and misleading statements in the 2013 Offering Documents and the 2014 Offering Documents.

474.     The 2013 Offering Documents and the 2014 Offering Documents were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.  To the extent any of the false or misleading statements at issue are deemed to be statements of opinion or belief, the Section 11 Defendants did not actually hold those opinions at the time the statements were made or did not have a reasonable basis for those opinions at the time the statements were made.

475.     The Section 11 Defendants are strictly liable to these Plaintiffs for the misstatements and omissions.

476.     Each of the Section 11 Officer and Director Defendants served as an officer or director of Petrobras and/or signed the 2012 Registration Statement, as detailed in ¶¶ 53-54 and ¶¶ 60-70 above.

477.     Petrobras, PifCo, and/or PGF caused the 2013 Offering Documents and the 2014 Offering Documents to be issued to investors in connection with the offering and sale of the 2013 Notes and the 2014 Notes, as detailed in ¶¶ 81-86 above.

478.     The Section 11 Defendants owed to these Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2013 Offering Documents and the 2014 Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Defendants did not fulfill their duty to make a reasonable and diligent investigation of the statements contained in or

incorporated by reference into the 2013 Offering Documents and the 2014 Offering Documents and did not possess reasonable grounds for believing that the 2013 Offering Documents and the 2014 Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  As such, the Section 11 Defendants are liable.

479.    By reason of the conduct herein alleged, each of the Section 11 Defendants violated Section 11 of the Securities Act.

480.    These Plaintiffs acquired 2013 Notes and 2014 Notes in or traceable to the 2013 Offering and the 2014 Offering and pursuant to the materially false and misleading 2013 Offering Documents and 2014 Offering Documents.

481.    At the time they obtained 2013 Notes and 2014 Notes, these Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts or omissions of material facts in the 2013 Offering Documents and the 2014 Offering Documents.

482.    These Plaintiffs suffered damages.  The value of the 2013 Notes and the 2014 Notes has declined substantially, subsequent to, and due to, the Section 11 Defendants' violations.

483.    By virtue of the foregoing, these Plaintiffs are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Section 11 Defendants.

**FOURTH CLAIM FOR RELIEF**
**Violation of Section 15 of the Securities Act**
**By Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund**
**Against Petrobras, PAI, and the Section 15 Officer and Director Defendants**

484.     Plaintiffs Dodge & Cox Income Fund and Dodge & Cox Balanced Fund repeat

and reallege the allegations set forth in ¶¶ 1-456 above as if set forth fully herein, only to the

extent such allegations do not allege fraud, scienter, or the intent of Defendants to defraud these

Plaintiffs.

485.     This count is asserted against Defendants Petrobras, PAI, and the Section 15

Officer and Director Defendants and is based on Section 15 of the Securities Act.

486.     Each of Defendant Petrobras and the Section 15 Officer and Director Defendants

was, by virtue of its, his, or her control, ownership, offices, directorship, and specific acts, at the

time of the wrongs alleged in this Complaint, a controlling person of PGF and/or PifCo within

the meaning of Section 15 of the Securities Act.  Each of Defendant Petrobras and the Section 15

Officer and Director Defendants had the power and influence and exercised the same to cause

PGF and/or PifCo to engage in the acts described in this Complaint.

487.     Additionally, each of Defendants Gabrielli, Foster, Barbassa, Costa, Cosenza,

Duque, Estrella, Filho, Silva, and Pinheiro was, by virtue of his or her control, ownership,

offices, directorship, and specific acts, at the time of the wrongs alleged in this Complaint, a

controlling person of Petrobras within the meaning of Section 15 of the Securities Act.  Each of

these individual Defendants had the power and influence and exercised the same to cause

Petrobras to engage in the acts described in this Complaint.

488.     Further, Defendant PAI was a controlling person of Defendant Helms within the

meaning of Section 15 of the Securities Act.  By virtue of its power to control public statements

made by Defendant Helms, Defendant PAI had the power and ability to control his actions.

489.    Petrobras, PAI, and the Section 15 Officer and Director Defendants' control, ownership, and position made them privy to, and provided them with knowledge of, the material facts concealed from these Plaintiffs.

490.    By virtue of the conduct alleged herein, Petrobras, PAI, and the Section 15 Officer and Director Defendants are liable for the aforesaid wrongful conduct and are liable to these Plaintiffs for damages suffered as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, as follows:

1.    For rescission;

2.    For an award of compensatory damages against Defendants in favor of Plaintiffs for damages sustained as a result of Defendants' wrongdoing;

3.    For an award to Plaintiffs of their costs and disbursements in this suit, including reasonable attorneys' fees and expert fees; and

4.    For such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  January 29, 2016                     Respectfully submitted,

                                             LIEFF CABRASER HEIMANN &
                                             BERNSTEIN, LLP

                                             By:    */s/ Steven E. Fineman*
                                                    Steven E. Fineman (SF 8481)

Steven E. Fineman (SF 8481)
Daniel P. Chiplock (DC 1137)
Michael J. Miarmi (MM 1193)
Douglas I. Cuthbertson (DC 1004)
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Tel.: (212) 355-9500
Fax: (212) 355-9592
E-mail: sfineman@lchb.com
          dchiplock@lchb.com
          mmiarmi@lchb.com
          dcuthbertson@lchb.com

Richard M. Heimann
Bruce W. Leppla
Sharon M. Lee
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.: (415) 956-1000
Fax: (415) 956-1008
E-mail: rheimann@lchb.com
          bleppla@lchb.com
          slee@lchb.com

*Counsel for Plaintiffs*